Kevin N. Anderson, Esq.
Nevada State Bar No. 4512
**FABIAN VANCOTT**
2275 Corporate Cir., Suite 220
Henderson, NV 89074
Telephone:    (702) 233-4444
kanderson@fabianvancott.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ARCHETYPE CAPITAL PARTNERS, LLC, a Nevada limited liability company,<br><br>    Plaintiff,<br><br>vs.<br><br>BULLOCK LEGAL GROUP, LLC, a Georgia limited liability company, and ANDREW SCHNEIDER, an individual residing in Texas,<br><br>    Defendants. | **PLAINTIFF ARCHETYPE CAPITAL PARTNERS, LLC'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Case No. 2:25-CV-01686-JCM-BNW<br><br>Judge James C. Mahan<br><br>Magistrate Judge Brenda N. Weksler |

Plaintiff Archetype Capital Partners, LLC ("**Archetype**") brings this motion pursuant to Rule 65 of the Federal Rules of Civil Procedure to prohibit Defendants Bullock Legal Group, LLC ("**BLG**") and Andrew Schneider ("**Schneider**") (collectively "**Defendants**") from continuing to violate the Defend Trade Secrets Act and other contractual and statutory obligations. This Motion is based upon the Memorandum of Points and Authorities below, the exhibits attached hereto, including the Declaration of Doug Mayer, the pleadings and papers on file herein, and such other and further arguments and evidence as may be presented to the Court in connection with the Motion.

DATED this 15th day of October, 2025.

/s/ Kevin N. Anderson
Kevin N. Anderson, Esq.
Nevada State Bar No. 4512
**FABIAN VANCOTT**
2275 Corporate Cir., Suite 220
Henderson, NV 89074
Telephone:     (702) 233-4444

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

**INTRODUCTION** ........................................................................................................... 1

**STATEMENT OF FACTS** ............................................................................................ 3

**ARGUMENT** ................................................................................................................ 20

**I.    LEGAL STANDARD FOR TEMPORARY RESTRAINING AND PRELIMINARY INJUNCTION** ......................................................................... 20

**II.   PLAINTIFF ARCHETYPE IS LIKELY TO SUCCEED ON THE MERITS** ............. 22

  **A.  Misappropriation of Trade Secrets under DTSA and NUTSA.** .......................... 22

    **1.  Trade Secrets** ................................................................................ 22

    **2.  Misappropriation of Trade Secrets and Damage** ............................... 24

  **B.  Breach of Contracts** ............................................................................. 26

    **1.  Existence of Valid Contracts** ......................................................... 27

    **2.  Existence of Breaches** ................................................................... 27

    **3.  Resulting Damage** .......................................................................... 28

**III.  ARCHETYPE WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF** ............................................................ 29

**IV.   THE BALANCE OF EQUITIES FAVORS ARCHETYPE** ............................................ 33

**V.    THE PUBLIC INTEREST STRONGLY FAVORS GRANTING INJUNCTIVE RELIEF IN THIS CASE** ......................................................... 34

**VI.   THE EQUITABLE RELIEF IS APPROPRIATE** ........................................................ 35

  **A.  A TRO Immediately Enjoining Defendants' Unauthorized Use of Archetype's Data Is Appropriate.** ........................................................ 36

  **B.  Preventing the Distribution of Funds Is Necessary.** ................................. 36

**VII. THE COURT SHOULD NOT REQUIRE A BOND** ...................................................... 38

**RELIEF REQUESTED** .............................................................................................. 39

**CONCLUSION** ........................................................................................................... 39

# TABLE OF AUTHORITIES

**Cases**

*Aerodynamics Inc. v. Caesars Ent. Operating Co.*, No. 2:15-cv-01344-JAD, 2015 WL 5679843 (D. Nev. Sept. 24, 2015) ................................................................................ 30, 33

*Alliance for The Wild Rockies v. Pena*, 865 F.3d 1211 (9th Cir. 2017) ...................................... 20

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) ................. 30, 31

*Animale Grp. Inc. v. Sunny's Perfume Inc.*, 256 F. App'x 707 (5th Cir. 2007) .......................... 36

*Bass Underwriters, Inc. v. Kono*, No. 2:22-CV-0138-RFB-EJY, 2022 WL 256971 (D. Nev. Jan. 27, 2022) ................................................................................................... passim

*Credit Bureau Connection, Inc. v. Pardini*, 726 F. Supp. 2d 1107 (E.D. Cal. 2010) ................... 30

*Excellence Cmty. Mgmt. v. Gilmore*, 131 Nev. 347, 353, 351 P.3d 720 (2015).......................... 30

*Fernandez v. State of Nevada*, 2011 U.S. Dist. LEXIS 6103 at *2-3 (D. Nev Jan. 15, 2011) .................................................................................................................................. 20

*Frantz v. Johnson*, 116 Nev. 455, 466, 999 P.2d 351, 358 (2000) ............................................... 23

*Gallagher Benefits Servs., Inc. v. De La Torre*, No. C 07-5495 VRW, 2007 WL 4106821 (N.D. Cal. Nov. 16, 2007), aff'd, 283 F. App'x 543 (9th Cir. 2008)............................. 30

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir. 2020)................ 22

*Lagos v. United States*, 584 U.S. 577 (2018)............................................................................... 23

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982 (11th Cir. 1995) .......................... 37

*Marina Dist. Dev. Co. v. AC Ocean Walk, LLC*, 2020 WL 8608166 (D. Nev.)...................... 21, 27

*Marlyn Nutraceuticals, Inc. v Mucos Pharma GmbH & Co.*, 571 F.3d 873 (9th Cir. 2009) .................................................................................................................................. 21

*Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079 (E.D. Cal. 2012).............................. 38

*Reebok Int'l Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552 (9th Cir. 1992)................................. 36

*Richardson v. Jones*, 1 Nev. 405 (1865)...................................................................................... 26

*Saini v. Int'l game Tech.*, 434 F. Supp. 2d 913 (D. Nev. 2006)...................................... 26, 27, 28

*San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184 (N.D. Cal. 2025) ..................... 38

*Sony Computer Entertainment Am., Inc. v. Bleem, LLC*, 214 F.3d 1022 (9th Cir. 2000) ............ 33

*Stanley v. Univ. of S. Cal.*, 13 F.3d 1313 (9th Cir. 1993) ............................................................ 21

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) ............................................................ 34

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001)........................ 30

*Terrier, LLC*, 2022 WL 4280251.......................................................................................... 33, 35

*Travelers Cas. & Sur. Co. of Am. v. Williams Bros., Inc.*, No. 2:12-cv-00058, 2013 WL 5537191 (D. Nev. Oct. 4, 2013) ......................................................................................... 34

*United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016)...................................................... 23

*Zitan Techs., LLC v. Liang Yu*, No. 3:18-cv-00395-RCJ-WGC, 2018 WL 5045207 (D. Nev. Oct. 17, 2018) .................................................................................................................. 30

**Statutes**
18 U.S.C. § 1836 ............................................................................................. 21, 35, 36, 37
18 U.S.C. § 1839 ............................................................................................................. 22, 24

**Rules**
NRS 600A.010 .......................................................................................................................... 22
NRS 600A.030 .................................................................................................................... 22, 24
NRS 600A.050 .......................................................................................................................... 37
Fed. R. Civ. P. 65 .................................................................................................. 20, 21, 35, 38

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Third-party litigation funding has fundamentally transformed mass tort litigation in the United States, creating a multibillion-dollar industry where hedge funds, institutional investors, and other financial entities provide capital to plaintiffs and law firms in exchange for a repayment with interest upon the occurrence of a settlement or judgment. This practice has particularly flourished in mass tort cases, which involve multiple plaintiffs with similar claims against defendants, often resulting in complex multidistrict litigation proceedings.

The litigation funding industry has experienced explosive growth, with the U.S. commercial litigation finance sector managing approximately $15.2 billion in assets as of 2023. Total litigation funding investments are projected to reach $18.9 billion in 2025.

The most common approach, where funders provide capital to law firms handling multiple cases across various mass tort matters. This allows funders to diversify risk while providing firms with substantial working capital. In the mass tort context specifically, funding provided to individual law firms now regularly exceeds $50 million. Single-matter deals averaged $4.8 million in 2023, while portfolio deals averaged almost $10 million.

Third-party litigation funding is increasingly integrating with legal technology and data analytics to improve case assessment, among other things. Archetype, co-founded by Douglas Mayer ("**Mayer**") and Schneider in 2020, developed proprietary models for a more efficient case assessment process, especially for mass tort cases. Archetype developed these proprietary models over several years through thousands of hours of efforts and significant financial investments.

As litigation funders more often employ sophisticated due diligence processes and risk assessment models to evaluate potential investments, Archetype's early case valuation,

detection of case overlaps, and more data-driven approach to litigation finance created a competitive advantage for Archetype and its subsequent clients and partners.

One type of mass tort cases, Video Game Addiction ("**VGA**") lawsuits, are in their early stages. The settlement process follows standard mass tort procedures, involving comprehensive damage assessment, evidence gathering, expert testimony, and negotiations between plaintiff and defense attorneys. Potential settlements vary based on the severity of addiction-related harm. VGA attorneys operate almost exclusively on contingency fee arrangements.

BLG's website claims it is "leading the fight against the multi-billion-dollar video game industry" and has positioned attorney Tina Bullock as "the pioneer behind video game addiction." The firm advertises having handled "over two million cases" and recovered "over one billion dollars," though these figures appear to include all types of product liability cases, not specifically VGA cases. While BLG operates on contingency fee arrangements, it has additional revenue streams from: referral fees, from other attorneys who send cases to the firm; co-counsel arrangements where they partner with local attorneys nationwide; and case screening services through affiliated websites.

Despite no reported settlements, BLG generates revenue through several mechanisms: litigation financing relationships; volume lead generation; speculative investment model; and cross-subsidization.

Archetype respectfully seeks a Temporary Restraining Order and Preliminary Injunction to immediately halt Defendants' ongoing misuse and dissemination of Archetype's confidential and proprietary information. Specifically, Archetype requests that the Court: (1) enjoin Defendants and those acting in concert with them from using, disclosing, or transmitting Archetype's trade secrets and confidential information; (2) compel Defendants

2

to return all Archetype property and materials containing such information, including the company-issued laptop; (3) preserve and restrain the distribution of attorney fees and other funds derived from the use of Archetype's misappropriated trade secrets; (4) require Defendants to preserve all evidence relevant to this action; (5) enjoin Defendants from soliciting or interfering with Archetype's customers, vendors, or partners through the use of misappropriated information; and (6) restrain Defendants from engaging in any business activities that violate the restrictive covenants imposed by the Operating Agreement.

## STATEMENT OF FACTS

### Archetype and Schneider's Relationship

1.      Mayer and Schneider founded Archetype in 2020. From July 27, 2020 through February 18, 2025, Schneider served as an officer, director, or member of Archetype. *See* Decl. Of D. Mayer, attached hereto as Exhibit A, at ¶¶ 2-3.

2.      On June 28, 2023, Mayer and Schneider executed the Operating Agreement of Archetype Capital Partners, LLC ("**OA**"), which controls their relationship. *Id.* at ¶ 4.

3.      Section 10.1.1 of the OA strictly requires Schneider to hold all "Confidential Information," as defined in the OA, in the highest confidence, prohibiting its use or disclosure without Mayer's prior written consent. Section 10.1.1 further specifies that "[a]ll confidential information shall remain the sole property of the [Archetype]." *Id.* at ¶¶ 8-9.

4.      The OA includes a twelve-month non-compete provision, prohibiting Schneider from competing against Archetype following the end of his membership interest, as well as a non-solicitation provision. *Id.* at ¶¶ 10-11.

5.      The parties agreed that a breach of confidentiality, non-compete, or non-solicitation provisions would cause irreparable harm, entitling the non-breaching party to injunctive relief as well as all other available legal and equitable remedies. *Id.* at ¶ 12.

3

**Archetype Creation of Trade Secrets**

6.      Over time, Archetype developed its own models for underwriting and reviewing litigation, claims, and lending solutions specific to mass tort litigation, such as VGA. As a result of its investment and efforts, Archetype created valuable trade secrets—the subject of this lawsuit—which are referenced and protected by the OA, as well as other agreements and protections discussed below. *Id.* at ¶¶ 5-7.

7.      Archetype developed many trade secrets which include, but are not limited to, (without public disclosure of the specific secret information): actual and prospective customer names, lists, contact information in the litigation funding market, including but not limited to, customers seeking litigation funding; actual and prospective investor list and contact information; particular research and development strategies and efforts in creating a lending model to cater to the needs of customers and the market; specialized process, procedures, and compiled research regarding the creation of the lending models; multi-tiered valuation framework for different injuries; causation analysis framework; alternative causation strategies and framework; multi-litigation overlapping injury matrices and evaluation; integrated claims processing workflow; lender specific financing terms; pre-use customers' and potential customers' presentations and marketing materials; customers' and potential customers' financing terms; investment memoranda prepared by Archetype in anticipation of distribution to investor/lenders related to VGA, mass torts and other multi-district litigations; systematic process for potential plaintiff intake and determining the qualification of each potential plaintiff, verifying the potential plaintiff's claims, valuing the potential plaintiff's injury and dollar value of injury, developing an injury matrix regarding the value of the injury, and developing a complete claim processing methodology; and vendor outlines and proposals to use with

partnering with identified potential partners. (Collectively "**Archetype Trade Secrets**"). *Id.* at ¶ 13.

8.  Archetype Trade Secrets and Confidential Information—developed over several years and thousands of hours of work, including significant financial investment. *Id.* at ¶ 14.

9.  Archetype has undertaken substantial and reasonable efforts to protect Archetype's Trade Secrets and Confidential Information, including maintaining comprehensive security and data privacy controls, consistent with industry standards, ensuring access to sensitive systems and data is limited to authorized members only. Because of these technology protections, and Schneider's use of Archetype technology, specifically an Archetype owned laptop, every email, Zoom call, contract, draft, and related correspondence up until February 2025 remains the property of Archetype. *Id.* at ¶¶ 15-23.

10. Archetype further mandates that customers and potential customers enter into non-disclosure agreements ("**NDAS**") before any of Archetype Trade Secret and Confidential Information is shared. *Id.* at ¶ 24.

**Overall Mass Tort Claim Review Services (July 2024)**

11. In July 2024, Archetype developed and documented a proprietary framework for delivering comprehensive mass tort claim review services which included: creation of holistic claim packets tailored to all phases of mass tort litigation; proprietary guidelines for early, middle, and late-stage cases; targeted documentation requests designed to maximize efficiency; a standardized set of files that delivered all necessary claimant information and proof of injury in a scalable format; specialized screening protocols enabling identification of overlapping claims and comorbidities (for example, the connection between VGA and other mass tort allegations); use of proprietary information to accurately value cases earlier than competitors; and processes ensuring

the right information was collected at intake and proactively surfacing issues that could affect a firms' mass tort portfolio. *Id.* at ¶ 25.

12.     Around the same time, Archetype created a Vendor Outline that formalized Archetype's unique intake qualification, claims verification, and claims processing systems. *Id.* at ¶ 28.

13.     As part of the comprehensive mass claim review process, Archetype expanded its proprietary systems into additional mass tort areas, including VGA,[1] RealPage,[2,3] Paraquat, Abbott Heavy Metals NEC, Camp Lejeune, and Asbestos litigations *Id.* at ¶ 26.

14.     To expand the reach of these proprietary systems, Archetype contracted with a marketing firm, enabling Archetype to integrate its claim review framework with the marketing firm's lead generation and intake capabilities, broadening application and increasing effectiveness while ensuring Archetype retained control over its trade secret methodologies. *Id.* at ¶ 29.

15.     When marketing Archetype's new claim review methodology, Schneider emphasized that Archetype's industry expertise enabled it to deliver claim review packages superior to competitors, citing its efficient intake protocols, reduced document requests, and proprietary screening questions:

> The most difficult part of mass torts is file review. . . . The experience in the space allows [Archetype] to provide a package that is more comprehensive than any of the current offerings on the market and [Archetype] ha[s] the systems in place to handle the volume efficiently. The efficiency is gained from knowing the right questions to ask during intake. . . . It also allows [Archetype] to provide screening questions that [] competitors do not have. . . . What we can offer is a comprehensive

[1] VGA, or Internet Gaming Disorder, is a recognized behavioral addiction marked by impaired control over gaming and significant life consequences. Lawsuits have named over twenty defendants involved in manufacturing and distributing the games and products at issue. *See* Ex. A, at n.1.

[2] RealPage is a technology company that provides data analytics to apartment property management companies for resident screening and rent pricing optimization. The litigation alleges landlords used RealPage information to inflate rents. *Id.* at n.2.

review with a standardized deliverable that removes the guesswork from the purchasers. . . . Depending on the stage of the mass tort; [Archetype] may also include the matrices and the claim value.

*Id.* at ¶ 30.

16.    Schneider explained that this streamlined process would reduce the number of people involved, speed up turnaround times, and allow Archetype to provide scalable, high-quality medical reviews under a single banner. Clients would still receive Archetype's proprietary work product—only now enhanced by integrated intake and marketing systems. *Id.* at ¶ 31.

17.    In short:

The most important thing that [Archetype] do[es] differently from anybody else is provide a comprehensive claim packet that is ready for submission to a claims administrator….[Archetype] provides [their] outlines of what would be considered a 'compensable' claim in each of the mass torts that [they] work in. If the Firm purchasing the retainers wishes to use [Archetype's] guidelines, they do not need to create the document requests because we already have….Because of the spectrum of cases that [Archetype has] handled; [they] notice overlap in allegations and class members that can be detrimental to firms before they do."

*Id.* at ¶ 32.

18.    These frameworks, protocols, and vendor systems represented the core of Archetype's Trade Secrets and its competitive edge in the mass tort industry. *Id.* at ¶ 33.

**Archetype's VGA Materials (July – December 2024)**

19.    In July 2024, Archetype created a "Video Game Addiction Litigation Overview" document, integrating VGA into its broader mass tort claim assessment program. Shortly thereafter, Archetype formally updated its Mass Tort Program to include VGA claims as a distinct area of focus. *Id.* at ¶ 34.

20.    By October 2024, Archetype finalized its service package for VGA litigation. This package included: (a) provider network integration; (b) scalable processing system; (c) a document for medical records collection titled "Document List to Confirm Injury by Tier and

7

Process," which systematically categorized claimants by injury severity; and (d) a "Settlement Values by Range" document, which set out detailed valuation ranges for VGA claims. *Id.* at ¶ 35.

21.    In November 2024, Archetype further memorialized its methodology by creating the "Step by Step Video Game Addiction Litigation Review," a document outlining Archetype's proprietary process for evaluating and reviewing VGA claims. *Id.* at ¶ 36.

**Archetype's RealPage Materials (June – December 2024)**

22.    In June 2024, Archetype identified RealPage as a high-priority litigation opportunity. *Id.* at ¶ 37.

23.    In August 2024, Archetype began developing proprietary intellectual property and processes tailored to the RealPage antitrust litigation and related opportunities. *Id.* at 38. As part of this effort, Archetype compiled a comprehensive database, covering all defendants and their properties in the RealPage litigation. Importantly, the database included a cross-litigation overlap built from previous work on other mass torts and multi-district litigations, allowing Archetype to screen RealPage claimants for other tort opportunities by leveraging demographic, geographic, and facility data while maintaining claim-specific damage segregation. *Id.* at ¶¶ 39-41.

24.    Between October and November 2024, Archetype developed specifications for RealPage overlap discovery policies. By the end of November 2024, Archetype had nearly completed its comprehensive defendant property database and step-by-step processing methodology for RealPage litigation. *Id.* at ¶ 42.

**Initial Relationship Between Archetype and BLG (May – September 2024)**

25.    BLG, a Georgia law firm headed by Tina Bullock ("**Tina**"), specializes in litigating complex mass tort and medical malpractice cases. Specifically, BLG serves as plaintiffs' counsel in the VGA litigation and is responsible for overseeing the settlement of the claims. *Id.* at ¶ 43.

26.     In late May 2024, BLG expressed interest in becoming a potential customer of Archetype's in relation to funding its VGA claims. Schneider—acting at the direction of Mayer and as a Member of Archetype—handled BLG. *Id.* at ¶ 44.

27.     On May 29, 2024, BLG and Schneider, acting on behalf of Archetype, executed a Non-Disclosure Agreement ("**BLG NDA**"). Pursuant to the BLG NDA, BLG agreed "not to disclose, or allow disclosure of, all or any portion of the Confidential Information or data of whatever kind and in whatever form, and whether written or oral, provided to them in connection with the Opportunity." *Id.* at ¶ 45.

28.     BLG agreed to use Archetype's Confidential Information for the purposes of evaluating the opportunities to obtain litigation funding (for which Archetype would receive a fee each time funding is secured through Archetype or when utilizing Archetype's Confidential Information), and related to entering into a consulting agreement with Archetype to assist BLG in increasing its client acquisition on VGA cases, and reducing its per-case qualification and claims work up costs. *Id.* at ¶¶ 45-48.

29.     In the event BLG breached the terms of the agreement, it agreed that Archetype is entitled to temporary and/or permanent injunctive relief restraining BLG from any activity that may result in or continue a breach of the BLG NDA without the need to show irreparable harm. *Id.* at ¶ 49.

**Formation of the Alleged Conspiracy with VGA (June – October 2024)**

30.     On June 17, 2024, Schneider sent Tina of BLG a detailed analysis of BLG's VGA claims, where he identified critical flaws in BLG's existing strategy concerning alternative causation arguments—an issue BLG had no solution for at the time, and also disclosed Archetype's proprietary alternative causation strategy. *Id.* at ¶¶ 52-53.

31. Schneider later informed Mayer that Tina had no solution to the alternative causation problem until he provided her with Archetype's confidential analysis, which at the time and still is protected under the BLG NDA. *Id.* at ¶ 54.

32. At this time, BLG's VGA claimant pool consisted of only 2,590 cases. Only after Schneider began sharing Archetype's proprietary methods did BLG's numbers—and its negotiating leverage—significantly increase. *Id.* at ¶ 55.

33. Schneider proposed to Mayer an arrangement whereby Schneider would become "Settlement Counsel" for BLG. Schneider assured Mayer that having Schneider as an Archetype representative and settlement counsel would also help Archetype stay involved with BLG's litigation funding and VGA claims review process. Thus, on September 26, 2024, Schneider proposed becoming Settlement Counsel to BLG, Schneider, using Archetype's documents, told Tina that he'll "use [his] private settlement comparable from [his] database as a cross check." *Id.* at ¶¶ 56-57.

34. On September 27, 2024, Schneider and BLG executed a Joint Venture Agreement ("**Schneider/BLG JVA**"), under this Joint Venture Agreement ("**JVA**"), Schneider would receive 2% of gross settlements of VGA claims. *Id.* at ¶ 58.

35. In late September and early October 2024, unbeknownst to Mayer, Schneider began transmitting Archetype's Trade Secrets and Confidential Information to BLG so that BLG could use them to secure alternative funding for its VGA claim cases outside of Archetype. During this time, BLG provided Schneider with an official BLG email address. *Id.* at ¶ 59.

36. During this time Schneider created his own personal NDA by removing Archetype logo from Archetype NDA template, which he then circulated as his own to existing Archetype clients. *Id.* at ¶ 61.

37.     Between October 3 and October 7, 2024, Schneider sent BLG Archetype's "VGA Proposed Document List For Injuries" and disclosed Archetype's proprietary methodology concerning claim qualification and alternative causation defenses, in order to prepare BLG for its October mediation with one of the corporate defendants in the VGA litigation ("**Defendant X**").[4] *Id.* at ¶ 60.

38.     Throughout October 2024, Schneider distributed memoranda to litigation funders describing the VGA litigation and requesting capital, which substantially replicated Archetype's "Video Game Addiction Litigation Overview" and "Settlement Values by Range" documents created in July and October 2024. Four of the parties who received these memorandums—Western Alliance Bank, Nhan Nguyen, Kerberos, and Legalist—already had pre-existing relationships with Archetype. *Id.* at ¶ 62.

39.     Although Schneider was still working for Archetype, the October 2024 memoranda sent by Schneider on behalf of BLG made no reference to Archetype. *Id.* at ¶ 63.

40.     In October 2024, Schneider, using his Archetype email address, sent Paul Crouch of the Crouch Law Firm ("**Crouch**") a proposal to work together to settle VGA claims. Crouch had been a client of Archetype since October 2020, and Archetype had previously worked with Crouch to secure litigation funding for Crouch's Risperdal docket, a mass tort case. *Id.* at ¶¶ 64-65.

41.     According to Schneider, "[t]he Risperdal docket is where the data mining project began for the VGA Litigation. The Risperdal docket was mined for VGA cases because of correlation," and that the claim overlap are "bonus cases from previous and current clients." *Id.* at ¶ 66.

---

[4] For purposes of this Motion, Archetype refers to the principal corporate defendant in the VGA litigation as **"Defendant X"** to preserve confidentiality and avoid disrupting ongoing sealed settlement negotiations.

42.     In November 2024, BLG drafted a "Confidential Master Settlement Agreement" that incorporated Archetype's Trade Secrets and Confidential Information. For example, Section E, "Tiers of Injury and Extraordinary Injury Funds," directly drew from Archetype's "Settlement Value by Range" document created on October 7, 2024, and the "Step by Step Video Game Addiction Litigation Review" created on November 18, 2024, including language requiring claimant to "display 5 out of 9 symptoms." *Id.* at ¶ 67.

43.     On December 10, 2024, Schneider created a document titled "Using the VGA Data to Aggregate Additional Cases," which described the systematic processing methodology and cross-litigation overlap strategy originally developed by Archetype. *Id.* at ¶ 92.

44.     On December 23, 2024, BLG created a "Video Game Addiction Litigation step-by-step" document that combined multiple Archetype's trade secret materials, including: "Document List to Confirm Injury by Tier and Process" (created October 1, 2024), "Settlement Values By Range" (created October 7, 2024), and "Step By Step Video Game Addiction Litigation Review" (created November 18, 2024). *Id.* at ¶ 97.

**BLG Creates an Exclusive Platform Using Archetype's Trade Secrets**
**(November 2024-January 2025)**

45.     On October 24, 2024, the Defendant X sent BLG a settlement letter raising serious concerns about the evidentiary deficiencies in BLG's VGA claims. *Id.* at ¶¶ 72-74.

46.     A few weeks after the October letter from Defendant X, BLG  entered into arrangements to create an all-in-one platform for mass torts processing and settlement, similar to the one Archetype was working on since early 2024. To do so, SimplyConvert became BLG's, and all of its referring counsels', exclusive Customer Relationship Management ("**CRM**") vendor to provide data management and support services for its VGA client workup and settlement efforts.

12

*Id.* at ¶¶ 75-77. BlueKey Tek[5] was designated as the data processor responsible for applying proprietary algorithms to confirm Gamertags, a required step for claims validation in settlement agreements. For any necessary lien resolution, BLG partnered with Litpro. Lastly, BLG appointed Milestone Settlement Solutions ("**Milestone**") as the administrator of VGA Qualified Settlement Funds ("**QSF**"), making Milestone charge of processing all the Defendant X settlement funds and administering distributions to plaintiffs and counsel. *Id.* at ¶¶ 78-80.

47.     This all-inclusive platform allows other law firms that BLG partners with to upload and store all their data in one CRM, while it is also being mined for additional claims and entitles the law firm to referral fees for no additional work. *Id.* at ¶ 81.

48.     Unbeknownst to Mayer and Archetype, in early November 2024, BLG formally hired Schneider, who immediately began working with SimplyConvert to upload remaining materials—including Crouch's Risperdal docket and Archetype's proprietary methodologies and requirements—into the SimplyConvert platform. Among the documents Schneider transmitted was Archetype's "Document List to Confirm Injury by Tier and Process." *Id.* at ¶ 82.

49.     During this time, Schneider disclosed that Mayer at Archetype was designing a system that would provide a service similar to SimplyConvert. *Id.* at ¶ 87.

50.     Schneider formalized his and BLG's relationship with Crouch through separate JVAs, enabling Defendants—working in coordination with SimplyConvert[6]—to mine Crouch's Risperdal docket for overlaps using Archetype proprietary VGA claim-qualification criteria. *Id.* at ¶¶ 82-83.

---

[5] BlueKey Tek, owned by Alan Bracken, Tina Bullock's son, serves as a vendor BLG, providing services such as call center intake, medical records retrieval, and gamer tag verification for VGA litigation. Further, Tina Bullock is the registered agent for BlueKey Tek.

[6] SimplyConvert is a technology platform for client data housing, document housing and settlement administration, among other technology providers that BLG choice to be its operational hub for its VGA litigation services.

51. During this same period, SimplyConvert, BlueKey Tek, BLG, Schneider, and Crouch launched the first test marketing campaign for VGA claims, targeting Crouch's Risperdal docket. Overnight, BLG reported acquiring 42 new signed cases and 12 additional pending contracts. *Id.* at ¶ 84. Following this campaign, Schneider and BLG represented to litigation funders that BLG's claimant pool had grown from 2,590 to approximately 40,000—a 1,444% increase (*id.* at ¶ 85), which helped BLG to secure substantial funding agreements, including $20 million from Calumet Capital, with One Williams Street as one of the main investors.[7] *Id.* at ¶ 89.

52. On December 8, 2024, Schneider, acting on behalf of BLG, pitched SimplyConvert's program to Stranch, Jennings & Garvey, PLLC ("**Stranch**")—a prospective client working directly with Archetype on another client's litigation funding—and requested access to mine Stranch's data for additional claims. *Id.* at ¶¶ 90-91.

53. Throughout December 2024, Schneider continued transmitting Archetype's Trade Secrets and Confidential Information to SimplyConvert to build BLG's CRM platform, including instructions for document requests for value claims, which directly replicated Archetype's "Document List to Confirm Injury Tier and Process," created in October 2024. *Id.* at ¶¶ 92-93; 97; 99.

54. On December 22, 2024, four days after Defendants executed an agreement with Milestone for the QSF, Schneider abruptly resigned from Archetype.[8] *Id.* at ¶¶ 94-95.

---

[7] One Williams Street was also under NDA with Archetype. *See id.* at n.4.

[8] Neither Archetype's OA nor Nevada law allows Schneider to "voluntary withdrawal." *See id.* at ¶ n.5.

55. Although Archetype did not formally accept Schneider's resignation until February 18, 2025, Schneider remained bound by the OA's one-year non-compete provision regardless of the effective date.[9] *Id.* at ¶ 96.

56. In January 2025, Schneider, on behalf of BLG, continued disseminating Archetype's Trade Secrets and Confidential Information. *See id.* at ¶ 98.

**Schneider Sets Up BLG's Next Investment: RealPage (December 2024 – July 2025)**

57. On December 28, 2024, Schneider sent Tina a "step-by-step guide of overlap in mass tort" to add cases to their inventory, describing it as "the secondary thing I've been working on. A step-by-step guide to aggregating additional cases with no additional costs." In reality, Schneider was sharing Archetype's proprietary work, including its "RealPage step-by-step guide" AR-RP database and "RealPage Litigation overview," without attribution. *Id.* at ¶ 100.

58. By January 2025, Schneider had persuaded BLG to transition its strategy toward pursuing RealPage litigation, positioning Archetype's stolen methodologies as the foundation of BLG's new practice area:

> Realpage Litigation. BLG has compiled a spreadsheet that can confirm with certainty that a current client is a member of this class. The individual claims are small and would not be worth acquiring if there was a cost involved. The cost of acquisition is $0 per claim which alleviates this concern. The overlap of these claims with other litigation is uncomfortably high because of the correlation of the plaintiff populations. Claims who respond are more likely to answer some additional questions to screen for discrimination in housing, wage discrimination, PFAS claims, discrimination in schools, etc. The same data points can be mined beyond just the Sherman Antitrust violations.

*Id.* at ¶¶ 101-102.

59. Like the VGA material, RealPage material was given to and processed through SimplyConvert, creating a system that automatically filters for additional RealPage and PFAS

---

[9] Archetype notes that the one year non-compete has not commenced because Schneider has never come into compliance.

15

claims, converting Archetype's proprietary overlap framework into a built-in feature. This has created a self-sustaining pipeline that continuously generates new claims and revenue—an enormous and ongoing stream of value from Archetype's stolen methodology. *Id.* at ¶¶ 104-107.

60. By mid-January 2025, Schneider said he was meeting with Scott & Scott Attorneys at Law LLP, the court appointed Plaintiffs' Interim Co-Lead Counsel in the RealPage litigation, to pitch BLG's RealPage litigation services which utilized Archetype's stolen RealPage claims analyzer and overlap discovery methodologies. This placed Archetype's misappropriated intellectual property in immediate proximity to decisionmakers, significantly amplifying both the scope and potential harm of the trade secret theft. *Id.* at ¶ 108.

61. As of June 2025, BLG was publicly advertising four practice areas on its website were: product liability; VGA; Roblox sex abuse cases; and video game sexual abuse litigation. In September 2025, BLG launched a public marketing website for RealPage litigation, formally adding RealPage litigation as one of its five listed practice areas. Only after Archetype filed its Complaint, BLG quietly removed RealPage litigation from its webpage. *Id.* at ¶¶ 109-111.

**VGA Defendant X Settlement and Aftermath (January 2025 - Present)**

62. By February 2025, BLG had expanded its co-counsel network to about 75 firms with fee-split agreements for the VGA litigation and had 148,219 VGA cases with SimplyConvert—an extraordinary expansion from the 2,590 claims BLG held before the October 2024 mediation with the Defendant X. *Id.* at ¶¶ 113-115.

63. On February 5-6, 2025, BLG participated in a mediation with Defendant X, during which the parties developed a proposed settlement framework intended to serve as a model for all other VGA defendants moving forward. BLG identified Defendant X as bearing approximately 25% to 30% of the overall liability in the VGA litigation and represented that it had approximately 61,293 claims against Defendant X alone. *Id.* at ¶ 116.

64.     The mediation produced a non-binding draft term sheet for discussion purposes, outlining a general settlement structure. Under the proposed framework, rather than a lump-sum payment, Defendant X would retain a Settlement Administrator to determine claim validity and payment eligibility. Each eligible claimant would receive a base payment with the potential for enhancements depending on the severity of symptoms and supporting documentation. As discussed, "[e]veryone who meets the causation threshold would be entitled to a base payment at the lowest tier," with a contemplated range of $15,000-$25,000 per base claim for Defendant X's portion. *Id.* at ¶ 117.

65.     The draft terms further provided that, within 60 days of executing a final settlement agreement, claimants would submit a claim form and supporting documentation establishing eligibility. The Settlement Administrator would then review submissions, determine which claimants qualified for enhanced payments, and notify eligible claimants, who would have 30 days to execute a release before payment. *Id.* at ¶ 118.

66.     Crucially, the draft settlement framework incorporated Archetype's proprietary methodology drawn directly from its "Step-by-Step Video Game Addiction Litigation Review" document, finalized on November 18, 2024, including the "5 of 9 symptoms" diagnostic criteria, the "parent declaration" option that removed the requirement for a formal medical diagnosis, the objective gameplay metric of fifteen hours per week, the GPA impact measurement, and the age cutoff of twenty-five for eligible claimants. *Id.* at ¶ 119.

67.     Accordingly, the timing of any finalized agreement remains uncertain, as Schneider informed litigation funders that BLG had not signed the draft term sheet to avoid being restricted from bringing additional cases against Defendant X. *Id.* at ¶ 120.

68.     However, it is possible that BLG has since executed a final settlement agreement with Defendant X, thereby triggering the payment timeline outlined in the settlement framework.

There are regulatory limitations on how quickly those payments can be processed. In Gwinnett County, Georgia, where BLG and the settlement funds are administered, no more than 5,000 settlements involving minors may be approved every 120 days, although settlements for adult claimants can be processed much more rapidly. *Id.* at ¶ 121.

69. If the settlement agreement has been executed and the payment timeline has commenced, the VGA QSF structure would take effect. The VGA QSF consists of two distinct funds with separate functions. QSF #1, held at UBS, receives all funds from the estimated $5.6 billion Defendant X settlement and is responsible for disbursing payments to claimants, as well as case costs, administrative costs, and attorney fees. QSF #2, held at Esquire Bank, receives transfers of attorney fee payments exclusively from QSF #1 and serves to segregate and distribute those fees among BLG, Schneider and BLG's extensive co-counsel network. *Id.* at ¶ 122.

70. These settlement value estimates are derived from Schneider's own projections and the number of claim submitted to Defendant X in February. Schneider estimated that the average gross settlement number is $91,250. This yields a total projected settlement value of $5,594,986,250 (61,293 × $91,250), consistent with the framework negotiated during the February 2025 mediation. *Id.* at ¶ 123.

71. Once distributions begin, Milestone—acting as the settlement administrator—first deducts its administrative fees and then processes payments through BLG's internal team using the SimplyConvert platform. Milestone retains authority to direct or halt payments, providing an appropriate mechanism for judicial oversight and intervention. *Id.* at ¶ 124.

72. QSF #2, which holds the attorney-fee portion of the Defendant X settlement, is the immediate focus of Archetype's request for injunctive relief. The attorney-fee pool is estimated at $2.409 billion (representing 40% of the total settlement). Of that amount, BLG controls approximately 49.53% of the total, equating to roughly $1,107,889,078.85. Schneider personally

18

receives 2% of the gross settlement, or approximately $111,899,725. Together, BLG and Schneider stand to gain approximately $1.3 billion in attorney fees derived directly from Archetype's proprietary methodologies—while Archetype itself receives nothing, despite its intellectual property forming the foundation of the settlement framework. *Id.* at ¶ 125.

73.    If the settlement agreement with Defendant X was executed between February and April 2025, the first scheduled payment, representing 50% of the total settlement expected to be approximately $3.25 million would have become due around mid-July 2025 and has likely already been completed or is imminent. The final payment will be triggered once the "participation threshold" (when at least 90% of claimants submit paperwork), which is expected to occur in or around September 2025, making the final payment due approximately October 2025. *Id.* at ¶ 126.

74.    Under the settlement structure, it is believed that attorney-fee distributions are expected 60-90 days after Defendant X's final payment, placing those distributions between December 2025 and January 2026. Once disbursed to approximately 75 law firms nationwide, recovering or tracing the funds will become exceedingly difficult, if not impossible. Given the lack of administrative-review deadlines and the staggered approval process for minor settlements, these dates remain estimates. *Id.* at ¶ 127.

75.    Following the February mediation, the parties scheduled another mediation for May 2025, presenting additional opportunities for profit. As of January 2025, BLG had also scheduled mediations with two additional VGA defendants. Now that a settlement framework has been established, nothing prevents Defendants from pursuing and finalizing further settlements with the remaining VGA defendants, allowing them to continue profiting. *Id.* at ¶ 128.

76.    Beyond attorney fees, Archetype's stolen Trade Secrets and Confidential Information are generating tens of millions of dollars annually for service vendors. For example, SimplyConvert collects $150,000 plus monthly minimums for its exclusive case management

19

platform; BlueKey Tek earns about $18.4-23.3 million per settlement for data processing.In total, Archetype's work has generated at least $20+ million in guaranteed annual vendor revenue—while Archetype has been cut out completely. *Id.* at ¶¶ 130; 132.

77.     Even as of September 2025, BLG's 75 co-counsel firms continue to advertise for new VGA claims (against other defendants outside of the Defendant X) as well as RealPage, and PFAS claims. They are doing so using SimplyConvert—which is built on Archetype's stolen methodologies. *Id.* at ¶ 131.

78.     Accordingly, Archetype seeks a temporary restraining order and preliminary injunction (1) enjoining Defendants from disposing, disbursing, or transferring funds from QSF #2 and or QSF #1 of the Defendant X Settlement, and (2) prohibiting Defendants from further using or profiting from Archetype's Confidential Information and Trade Secrets in the VGA, RealPage, PFAS or any other litigation.

## ARGUMENT

### I.     LEGAL STANDARD FOR TEMPORARY RESTRAINING AND PRELIMINARY INJUNCTION

Rule 65 of the Federal Rules of Civil Procedure authorizes this Court to issue a temporary restraining order and preliminary injunction when necessary to preserve the status quo and prevent irreparable harm. To obtain such relief, Archetype must establish that: 1) they are likely to succeed on the merits; 2) they are likely to suffer irreparable harm in the absence of preliminary relief; 3) the balance of equities tips in their favor; and 4) an injunction is in the public interest. *Alliance for The Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017); *Fernandez v. State of Nevada*, 2011 U.S. Dist. LEXIS 6103 at *2-3 (D. Nev Jan. 15, 2011) (citing Fed. R. Civ. P. 65). Although injunctive relief is an extraordinary remedy, it is particularly appropriate in cases involving misappropriation of trade secrets and breaches of restrictive covenants, because the resulting harm is presumed to be irreparable. *See Bass Underwriters, Inc. v. Kono*, No. 2:22-CV-0138-RFB-EJY,

2022 WL 256971 (D. Nev. Jan. 27, 2022); *Marina Dist. Dev. Co. v. AC Ocean Walk, LLC*, 2020 WL 8608166 (D. Nev.). Relief that "orders a responsibly party to take action" is treated as a mandatory injunction. *Marlyn Nutraceuticals, Inc. v Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009); *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1993). Archetype satisfies the applicable standard here.

The Defend Trade Secrets Act ("**DTSA**"), 18 U.S.C. § 1836 *et seq.*, modifies the traditional test slightly. Section 1836(b)(2) sets forth specific statutory criteria that entitle a moving party to injunctive relief. That section provides that injunctive relief in the form of civil seizure may issue if the moving party's claims are 1) based on an affidavit or verified complaint; and 2) when an order providing for the seizure of property is necessary to prevent the propagation or dissemination of trade secrets subject to the action. To that end, the DTSA further provides that a seizure order is appropriate if 1) a traditional injunction pursuant to Fed. R. Civ. P. 65 would provide inadequate relief because the party to which the order would issue would evade, avoid, or otherwise not comply with such an order; 2) immediate and irreparable injury will occur if seizure is not ordered; 3) the harm to the applicant of denying the application outweighs the harm to the legitimate interest of the person against whom seizure would be ordered; 4) the information in question is a trade secret that has been misappropriated or subject to a conspiracy to misappropriate the trade secret by improper means; 5) the person against whom seizure would be ordered has actual possession of the trade secret; 6) the application describes with reasonable particularity the matter to be seized and, to the extent reasonable, the location; 7) the person against whom seizure would be ordered would destroy, move, hide, or otherwise make such matter inaccessible to the court if the applicant were to proceed on notice, and; 8) the applicant has not publicized the requested seizure. 18 U.S.C. § 1836(b)(2)(a)(ii).

## II.    PLAINTIFF ARCHETYPE IS LIKELY TO SUCCEED ON THE MERITS

Archetype is likely to succeed on the merits of its (i) misappropriation of trade secrets under the DTSA and Nevada's Uniform Trade Secrets Act ("**NUTSA**"), NRS 600A.010, *et seq.*, and (ii) breach of contract claims under Nevada law, each of which is addressed in detail below.

### A.    Misappropriation of Trade Secrets under DTSA and NUTSA.

Archetype is likely to succeed on the merits of its trade secret claims under both the DTSA and NUTSA. Both statutes create a private right of action for misappropriation of trade secrets and authorize injunctive relief to prevent actual or threatened misuse. *See* 18 U.S.C. § 1836(b)(1); NRS 600A.010, *et seq.*

The elements of a claim under the DTSA and NUTSA overlap, and courts routinely analyze them together. *See InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir. 2020) (recognizing the similarity of DTSA and state versions of the UTSA). To prevail, a plaintiff must show: 1) the existence of a trade secret; 2) misappropriation of that trade secret by the defendant; and 3) resulting or threatened damage. 18 U.S.C. § 1839; NRS 600A.030(2). Because the elements are materially the same, the Court may apply the same analysis to both statutes.

### 1.    Trade Secrets

The DTSA and the NUTSA broadly defines a "trade secret" to include financial, business, scientific, technical, and economic information—such as patterns, compilations, formulas, methods, techniques, processes, or programs—that derives independent economic value from not being generally known and that has been subject to reasonable secrecy measures. *See* 18 U.S.C. § 1839(3); NRS 600A.030(5) (adopting a nearly identical definition).

Courts consistently recognize that business strategies, proprietary methodologies, and customer-related data constitute protectable trade secrets where they are closely guarded and provide competitive advantage. *See Frantz v. Johnson*, 116 Nev. 455, 466, 999 P.2d 351, 358

22

(2000) (holding that customer and pricing information qualified as a trade secret where extremely confidential, actively guarded, and not readily ascertainable in a highly specialized industry). It is equally well established that a trade secret may consist of a compilation of otherwise public or known information, so long as the combination as a whole is secret and provides a competitive edge. *See United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016), overruled in part on other grounds by *Lagos v. United States*, 584 U.S. 577 (2018) (explaining that "a compilation that affords a competitive advantage and is not readily ascertainable falls within the definition of a trade secret" and noting that reconstructing information from scattered public sources does not defeat trade secret protection).

Here, Archetype's trade secrets consist of a comprehensive suite of proprietary systems, methodologies, and intellectual property for various mass tort litigations, such as VGA, RealPage, PFAS, and Mastercard/Visa, that it developed at significant expense and effort, including but not limited to: settlement frameworks and valuation models; proprietary claim qualification criteria and intake protocols; case inventory and growth analytics; claims processing infrastructure and workflow systems; funding models and requirements; cross-litigation overlap discovery methodologies; confidential databases and analytical tools; and strategic business relationships and vendor systems. Each of these categories derives independent economic value from secrecy. Together, they enabled Archetype to uniquely qualify claims, anticipate defenses, maximize settlement leverage, and scale litigation portfolios more effectively than competitors.

Archetype has taken extensive and reasonable measures to protect the secrecy of these trade secrets. Internal access was tightly restricted, with development and use confined to a small group of employees. Archetype implemented comprehensive information-security protocols, including encryption, access controls, activity monitoring, and insider-threat detection through screen recording, email logs, and keystroke tracking. The OA itself expressly safeguarded "trade secrets,

plans, proposals, codes, marketing information," among other confidential materials. And BLG was bound by a formal NDA expressly covering "proprietary information, methodologies, and trade secrets." These measures collectively demonstrate rigorous efforts to maintain secrecy.

Archetype also ensured protection of trade secrets at the employee level. Schneider, for example, was provided a company-issued laptop so that sensitive data would not be stored on personal devices. Additionally, the OA prohibits disclosure, use of Archetype's trade secrets while employed or afterward in competition, and solicitation of Archetype's clients or employees.

Because Archetype's methodologies and data are the product of significant investment, derive independent economic value from their secrecy, and have been subject to robust protective measures, they qualify as trade secrets under both the DTSA and NUTSA. *See* 18 U.S.C. § 1839(3); NRS 600A.030(5).

### 2.    Misappropriation of Trade Secrets and Damage.

The DTSA and NUTSA both define misappropriation broadly to include the acquisition of a trade secret by improper means, as well as the disclosure or use of a trade secret without consent. 18 U.S.C. § 1839(5)(A)–(B); NRS 600A.030(2)(a) (defining misappropriation as the "[a]cquisition of the trade secret of another by a person by improper means"). "Improper means" expressly encompasses theft, misrepresentation, and the breach or inducement of a breach of a duty to maintain secrecy or contract. 18 U.S.C. § 1839(6); NRS 600A.030(1). Misappropriation therefore includes violations of contractual confidentiality, non-solicitation, and non-use provisions. *See* 18 U.S.C. § 1839(6) (defining improper means to include "breach or inducement of a breach of a duty to maintain secrecy"); NRS 600A.030(d)-(e) ("Willful breach or willful inducement of a breach of a duty to maintain secrecy" and "imposed by… contract….").

Here, Defendants' conduct satisfies each form of misappropriation recognized by law. First, Schneider's actions breached the OA to which he was bound, as well as the NDA executed

24

between Archetype and BLG. Second, BLG induced and facilitated Schneider's breach by employing him in a role nearly identical to the one he previously held with Archetype, thereby encouraging and relying on his use of Archetype's proprietary knowledge. Both Defendants were subject to contractual duties of confidentiality and non-use, yet they exploited Archetype's trade secrets for their own benefit, conduct expressly prohibited under the DTSA and NUTSA.

The record demonstrates that misappropriation occurred in multiple ways. Theft or conversion of Archetype's data is itself improper means. Equally improper is the breach of a contractual duty to maintain secrecy, or inducing another to do so. Even apart from physical possession of Archetype's laptop, Schneider retains intrinsic knowledge of Archetype's trade secrets and deployed that knowledge in direct competition. BLG's hiring of Schneider, combined with its own contractual obligations under the BLG NDA, created both inducement and actual breach of duties of secrecy.

Defendants' misappropriation was not passive—it was active, deliberate, and systematic. For example, on June 17, 2024, Schneider handed BLG the core proprietary solution to overcoming alternative causation problems in the VGA litigation by providing Archetype's unique approach to offsets rather than exclusions. By October 2024, the Defendant X was criticizing BLG's inability to substantiate its claims, underscoring BLG's lack of evidentiary support without Archetype's system. Then, beginning in November 2024, Defendants embedded Archetype's proprietary workflows directly into SimplyConvert's platform, transforming BLG's weak docket of 2,590 VGA cases into more than 148,000 cases by February 2025. On January 7-8, 2025, Schneider circulated Archetype's intake criteria forms and engaged vendors and co-counsel to process claims using Archetype's proprietary methodologies. By early 2025, Defendants were not only using Archetype's systems in VGA, but had expanded them to RealPage, PFAs, and other litigations through SimplyConvert.

These facts establish that Defendants have not only acquired Archetype's trade secrets by improper means but are actively using them in ongoing operations, causing and threatening substantial harm to Archetype. Archetype's proprietary intake protocols, qualification algorithms, cross-litigation overlap methodologies, and financial models have been transplanted wholesale into SimplyConvert and BLG's operations. The result is that Archetype's once exclusive market niche—low-cost, zero-acquisition mass tort qualification—has been stripped from it and repackaged by Defendants.

Archetype has suffered, and will continue to suffer, significant damage as a result of Defendants' misappropriation.[10] Here, the harm is both ongoing and compounding: Defendants remain in possession of Archetype's proprietary information and continue to profit from it, diverting business opportunities away from Archetype and damaging its reputation, market position, and client relationships.

Because Archetype can demonstrate that its methodologies qualify as trade secrets, that Defendants have misappropriated and continue to misappropriate those trade secrets, and that this misappropriation has caused and will continue to cause serious economic injury, Archetype is likely to prevail on the merits of its DTSA and NUTSA claims.

### B.    Breach of Contracts

In addition to its statutory claims, Archetype is also likely to prevail on its breach of contract claims. Under Nevada law, a breach of contract requires "(1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach." *Saini v. Int'l game Tech.*, 434 F. Supp. 2d 913, 919–20 (D. Nev. 2006) (citing *Richardson v. Jones*, 1 Nev. 405, 408 (1865)).

---

[10] Damages resulting from Defendants' conduct are addressed in detail in Section III (Irreparable Harm), *infra*.

26

Both the OA and the BLG NDA imposed binding confidentiality and non-use obligations, which Defendants breached by misappropriating and exploiting Archetype's trade secrets. These breaches, combined with the ongoing misappropriation, strongly support entry of a temporary restraining order.

### 1. Existence of Valid Contracts

Here, two valid contracts govern Defendants' obligations: (i) the OA, to which Schneider was a party, and (ii) the BLG NDA executed between Archetype and BLG. Section 10 of the OA imposed binding confidentiality, non-disclosure, non-compete and non-solicitation provisions. *See Marina Dist. Dev. Co. v. AC Ocean Walk, LLC*, 2020 WL 8608166 (D. Nev. 2020) (finding defendant in breach of agreement by violating its non-competition provision). The NDA likewise bound BLG to maintain strict confidentiality, prohibit unauthorized use or disclosure of Archetype's Confidential Information, and limit access solely to representatives with a legitimate need-to-know basis in evaluating a potential lending opportunity.

### 2. Existence of Breaches

"Failure to perform one's obligations within the express terms of an agreement constitutes a literal breach of contract." *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 923 (D. Nev. 2006). In *Saini*, the court held that an employee breached his employment agreements by delivering his employers confidential documents to a competitor for use in litigation. *Id.* The agreements expressly required the employee to maintain the secrecy of IGT's trade secrets and confidential information and prohibited him from using that information against IGT. *Id.* The court rejected the employee's defense that the information was not confidential, finding that much of the disclosed material—including engineering schematics, re-work instructions, and internal quality team notes—was both confidential and economically valuable, qualifying as trade secrets under Nevada

law. *Id.* The court emphasized that disclosing and misusing such information violated the express terms of the agreements and constituted a breach of contract. *Id.*

Similarly, Defendants materially breached both these agreements. Schneider, who was intimately involved in designing and implementing Archetype's proprietary systems—took that knowledge and applied it for BLG's benefit, in direct violation of his contractual obligations under the OA. BLG, in turn, not only induced Schneider's breaches but also independently violated its own NDA obligations by exploiting Archetype's confidential methodologies, funding structures, and proprietary intake and marketing systems to attract clients and secure financing.

Just as in *Saini*, where the court found breach of contract when an employee disclosed and used confidential engineering schematics and internal memoranda against his former employer, here Defendants repurposed Archetype's confidential and trade-secret-protected methodologies in direct contravention of their contractual obligations. Defendants' email correspondence and communications with co-counsel and vendors confirm that they wrongfully possessed, used, and repurposed Archetype's confidential information in breach of their express contractual obligations. In both cases, the agreements expressly prohibited using confidential information against the company, yet the defendants delivered it to competitors for their own gain.

The record is replete with evidence of these breaches. Defendants' emails with co-counsel, vendors, and litigation funders confirm their wrongful possession and use Archetype's confidential and proprietary information. These communications show Defendants repurposed Archetype's methodologies as their own, embedding them into third-party platforms and using them to negotiate settlements and raise capital—all while concealing Archetype's role.

### 3. Resulting Damage

The resulting damages are substantial. Leveraging Archetype's systems, Defendants grew their VGA case portfolio from approximately 2,590 cases to more 148,000 cases in just months,

ultimately closing a billion-dollar settlement and generating tens of millions in vendor revenue. In doing so, Defendants deliberately excluded Archetype from the market that it had built through years of investment and innovation. This wrongful conduct deprived Archetype of revenue, destroyed its competitive position, and eroded goodwill with clients and partners.

Accordingly, Archetype's breach of contract claims are not only well founded in law but are also firmly supported by the factual record. Archetype has demonstrated a substantial likelihood of success on the merits of these claims.

## III.    ARCHETYPE WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF

Irreparable harm to Archetype is certain. Defendant Schneider remains in possession of Archetype's company-owned computer, despite repeated demands for its return. That device contains a comprehensive list of Archetype's actual and prospective clients, as well as a repository of Archetype's Trade Secrets and Confidential Information. Because Archetype has been deprived of access to its own property, the files and data on that computer are effectively lost to Archetype while available to Defendants. Schneider's continued defiance in refusing to return the device not only deprives Archetype of critical business information but ensures that the confidentiality of its trade secrets has been permanently compromised. The harm is ongoing and irreparable: Archetype has no way to know the full extent to which its proprietary materials have been accessed, copied, or disseminated, and recovery of that information is now beyond its control.

The law presumes irreparable harm where trade secrets are disclosed or restrictive covenants are breached, particularly when disclosure occurs through a knowing inducement to violate duties of confidentiality. Here, the record demonstrates not only disclosure but Defendants' active use of Archetype's proprietary methodologies to expand their own business, secure funding, and negotiate settlements.

29

The Ninth Circuit has long recognized that intangible injuries—such as loss or the threatened loss of prospective customers, goodwill, market position, or business relationships—constitute irreparable harm. *Id.*; *see also Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) (explaining that the loss of one's business entails damages that are not purely monetary and cannot be remedied through back pay alone); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (affirming a finding irreparable harm where, without an injunction, plaintiff risked losing newly acquired customers, goodwill, and revenue); *Bass*, No. 2:22-cv-0138-RFB-EJY, 2022 WL 256971, at *1 (finding that plaintiff "will suffer irreparable harm if an injunction does not issue due to a loss of business and goodwill").

Courts throughout the Ninth Circuit and this District have repeatedly found irreparable harm in the loss and misuse of confidential business information and trade secrets. *See, e.g., Aerodynamics Inc. v. Caesars Ent. Operating Co.*, No. 2:15-cv-01344-JAD, 2015 WL 5679843, at *12 (D. Nev. Sept. 24, 2015) (holding that loss of property interest in and diminution in value of trade secrets constitutes irreparable harm); *Credit Bureau Connection, Inc. v. Pardini*, 726 F. Supp. 2d 1107, 1123 (E.D. Cal. 2010) (explaining that loss of goodwill and diminished market share due to misuse of trade secrets constitutes irreparable harm); *Gallagher Benefits Servs., Inc. v. De La Torre*, No. C 07-5495 VRW, 2007 WL 4106821, at *5 (N.D. Cal. Nov. 16, 2007), aff'd, 283 F. App'x 543 (9th Cir. 2008) ("In general, the imminent use of a trade secret constitutes irreparable harm"); *see also Excellence Cmty. Mgmt. v. Gilmore*, 131 Nev. 347, 353, 351 P.3d 720, 724 (2015) ("Irreparable harm is also presumed where a party misappropriates a trade secret."). That presumption becomes even stronger where, as here, there is direct evidence of ongoing use, competition, or solicitation based on misappropriated information. *See Zitan Techs., LLC v. Liang Yu*, No. 3:18-cv-00395-RCJ-WGC, 2018 WL 5045207, at *4 (D. Nev. Oct. 17, 2018).

The record here establishes both the presumption and clear evidence of irreparable harm.

Defendants are not merely in past possession of Archetype's trade secrets—they continue to use them in real time through the SimplyConvert platform, embedding Archetype's proprietary intake systems, valuation matrices, and cross-litigation overlap methodologies into an infrastructure that now drives tens of thousands of claims. Once misappropriated information is used in this way, the loss of secrecy, market niche, and competitive advantage cannot be undone.

The consequences are immediate and compounding. Defendants expanded their case inventory from 2,590 to over 148,000 cases, and over 60,000 secured settlements, within months using Archetype's stolen systems, secured a billion-dollar settlement with the Defendant X that directly mirrored Archetype's frameworks, and positioned themselves to generate recurring vendor revenue exceeding $20 million annually. Beyond the one-time distribution of attorney fees, the evidence reveals $20+ million in recurring service provider revenues that constitute continuing instrumentalities of misappropriation, warranting parallel injunctive relief. Critically, these service provider revenues represent ongoing instrumentalities of misappropriation, not merely past profits. Every monthly SimplyConvert payments, every BlueKey Tek processing fee payment compensates current use of Archetype's stolen intellectual property. This continuing harm justifies immediate injunctive relief to prevent further unjust enrichment while this case proceeds to judgment.

Meanwhile, Archetype has been cut out of its own market—firms across the industry now access and apply Archetype's systems through SimplyConvert, bypassing Archetype entirely. This diversion of clients, loss of goodwill, and erosion of Archetype's unique market position are injuries that cannot be redressed through damages alone. Courts have expressly recognized that this type of harm "does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of losses." *Bass*, No. 2:22-cv-0138-RFB-EJY, 2022 WL 256971, at *1; *Am. Trucking*, 559 F.3d at 1059.

The urgency is heightened by the imminent distribution of attorney fees from the Defendant X settlement. QSF #1 and/or QSF #2 currently holds more than $2.2 billion in attorney fees, of which Defendants claim a substantial portion. If those funds are disbursed before relief is entered, Archetype will suffer irreparable harm. Once fees are distributed among approximately 75 different law firms nationwide, recovery becomes virtually impossible, and Archetype will have lost the only practical opportunity to secure compensation for its stolen intellectual property and labor. Without an injunction identifying and freezing Defendants' share of those funds, Archetype's losses will be permanent and unrecoverable, depriving it of fair payment for the very work Defendants used to secure the settlement.

Even the parties' contracts confirm the inadequacy of legal remedies. Section 10.1.3 of the OA expressly provides that any breach of confidentiality will cause "irreparable injury" not compensable by damages, entitling the non-breaching party to injunctive relief. The BLG NDA echoes this, stating that legal remedies are inadequate and expressly authorizing injunctive relief without proof of actual damage or irreparable harm.

The misconduct here is precisely the harm these provisions were designed to prevent. Defendants' continued possession and exploitation of Archetype's intellectual property not only diverts business opportunities but threatens the very survival of Archetype's enterprise and the livelihoods of its employees. Without an injunction, Defendants will continue to grow their market share, expand into new tort areas using Archetype's frameworks, and reap benefits from a system Archetype alone created—all while Archetype is irreparably excluded.

Accordingly, Archetype has demonstrated not only a likelihood of success on the merits and a high likelihood of immediate, irreparable harm. The equities and governing law therefore weigh decisively in favor of injunctive relief to preserve the status quo, stop disbursement of settlement funds, and prevent further unlawful exploitation of Plaintiff's trade secrets.

32

## IV.    THE BALANCE OF EQUITIES FAVORS ARCHETYPE

"The equities must balance out in favor of the plaintiff in order to grant injunctive relief." *Terrier, LLC v. HCAFranchise Corp.*, No. 2:22-cv-01325-GMN-EJY, 2022 WL 4280251, at *8 (D. Nev. Sept. 15, 2022) (citing *Sony Computer Entertainment Am., Inc. v. Bleem, LLC*, 214 F.3d 1022, 1025 (9th Cir. 2000)). Courts hold that the equities tip toward protecting trade secrets and enforcing contractual obligations where defendants' claimed "harm" consists only of being required to comply with the law. *See Bass*, No. 2:22-cv-0138-RFB-EJY, 2022 WL 256971, at *1.

Here, the balance of hardships weighs overwhelmingly in Archetype's favor. Archetype faces the imminent loss of trade secrets, confidential systems, goodwill, and competitive advantage if an injunction is denied. These harms are not compensable by money damages alone and threaten the viability of Archetype's business itself. By contrast, Defendants will suffer no cognizable hardship from being enjoined from conduct they have no right to pursue—namely, the possession, use, and misappropriation of Archetype's proprietary information.

Further, once trade secrets are embedded into competitor platforms, disseminated across co-counsel networks, or used to secure massive funding arrangements, the damage cannot be undone. Likewise, once attorney fees from the multi-billion Defendant X Settlement are distributed to more than 75 law firms, Archetype's ability to recover the value of their work will be irretrievably lost. Preventing this distribution is essential to preserve the relief Archetype seeks and to prevent from unjustly enriching themselves with funds derived directly from misappropriated trade secrets.

By contrast, Defendants face no legitimate hardship from being restrained from unlawful conduct. *See Aerodynamics Inc.*, 2015 WL 5679843, at *13 (recognizing irreparable harm where plaintiff invested considerable time and resources developing proprietary information later misappropriated by defendants). Defendants' position is especially untenable given their

33

contractual obligations. Both the OA and the BLG NDA required Defendants to return, delete, or destroy Archetype's Trade Secrets and Confidential Information. Instead, they deliberately retained it, repurposed it for their own gain, and profited through competitors and third-party platforms. Having voluntarily placed themselves in breach of their duties, Defendants cannot now claim equitable hardship from being ordered to do what the law and their contracts already required. Any "harm" they may claim is self-inflicted, the direct result of their willful misappropriation. Equity therefore weighs decisively in Archetype's favor and supports issuance of a temporary restraining order.

## V.     THE PUBLIC INTEREST STRONGLY FAVORS GRANTING INJUNCTIVE RELIEF IN THIS CASE

Courts recognize that the weight of the public interest depends on the scope of the injunction. "When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be at most a neutral factor in the analysis rather than one that favor[s] in [granting or] denying the preliminary injunction." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138–39 (9th Cir. 2009). By contrast, "[w]hen an injunction will impact non-parties and has the potential to impact the public, the public interest is relevant." *Travelers Cas. & Sur. Co. of Am. v. Williams Bros., Inc.*, No. 2:12-cv-00058, 2013 WL 5537191, at *12 (D. Nev. Oct. 4, 2013).

Granting injunctive relief in this case aligns squarely with the public interest. An injunction will stop Defendants' ongoing violations of federal and state trade secret law, prevent further misuse of confidential information, and correct the false impression in the marketplace that Defendants lawfully developed and control the mass-tort systems they now exploit. In reality, Defendants' position rests on stolen data and blatant contractual breaches. Without intervention, the public is misled into believing that Defendants are legitimate innovators and competitors, when their success is built entirely on Archetype's trade secrets.

34

The public interest is directly implicated. Protecting trade secrets and enforcing confidentiality agreements benefits not only the contracting parties but also the broader business community by ensuring predictability in commercial dealings. Courts in this District consistently recognize a strong public interest in enforcing contracts and upholding the integrity of business relationships. *See Terrier, LLC*, 2022 WL 4280251, at *9 (noting public interest in enforcement of contracts and judgments); *First 100, LLC v. Omni Fin., LLC*, No. 2:16-cv-00099, 2016 WL 3511252, at *3 (D. Nev. June 27, 2016) (same, emphasizing predictability in commerce); *Travelers*, 2013 WL 5537191, at *12.

Moreover, courts have repeatedly emphasized that protecting trade secrets serves a broader societal function: it fosters innovation, safeguards investments, and preserves fair competition. *See Bass*, 2022 WL 256971, at *1 (recognizing the "strong public interest in protecting trade secrets"). Misappropriation, by contrast, undermines the integrity of entire industries.

Those principles apply with special force here. Defendants' misappropriation has distorted the mass-tort marketplace itself. By embedding Archetype's methodologies into the SimplyConvert platform, Defendants have enabled co-counsel firms and vendors to bypass Archetype altogether—cutting it out of the very market niche it created. Unless restrained, this scheme will continue to mislead the public, reward unlawful conduct, and destabilize a sector that depends on confidentiality, trust and contractual compliance. Accordingly, the public interest weighs heavily in favor of granting Archetype's request for a temporary restraining order.

## VI.   THE EQUITABLE RELIEF IS APPROPRIATE

The DTSA expressly authorizes courts to grant injunctive relief "to prevent any actual or threatened misappropriation" of trade secrets, subject only to narrow exceptions not applicable here. 18 U.S.C. § 1836(b)(3). Likewise, Fed. R. Civ. P. 65(d)(2)(C) provides that injunctions may bind not only the parties but also those acting in concert with them once they receive notice, such

as domain hosts or service providers who facilitate the unlawful conduct. These provisions confirm that the equitable relief requested here is both proper and necessary to prevent ongoing harm.

### A. A TRO Immediately Enjoining Defendants' Unauthorized Use of Archetype's Data Is Appropriate.

Defendants' continued possession and use of Archetype's confidential methodologies and trade secrets constitutes ongoing misappropriation. Unless restrained, Defendants will persist in exploiting Archetype's proprietary information to secure new clients, expand their case portfolio, and extract further profits, all at Archetype's expense. Beyond the one-time distribution of attorney fees, the evidence reveals $20+ million in recurring service provider revenues that constitute continuing instrumentalities of misappropriation, warranting parallel injunctive relief. This ongoing misconduct threatens not only Archetype's goodwill and competitive position but the very survival of its business.

A temporary restraining order is therefore necessary to stop the bleeding—halting Defendants' use of disclosure of Archetype's trade secrets and preventing them from continuing to profit from what they unlawfully took. Such relief is precisely the type contemplated by with the DTSA, which expressly empowers courts to grant injunctions to prevent "any actual or threatened misappropriation." 18 U.S.C. § 1836(b)(3). Acting swiftly is essential: once trade secrets are embedded into competitor platforms and disseminated across co-counsel networks, the secrecy and value that give them protection under the DTSA and NUTSA are irretrievably lost.

### B. Preventing the Distribution of Funds Is Necessary.

Courts have long recognized their equitable authority to freeze assets where necessary to preserve effective relief. *See Reebok Int'l Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 559 (9th Cir. 1992) (holding that the availability of an equitable profits remedy invokes the "district court's inherent equitable power to issue provisional remedies" to ensure final equitable relief); *Animale Grp. Inc. v. Sunny's Perfume Inc.*, 256 F. App'x 707, 709 (5th Cir. 2007); *Levi Strauss & Co. v.*

36

*Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995) (concluding that courts may freeze assets which could otherwise be used to satisfy an equitable award of profits).

In *Reebok Int'l, Ltd.*, the Ninth Circuit upheld an asset freeze where the plaintiffs showed a likelihood of success on the merits, immediate and irreparable harm, and a risk that defendants would conceal their ill-gotten funds absent judicial intervention. 970 F.2d at 562–63. The court rejected arguments that such relief unduly burdened defendants, noting that the order provided for legitimate expenses and could be modified as needed. *Id.* The decision confirms that asset freezes are a proper tool to prevent dissipation of profits derived from unlawful conduct.

Those same considerations apply with particular force here. The multi-billion dollar Defendant X Settlement was structured on Archetype's proprietary methodologies, but excluded Archetype from any share of the resulting attorney fees. Defendants' share of those funds, funneled from QSF #1 to QSF #2 at Esquire Bank, represents profits unjustly derived from Archetype's Trade Secrets and Confidential Information. Unless restrained, those funds will soon be disbursed to more than 75 law firms across multiple jurisdictions. Once distributed, they will be virtually impossible to trace or recover, leaving Archetype without any meaningful remedy.

Both the DTSA and NUTSA expressly authorize recovery of unjust enrichment and disgorgement of profits derived from misappropriation. *See* 18 U.S.C. § 1836(b)(3)(B)(i)(II); NRS 600A.050(2). Preserving the settlement funds is therefore not only equitable but essential to prevent the remedies provided under federal and state law from becoming hollow.

Archetype has shown a likelihood of success on the merits, immediate and irreparable harm, and a strong probability that Defendants will dissipate assets absent judicial intervention. Under these circumstances, an injunction restraining the distribution of the Defendant X Settlement proceeds is necessary and proper to preserve the status quo and ensure effective relief.

## VII.    THE COURT SHOULD NOT REQUIRE A BOND

Rule 65(c) provides, in part, that "[t]he court may issue a preliminary injunction ... only if the movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, "despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, if any. *San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1234 (N.D. Cal. 2025) (internal quotation and citation omitted). Further, the court "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." In other words, the discretion allows courts to tailor the bond requirement to the specific circumstances of the case, including cases involving trade secrets or non-compete agreements.

In the context of a restraining or enjoining the use of trade secrets or restricting competition in violation of a non-compete, the Ninth Circuit has found that if the injunction or restraint is narrowly tailored, no bond will be required. *See Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1098 (E.D. Cal. 2012) ("In this case, the narrow injunction to be entered will not preclude defendant from working in his chosen occupation. With respect to the six-month non-solicitation restriction, defendant will be permitted to work with J & M Displays or Hi–Tech FX, LLC customers and potential customers that are not covered by the terms of the injunction during that period…. Accordingly, no bond will be required.")

In the present matter, the relief requested and the activities to be enjoined are narrowly tailored to prohibit Defendants' wrongful use of trade secret and confidential information and to prevent the distribution of attorney fees. The relief requested is similar to the relief requested in *Pyro Spectaculars N., Inc.,* and does not prohibit Defendants from working or pursing litigation.

38

It simply seeks to prohibit the use of Archetype's trade secrets. Accordingly, like *Pyro Spectaculars N., Inc.,* the court should not require a bond.

**RELIEF REQUESTED**

For the foregoing reasons, Archetype respectfully request that this Court issue a Temporary Restraining Order, and upon further hearing a Preliminary Injunction, providing the following relief:

1. **Enjoining Use or Disclosure of Trade Secrets.** Defendants, and all those acting in concert with them, should be immediately enjoined from using, disclosing, transmitting, or otherwise disseminating Archetype's trade secrets and confidential information, as defined in the OA and applicable law.

2. **Return of Company Property and Information.** Defendants should be ordered to immediately return to Archetype all originals, copies, reproductions, or other materials— whether in physical, electronic, or other form—containing or derived from Plaintiffs' trade secrets or confidential information, including but not limited to documents, data, customer lists, marketing materials, business plans, electronic files and company-issued laptop.

3. **Preventing the Distribution of Attorney Fees Derived from Misappropriation.** The Court should order preservation of all attorney fees payable to Defendants from settlements, judgments, or other resolutions in litigation matters where Defendants have used or are using Archetype's misappropriated trade secrets and confidential information.

4. **Preservation of Evidence.** Defendants should be required to preserve all evidence relevant to this action, including any devices, accounts, or storage media containing Archetype's Trade Secrets or Confidential Information, and to refrain from altering, deleting, or destroying such evidence.

5. **Restraining Solicitation and Interference.** Defendants should be enjoined from soliciting, contacting, or interfering with Archetype's customers, vendors, or business partners through the use of Archetype's trade secrets or confidential information.

6. **Restraining Competition in Violation of the Agreement.** Defendants should be restrained from engaging in any business activities that violate the restrictive covenants and fiduciary duties set forth in the OA.

**CONCLUSION**

Archetype's litigation financing business is suffering irreparable harm as a result of Defendants' continued misappropriation of Archetype's proprietary methodologies. Unless

restrained, Defendants will persist in using and profiting from Plaintiff's trade secrets, further eroding Archetype's market position, goodwill, and relationships with existing and potential clients. Equally urgent, without entry of relief preserving the status quo, Defendants are likely to disburse proceeds from the Defendant X Settlement—including more than $2.2 billion in attorney fees—beyond the reach of equitable remedies, leaving Archetype without meaningful recourse even if it prevails on the merits.

For these reasons, Archetype respectfully requests that the Court grant its Motion and enter the proposed Temporary Restraining Order enjoining Defendants' continued use of Plaintiff's trade secrets and restraining the distribution of settlement funds.

DATED this 15th day of October 2025.

/s/ Kevin N. Anderson
Kevin N. Anderson, Esq.
Nevada State Bar No. 4512
**FABIAN VANCOTT**
2275 Corporate Cir., Suite 220
Henderson, NV 89074
Telephone:    (702) 233-4444

*Attorneys for Plaintiff*