D. CHRIS ALBRIGHT
Nevada Bar No. 004904
**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**
801 South Rando Drive, Suite D-4
Las Vegas, Nevada 89106
Tel: (702)384-7111/Fax: (702)384-0605
dca@albrigihtstoddard.com

MAZIN A. SBAITI
*Pro Hac Vice* forthcoming
Texas Bar No. 24058096
KEVIN N. COLQUITT
*Pro Hac Vice* forthcoming
Texas Bar No. 24072047
**SBAITI & COMPANY PLLC**
3102 Maple Avenue
Suite 400
Dallas, Texas 75201
Tel: (214) 214-3400
Fax: (214)853-4367
mas@Sbaitilaw.com
knc@sbaitilaw.com
***Attorneys for Defendant***
***Andrew Schneider***

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

ARCHETYPE CAPITAL PARTNERS, LLC,
a Nevada limited liability company,

    Plaintiff,

v.

BULLOCK LEGAL GROUP, LLC, a
Georgia limited liability company, and
ANDREW SCHNEIDER, an individual
residing in Texas,

    Defendants.

CASE NO. 2:25-CV-01686-JCM-BNW

**DEFENDANT ANDREW
SCHNEIDER'S RESPONSE AND
OPPOSITION TO PLAINTIFF'S
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

TABLE OF CONTENTS............................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................... ii

I.      SUMMARY OF THE ARGUMENT ..........................................................................1

II.     RELEVANT FACTS ...................................................................................................2

III.    APPLICABLE LEGAL STANDARDS .....................................................................5

IV.    ARGUMENTS AND AUTHORITIES........................................................................6

        A.     The Injunction is Overbroad and Violates Public Policy and
               Is Inequitable....................................................................................................6

               1.     The Relief Sought Violates Public Policy ................................................6

               2.     The Relief Sought Violates Rule 65 and Would Be
                      Highly Inequitable .................................................................................7

        B.     Plaintiff Has Not Proven Demonstrated Imminent Irreparable
               Harm ...............................................................................................................10

               1.     Damages Are a Sufficient Remedy..........................................................10

               2.     Plaintiff's Intentional Delay Undermines Any Question of
                      Imminency of Any Irreparable Harm ........................................................11

        C.     Plaintiff Has Not Demonstrated a Likelihood of Success on the
               Merits ..............................................................................................................11

               1.     Plaintiff Has Proven No Protectable Interest ...........................................12

               2.     Plaintiff Has Proven No Concrete Likely Injury—Past
                      or Present ..............................................................................................14

        D.     If this Court Grants Any Injunctive Relief, It Should Require the
               Posting of a $5,000,000 Bond.............................................................................14

V.     CONCLUSION............................................................................................................15

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

*All. For The Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ...............................................................................6, 10

*Amylin Pharm., Inc. v. Eli Lilly & Co.*,
   456 F. App'x 676 (9th Cir. 2011).............................................................................10

*Bankers Life & Cas. Co. v. Sanchez*,
   No. 2:22-CV-1474, 2022 U.S. Dist. LEXIS 178594 (D. Nev. Sep. 30, 2022)...............13, 14

*Calence, LLC v. Dimension Data Holdings, PLC*,
   222 F. App'x 563 (9th Cir. 2007)..............................................................................11

*Cardillo v. Bloomfield 206 Corp.*,
   988 A.2d 136 (Super. Ct. App. Div. 2010) ...............................................................7

*Caribbean Marine Servs. v. Baldridge*,
   844 F.2d 668 (9th Cir. 1988) ...................................................................................10

*Cuviello v. City of Vallejo*,
   944 F.3d 816 (9th Cir. 2019) ...................................................................................11

*Denburg v. Parker Chapin Flattau & Klimpl*,
   82 N.Y.2d 375 (N.Y. 1993) ....................................................................................7

*Earth Island Inst. v. Carlton*,
   626 F.3d 462 (9th Cir. 2010) ...................................................................................5

*eBay, Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006)................................................................................................10

*FBC Mortg., LLC v. Broker Sols., Inc.*,
   No. 23-cv-00143, 2023 U.S. Dist. LEXIS 133480 (N.D. Cal. Aug. 1, 2023) .......................13

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) .............................................................................5, 6, 7

*Granny Goose Foods. v. Bhd. of Teamsters & Auto Truck Drivers*,
   415 U.S. 423 (1974)................................................................................................5

*Grupo Mexicano de Desarrollo v. All. Bond Fund*,
   527 U.S. 308 (1999)................................................................................................1, 9

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt.,*
    736 F.3d 1239 (9th Cir. 2013) ...................................................................5, 6

*hiQ Labs, Inc. v. LinkedIn Corp.,*
    31 F.4th 1180 (9th Cir. 2022) ........................................................................6

*Hundred Acre Wine Grp. Inc. v. LeRner,*
    No. 22-cv-07305, 2024 U.S. Dist. LEXIS 46739 (N.D. Cal.  Feb. 2, 2024) .........................11

*Imax Corp. v. Cinema Techs., Inc.,*
    152 F.3d 1161 (9th Cir. 1998) .....................................................................12

*InteliClear, LLC v. ETC Glob. Holdings, Inc.,*
    978 F.3d 653 (9th Cir. 2020) ......................................................................11

 *L.A. Mem'l Coliseum Com. V. Nat'l Football League,*
    634 F.2d 1197 (9th Cir. 1980) .....................................................................5

*Lydo Enters. v. Las Vegas,*
    745 F.2d 1211 (9th Cir. 1984) ....................................................................10

*MAI Sys. Corp. v. Peak Computer, Inc.,*
    991 F.2d 511 (9th Cir. 1993) .....................................................................12

*Marlyn Nutraceuticals, Inc. v Mucos Pharma GmbH & Co.,*
    571 F.3d 873 (9th Cir. 2009) ......................................................................5

*Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.,*
    762 F.2d 1374 (9th Cir. 1985) ....................................................................11

*Sitrus Tech. Corp. v. Quynh Le,*
    600 F. Supp. 3d 1106 (C.D. Cal. 2022) ...........................................................14

*W. Directories, Inc. v. Golden Guide Directories, Inc.,*
    No. C 09-1625, 2009 U.S. Dist. LEXIS 52023, 2009 WL 1625945
    (N.D. Cal. June 8, 2009) .........................................................................10

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008)...............................................................................5, 6, 10

*X6D Ltd. v. Li-Tek Corps. Co.,*
    No. 10-cv-2327, 2012 WL 12952726 (C.D. Cal. Aug. 27, 2012) .........................................12

iii

**Rules & Statutes**

18 U.S.C. § 1839(3) ................................................................................................................12

18 U.S.C. § 1839(4) ................................................................................................................12

FED. R. CIV. P. 65(b) ................................................................................................................5

FED. R. CIV. P. 65(b)(1)(A) ......................................................................................................5

FED. R. CIV. P. 65(c) ..............................................................................................................14

FED. R. CIV. P. 65(d)(1) ...........................................................................................................7

FED. R. CIV. P. 65(d)(2) ...........................................................................................................7

**Other Authorities**

ABA Comm. On Prof'l Ethics & Prof'l Responsibility, Formal Op. 93-371 ...............................6

**I.**

**<u>SUMMARY OF THE ARGUMENT</u>**

TROs and PIs are for emergencies. Here, there is no emergency. Not only is there no emergency, Plaintiff cannot make a "clear showing" with evidence that it is entitled to the "extraordinary remedy" of injunctive relief. Indeed, Plaintiff's papers come nowhere close.

*First*, Plaintiff's requested relief is vastly overbroad, inequitable, and against public policy. It seeks to enjoin a lawyer from representing his clients. It seeks to freeze money that is already under court supervision and that belongs to non-parties and to force divestiture of vague rights and information from innocent third parties. The entire Motion is completely out of bounds, does nothing to preserve the status quo, and is the kind of abuse of injunctive power forbidden by the Supreme Court in *Groupo Mexicano*.

*Second,* Plaintiff never demonstrates imminent irreparable harm. While conceding that the availability of damages is kryptonite to granting injunctive relief, Plaintiff's alleged injuries are purely retrospective and economic—the alleged infraction has already occurred, resulting in lost fees, diverted customers, and lost vendor revenues which are all expressly quantified by the Plaintiff in dollars—meaning they are fully compensable by damages. Add to that the fact that Plaintiff waited over a year to seek relief, and the notion that any harm is irreparable or imminent is a delusion.

*Third*, Plaintiff's injury is practically non-existent. There is no confidential information or interest to secure and protect. The 82 exhibits show nothing. There is no evidence that Archetype ever "derived independent economic value" from the information, much less that it did so because they were kept secret. Half the documents reflect information that is publicly available to anyone interested in mass torts, and many existed prior to the founding of Archetype. The rest—which Archetype's access was unlawful—came from Schneider's law practice, which Archetype expressly consented to his engaging in and contractually quitclaimed any interest in. Archetype cites no evidence demonstrating otherwise.

*Fourth*, Plaintiff's injury is remote and speculative, at best. Archetype never cites to "specific facts" with "reasonable detail" as required under Rule 65 to show that there was any

1

1  violation, or is an imminent one by the Defendant that will proximately cause a concrete injury

2  that can be avoided only if the injunction issues.

3      *Finally*, one cannot let go unsaid the absurd premise of this Motion. Archetype—a

4  litigation funder that never closed a single litigation funding deal of its own—does not only

5  seek the lost "revenues" from a funding deal that never was, it does so without proving that it

6  even had the capital to make the funding deal work. And it doesn't stop there—Archetype then

7  contends that it had the secret sauce that *caused a settlement* sufficient to justify seeking the

8  legal fees earned and that could only be earned *by lawyers doing lawyer work* in a litigation that

9  was several years old when funding was made. In sum, the case is meritless, and the attempt to

10  use injunctive relief this early is a naked and improper attempt at leverage.

11      For all of these reasons, injunctive relief should be denied.

12  **II.**

13  **<u>RELEVANT FACTS</u>**

14      Andrew Schneider is a lawyer licensed to practice law in New Jersey, is in good standing,

15  and currently practices in the mass torts space as settlement counsel (Schneider Decl. ¶ 3). IN

16  2020, Schneider cofounded Archetype Capital Partners, LLC ("Archetype"). During his tenure at

17  Archetype, the company's primary business was the purchase of employee retention credits

18  (Schneider Decl. ¶ 5). During Schneider's tenure, Archetype never funded a single mass tort

19  litigation, and brokered only one litigation finance deal. (Schneider Decl. ¶ 5).

20      Mr. Schneider resigned his membership in Archetype in December 2024 (Schneider

21  Decl. ¶ 6). He retained the laptop in his possession because it contains his own legal work

22  product. (Schneider Decl. ¶ 6). Archetype is not a law firm, cannot practice law, cannot share

23  legal fees, and cannot participate in Mr. Schneider's legal representation of clients (Schneider

24  Decl. ¶ 7). While Mr. Schneider cannot admit to the authenticity of the operating agreement

25  proffered as Exhibit 1 in Plaintiff's Appendix ("<u>Ex. 1</u>"),  it shows that Schneider was a Member

26  of Archetype, not a Manager (Ex. 1 § 5.1), and thus owed no duty of loyalty as a Member, and

27  he was not an agent of the company. Further, Section 5.4.1 expressly permitted Schneider to

28

2

1    pursue his own ventures and did not assign his independent work product to Archetype

2    (Schneider Decl. ¶ 8).

3        Mr. Schneider reviewed the exhibits submitted with Plaintiff's TRO papers and has

4    confirmed that they do not evidence confidential, proprietary, or trade secret information of

5    Archetype, and he denies using or misappropriating any such information (Schneider Decl. ¶ 9).

6    He explains that materials such as the Incident Response Plan (Exhibit 2) reflect standard

7    protocols he knew before joining Archetype, were not shared by him, and bear no relation to any

8    alleged trade secret breach (Schneider Decl. ¶ 10). Exhibits 2-3, 5-11, 13-18, 23, 28, 32-34, 39,

9    43, 55-57, 59-60, and 62 consist of publicly available or common industry information, much of

10   which Schneider compiled himself, some of it predating his association with Archetype;

11   Archetype did not invest in developing or commercializing these materials, never used them, and

12   did not derive revenues from them, and their value does not depend on secrecy (Schneider Decl.

13   ¶ 11).

14       Exhibits 4 and 8 are high-level business pitches and templates identified by Plaintiff

15   similarly are generic tools commonly used by law firms, were not proprietary to Archetype, were

16   not used by Archetype, and did not generate revenue for it (Schneider Decl. ¶ 12). Exhibit 12 is a

17   template created by Mr. Schneider—it is generic and useful but not proprietary as virtually every

18   law firm uses a similar form. (Schneider Decl. ¶ 13).

19       After leaving Archetype in December 2024, Mr. Schneider worked with Bullock Legal

20   Group ("Bullock Law") in his capacity as an attorney settlement counsel. By that time, Bullock

21   Law had already engaged Calumet Capital to broker finance, and Archetype had not been

22   retained for that purpose (Schneider Decl. ¶ 14). The memoranda Schneider prepared were based

23   on Bullock's internal documents and were not Archetype's property. (Schneider Decl. ¶ 14).  He

24   received, and stands to receive, no compensation from any Bullock–Calumet funding

25   arrangement, and he did not use Archetype confidential information to obtain funding (Schneider

26   Decl. ¶ 14).

27       Although Archetype communicated with Bullock Law in May 2023, Archetype did not

28   secure a funding opportunity due to hurdles Mr. Schneider identified, which may explain

3

Bullock's later engagement with Calumet. (Schneider Decl. ¶ 15). Mr. Schneider's subsequent work for Bullock was as an attorney settlement counsel, of which Doug Mayer was aware, and Mr. Mayer encouraged that direction given Archetype's inability to pay Mr. Schneider since May 2024; because Mr. Mayer is not a lawyer, he could not participate in that work (Schneider Decl. ¶ 15).

Mr. Schneider's communications with other attorneys, including the Law Offices of Nhan Nguyen, who he knew years before Archetype was formed, were in his professional capacity as a lawyer and did not concern any consummated funding deal by him or any entity he controls (Schneider Decl. ¶ 16).

His communications with Western Alliance Bank on lines of credit were on Archetype's behalf in 2024; no confidential information was implicated, and later efforts to establish qualified settlement funds occurred after he returned to law practice (Schneider Decl. ¶ 17). His communications with Paul Crouch, including proposals and work product, were likewise in his capacity as a lawyer and not as an Archetype member (Schneider Decl. ¶¶ 18–19). None of Mr. Schneider's legal work product on behalf of clients with co-counsel law firms belongs to Archetype, which is not a law firm; and that work was never intended to be part of Archetype's business or platform (Schneider Decl. ¶ 20). Thus Exhibits 54-57, 59-60, 62, 64, 67-74, and 76-80 have never belonged to Archetype and are not its trade secrets or its confidential information. Mr. Schneider denies that Exhibits 67-68 and 80-82 are internal to Archetype.

Mr. Schneider resigned from Archetype after objecting to Mr. Mayer's plan to accuse a third party of trade secret theft, which Mr. Schneider believed would jeopardize his bar license (Schneider Decl. ¶ 22). Mr. Mayer told him to "shut the f— up" when Mr. Schneider refused to participate; his contemporaneous email reflects these concerns (Schneider Decl. ¶ 22).

Archetype placed TerMind® on Mr. Schneider's laptop, which gave Archetype access to Mr. Schneider's documents; however, upon his resignation, Mr. Schneider no longer consented to that monitoring, and any subsequent access was unauthorized (Schneider Decl. ¶ 24).

1

**III.**

2

<u>**APPLICABLE LEGAL STANDARDS**</u>

3        "An injunction is a matter of equitable discretion and is an extraordinary remedy that

4  may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Earth*

5  *Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quotation marks omitted) (citing

6        Under Rule 65(b) of the Federal Rules of Civil Procedure, plaintiffs seeking a temporary

7  restraining order must establish: (1) irreparable harm in the absence of injunctive relief, (2)

8  likelihood of success on the merits of their underlying claims, (3) the balance of equities tips in

9  their favor, and (4) an injunction is in the public interest. *See Winter v. Natural Resources*

10  *Defense Council, Inc.,* 555 U.S. 7, 20-23 (2008). Under Rule 65, a court may issue a temporary

11  restraining order when the movant alleges "specific facts in an affidavit" that immediate and

12  irreparable harm will occur before the adverse party can be heard in opposition. Fed. R. Civ. P.

13  65(b)(1)(A). The evidence supporting the injunction must be enough to make a "clear showing."

14  Fed. R. Civ. P. 65(d). The district court must "identify the harms which a preliminary injunction

15  might cause to defendants and. . .weigh these against plaintiff's threatened injury." *L.A. Mem'l*

16  *Coliseum Com. v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). Courts in this

17  Circuit deny TROs when any element is not convincingly established. *See Garcia v. Google,*

18  *Inc*., 786 F.3d 733, 740–46 (9th Cir. 2015) (*en banc*); *Herb Reed Enters., LLC v. Fla. Entm't*

19  *Mgmt.,* 736 F.3d 1239, 1249–51 (9th Cir. 2013).

20        A temporary restraining order is distinguished from a temporary injunction primarily by

21  its "underlying purpose of preserving the status quo and preventing irreparable harm just so long

22  as is necessary to hold a hearing, and no longer." *Granny Goose Foods. v. Bhd. of Teamsters &*

23  *Auto Truck Drivers*, 415 U.S. 423, 439 (1974).  Either way, relief that "orders a responsible party

24  to 'take action'" is treated as a mandatory injunction. *Marlyn Nutraceuticals, Inc. v Mucos*

25  *Pharma GmbH & Co*., 571 F.3d 873, 879 (9th Cir. 2009). Where, as here, the plaintiff seeks a

26  mandatory injunction, the plaintiff "must establish that the law and facts *clearly favor* her

27  position, not simply that she is likely to succeed." *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th

28  Cir. 2015).

The key element, irreparable harm, must be shown to be imminent and *likely*, not merely "possible." *Winter*, 555 U.S. at 21. Courts deny emergency injunctive relief where the movant's alleged harms are economic, compensable by damages, delayed, or otherwise speculative. *See id.; Herb Reed*, 736 F.3d at 1250–51 (requiring evidence of likely irreparable harm, not platitudes or conclusory assertions).

Next, on the element of likelihood of success, speculative or debatable claims do not suffice. *Garcia*, 786 F.3d at 740–46 (rejecting merits showing and vacating injunction).

Third, the balance of equities must tip in the movant's favor as well. Courts deny TROs where the injunction would impose significant, immediate burdens on the nonmovant or third parties outweighing any speculative harm to the movant. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188–90 (9th Cir. 2022) (applying serious-questions test but reiterating that equities must tip sharply for movant and other factors  be satisfied).

Fourth, the public interest must favor relief. Courts deny TROs that would disserve public policy or disrupt regulatory or contractual frameworks. *See All. For The Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011) (denying emergency injunctive relief under *Winter* factors).

## IV.

## <u>ARGUMENTS AND AUTHORITIES</u>

**A.  THE INJUNCTION IS OVERBROAD AND VIOLATES PUBLIC POLICY AND IS INEQUITABLE.**

**1.  The Relief Sought Violates Public Policy.**

Schneider is a lawyer and serves as settlement counsel for thousands of clients. The injunction attempts to directly interfere with Schneider's practice of law and his representation of his clients Professional Conduct Rule 5.6–-whether the ABA's, Nevada's and New Jersey's version, which are identical—bars agreements restricting a lawyer's right and ability to practice and represent clients. Any restraint impairing client representation is void as against public policy because enjoining a lawyer from representing clients and halting settlement administration harms thousands of claimants, delays distributions, and chills lawful advocacy. See ABA Comm. on Prof'l Ethics & Prof'l Responsibility, Formal Op. 93-371 (interpreting ABA Model Rule

5.6(b)); *Cardillo v. Bloomfield 206 Corp.*, 988 A.2d 136, 138-39 (N.J. Super. Ct. App. Div. 2010) (holding that agreements that violated ABA Rule 5.6 are void against public policy as unlawful restraints of trade); *accord Denburg v. Parker Chapin Flattau & Klimpl*, 624 N.E.2d 995, 998-99 (N.Y. 1993) (reaffirming the proposition that agreements that violate Disciplinary Rule 2-108(A) (now Rule 5.6(a)) are unenforceable on public policy grounds)).

### 2.    The Relief Sought Violates Rule 65 and Would be Highly Inequitable.

Archetype's requested relief fails Rule 65(d)'s core requirements of specificity and proper scope. Rule 65(d)(1) mandates that any injunction "state its terms specifically" and "describe in reasonable detail" the restrained acts. The rule also tightly limits who may be bound to parties, their agents, and non-parties "in active concert or participation" after actual notice. These constraints reflect due process and ensure courts do not conscript the broader commercial ecosystem into an injunction absent proof of knowing participation in the wrongful acts.

Archetype's motion flouts these limitations. Instead of specific and detailed, Archetype requests broad and amorphous relief. It seeks to enjoin the "use" of "all trade secrets," "confidential information," and "derived information" and to restrain "those acting in concert," while directing the "return/deletion" or "disabling" of vaguely defined information across platforms and accounts. It further asks to freeze or halt distributions from Qualified Settlement Funds ("QSF") and banked settlement proceeds and to reach "domain hosts or service providers who facilitate the unlawful conduct." The requested order thus fails for want of specificity and exceeds the permitted reach of Rule 65(d)(2).

Moreover, the Motion's use of broad labels such as "trade secrets," "confidential information," and "derived" data that do not identify discrete documents, file paths, data fields, or systems, fails Rule 65, and is practically unworkable. This defect is not academic. Archetype contends that the data and processes at issue are allegedly embedded in multi-tenant tools and cross-firm workflows rather than separable, party-specific artifacts. For example, Plaintiff asserts that SimplyConvert is "built on Archetype's stolen methodologies" and continues to drive claim intake and processing across "75 co-counsel firms." The relief sought would disrupt and interfere with hundreds of attorneys' representation of thousands of clients, while BlueKey Tek and other

vendors process mass settlement data at scale and are paid recurring fees per settlement. Plaintiff touts recurring vendor revenues of $20+ million per year tied to these platforms (Mayer Declaration at 30-31, ¶¶ 130–32). Never mind that there is zero evidence to support these statements, they are absurd given that Archetype never made anywhere near that kind of money from any of the information. Further, ordering "Archetype information" to be disabled, deleted, or returned is a prototypical mandatory injunction that plaintiff "must establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740.  It also invites outages, spoliation, and contempt exposure without any reliable way for non-parties to determine what, if anything, is covered.

Second, the proposed order impermissibly seeks to bind and burden non-parties who are not shown to be in "active concert" with any alleged misconduct. Rule 65(d)(2) does not convert a vendor, bank, or administrator into an "aider and abettor" merely because it provides ordinary services to a litigant. Yet Plaintiff explicitly invokes Rule 65(d)(2)(C) to reach "domain hosts or service providers," and its relief targets an array of non-parties—SimplyConvert (claims portal), BlueKey Tek (processing), Milestone (settlement administration), UBS/Esquire Bank (QSF custodians), and dozens of co-counsel and referral firms—none of whom are shown to have knowingly participated in misappropriation. *See, e.g.,* Exhibit 59. Routine provision of cloud hosting, CRM, claims intake, lien resolution, or banking functions is not "active concert" under Rule 65; extending the order to these actors would violate the rule's text and due process.

Third, the requested freeze on QSFs and distributions raises acute comity and jurisdictional concerns. Plaintiff asks this Court to restrain "QSF #1/#2 at Esquire Bank" and to halt distributions of settlement proceeds that, by Plaintiff's account, are being administered pursuant to agreements and processes under the supervision of other courts, with minors and thousands of claimants as beneficiaries. *See* proposed injunction at ¶¶ 36–41; *see also* Exhibit 59. A nationwide freeze of court-supervised QSFs would interfere with other courts' orders and fiduciary functions of neutral administrators while imposing collateral harm on non-party claimants. Rule 65 does not authorize this Court to commandeer the administration of separate

1  proceedings or to bind out-of-district fiduciaries absent jurisdiction, notice, and proof of "active

2  concert."

3      Fourth, the asset freeze component is independently barred by equitable limits recognized

4  by the Supreme Court in *Grupo Mexicano*. Under *Grupo Mexicano*, the Judiciary Act does not

5  empower a district court to enter a preliminary injunction freezing assets pending the

6  adjudication of an action brought solely at law—i.e., seeking damages. *Grupo Mexicano de

7  Desarrollo v. All. Bond Fund*, 527 U.S. 308, 310, 333 (1999). Therefore, this Court literally lacks

8  the authority to do what Archetype asks for, and Rule 65 does not give it authority that the

9  Judiciary Act did not. *Id.* Freezing assets to secure a potential money judgment is impermissible

10 absent a demonstrated equitable interest in specifically identified, traceable funds or a cognizable

11 equitable profits remedy tethered to particular res. *Id*.

12     Plaintiff's theory—again, with zero evidence to support it—is that its "trade secrets"

13 purportedly animated a multi-defendant settlement and the ordinary-course vendor fees that

14 attend it. Meanwhile, Plaintiff identifies no proprietary res within any QSF, and no tracing. The

15 broad restraints sought—on attorney-fee distributions, banked QSF proceeds, and "funds derived

16 from misappropriation"—would operate as a generalized pre-judgment freeze over commingled

17 funds held by non-party fiduciaries and financial institutions, which the Supreme Court forbids.

18     The *Reebok* equitable freeze cases do not help Plaintiff; those decisions turned on a tight

19 equitable nexus to specific ill-gotten gains and did not purport to authorize the blanket

20 interference with court-supervised payments Plaintiff demands. Here, Plaintiff cannot say that a

21 dime of the funds it seeks to freeze was taken from it or that it has any property interest in those

22 funds—it purely seeks those funds as damages.

23     *Finally*, the proposed injunction's burdens on third-party platforms and co-counsel

24 networks are neither incidental nor curable by judicial management. Plaintiff contends—without

25 any evidence—that its claimed "methodologies" have been "embedded" into SimplyConvert's

26 infrastructure and replicated across "tens of thousands of claims" through dozens of separate

27 firms. *See* proposed injunction at ¶¶ 30–31, 33; Exhibits 59, 69–71. A directive to "disable" or

28 remove unspecified "Archetype information" from those systems cannot be operationalized

without shutting down multi-tenant services, halting unrelated matters, or risking destruction of evidence—precisely the kinds of collateral impacts Rule 65(d) is designed to prevent. Nor can this Court, consistent with Rule 65 and basic due process, impose affirmative obligations on out-of-district vendors and banks that have not been heard and have not been shown to act in concert with any unlawful conduct.

**B.  PLAINTIFF HAS NOT PROVEN DEMONSTRATED IMMINENT IRREPARABLE HARM.**

### 1.  Damages Are a Sufficient Remedy.

Irreparable harm is a critical element, and without a likelihood of irreparable harm, plaintiffs are not entitled to injunctive relief under the traditional or sliding scale approach. *See Cottrell*, 632 F.3d at 1131. A moving party must show that "irreparable injury is likely in the absence of an injunction," rather than the mere "possibility of some remote future injury." *Winter*, 555 U.S. at 22 (citations omitted).

It is black letter law that where money damages will suffice, a plaintiff is not entitled to injunctive relief. *See Lydo Enters. v. Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (explaining that if money damages or other legal relief granted in the ordinary course of litigation can adequately compensate the plaintiff, there is no irreparable injury to warrant a preliminary injunction). Even where there is a risk of future injury due to the alleged use of intellectual property, injunctive relief is not warranted where those injuries can be quantified and money damages will satisfy them in the form of a royalty or other payment. *See Amylin Pharm., Inc. v. Eli Lilly & Co.*, 456 Fed. App'x 676, 678 (9th Cir. 2011) (trade secret damages sufficient even for future infringement); *eBay, Inc. v. MercExchang, LLC,* 547 U.S. 388 (2006) (patent holders not entitled to injunction for future violations where money damages will compensate). So while courts sometimes "presume[] that [a] Plaintiff will suffer irreparable harm if its proprietary information is misappropriated[,]" *W. Directories, Inc. v. Golden Guide Directories, Inc.*, No. C-09-1625, 2009 U.S. Dist. LEXIS 52023, 2009 WL 1625945, at *6 (N.D. Cal. June 8, 2009), a plaintiff must still demonstrate with clear evidence that there is an "immediate threatened *injury* as a prerequisite to preliminary injunctive relief", *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis added).

Here, Archetype's claimed harms are lost fees, deals, and vendor revenue—all quantified by Plaintiff in dollar ranges. They are historical—Archetype cites no evidence of imminent future infractions or misuses. That is the paradigm for damages, not injunctions. So, while Plaintiff merely speculates that it has suffered lost profits and value, both can be remedied through money damages—which is a basis to deny the injunction. *See Calence, LLC v. Dimension Data Holdings, PLC*, 222 F. App'x 563, 566 (9th Cir. 2007).

### 2. Plaintiff's Intentional Delay Undermines Any Question of Imminency of Any Irreparable Harm.

A substantial "delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) (citations omitted). *See also Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (plaintiff's "long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm").

Here, Plaintiff waited over a year before bringing the lawsuit, and then waited over a month after filing the case before seeking this injunction. Four months of delay is sufficient to rebut the inference of imminent harm. *See Hundred Acre Wine Grp. Inc. v. LeRner*, No. 22-cv-07305, 2024 U.S. Dist. LEXIS 46739, at *5 (N.D. Cal. 2024) (holding that roughly four-month delay from obtaining knowing of theft in summer of 2022 to filing for TRO in December 2022 rebutted inference of imminent irreparable harm).

Accordingly, there is simply no credible basis for holding that any alleged harm is imminent and irreparable.

### C.  PLAINTIFF HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.

To prevail on a trade secret misappropriation claim under the Defend Trade Secrets Act, the plaintiff must demonstrate "(1) that defendant possessed a trade secret [belonging to the plaintiff], (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657-58 (9th Cir. 2020).

A trade secret is defined as "all forms and types of financial, business, scientific,

technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing **if**— (A) the owner thereof has taken reasonable measures to keep such information secret; and **(B)** *the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information*." 18 U.S.C. § 1839(3) (emphasis added). One is an owner of a trade secret if one has "rightful legal or equitable title to, or license in, the trade secret." 18 U.S.C. § 1839(4).

### 1.  Plaintiff Has Proven No Protectable Interest – Trade Secret or Otherwise

To prove ownership of a trade secret, plaintiffs "must identify the trade secrets and carry the burden of showing they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993). "The plaintiff 'should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade.'" *Imax Corp. v. Cinema. Techs., Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998). Identifying trade secrets with sufficient particularity is important because defendants need "concrete identification" to prepare a rebuttal. *Imax*, 152 F.3d at 1167. Therefore, a plaintiff must "clearly refer to tangible trade secret material" instead of referring to a "system which potentially qualifies for trade secret protection." *Id*. at 1167 (emphasis in original). Plaintiffs may not simply rely upon "catchall" phrases or identify categories of trade secrets they intend to pursue at trial. *See Imax*, 152 F.3d at 1167; *X6D Ltd. v. Li-Tek Corps. Co.*, No. 10-cv-2327, 2012 WL 12952726, at *6 (C.D. Cal. Aug. 27, 2012). It is inadequate for plaintiffs to cite and incorporate by reference documents that purportedly reference or reflect the trade secret information. *X6D Ltd. v. Li-Tek Corps. Co.*, 2012 WL 12952726, at *6 (internal quotations omitted).

Archetype's motion fails on multiple levels. *First*, it never identifies the confidential information or trade secrets with any particularity. *Second*, under the LLC Agreement (Exhibit

1    1), Schneider's legal work on client matters does not belong to Archetype (a non-law firm).

2    Section 5.4 of the agreement expressly permitted Schneider to participate in other ventures, such

3    as his legal practice, and it is undisputed that Mr. Schneider was not a Manager of Archetype and

4    did not do his legal work in his capacity as a Manager (therefore, his work product did not

5    automatically become Archetype's confidential information), and the absence of an express

6    assignment of Schneider's independent work product undermines any and all of Archetype's

7    ownership claims.

8         *Second*, Archetype adduced no evidence that it expended a dime into developing the

9    things it considers a "trade secret" or that Archetype derived pecuniary gain due to those things

10   being kept secret or confidential. *Id*.

11        And *third*, there is no evidence that any of the 82 exhibits is anything other than publicly

12   available information in the mass tort space, common knowledge in the industry, or Mr.

13   Schneider's own work product in his capacity as a lawyer. Whereas, in fact, the only evidence on

14   this—Mr. Schneider's Declaration—shows that indeed, the things Archetype points to are not the

15   confidential information of Archetype at all. They are either public data that anyone had access

16   to, or they belong to Mr. Schneider as his work product. *See* Schneider Decl. at ¶¶ 9-10.

17        Courts have routinely denied TROs and injunctions where the petitions were not as

18   gossamer thin as this one. *Bankers Life & Cas. Co. v. Sanchez*, No. 2:22-CV-1474, 2022 U.S.

19   Dist. LEXIS 178594, at *3 (D. Nev. 2022) (Mahan, J.) ("Though plaintiffs aver that they risk

20   irreparable harm from defendants' use of allegedly confidential information, plaintiffs have

21   provided nothing to substantiate that claim."); *accord FBC Mortg., LLC v. Broker Sols., Inc.*, No.

22   23-cv-00143, 2023 U.S. Dist. LEXIS 133480, at *14 (N.D. Cal. 2023) (denying TRO for trade

23   secret protection where plaintiff only conclusorily identified trade secrets, but no evidence that

24   anything claimed was the result of money or expense expended by the plaintiff—as opposed to

25   being a generic description, or including things that predated defendant's joining the company or

26   what was publicly available to defendant after he left).

27        Therefore, Archetype cannot seriously contend that it has a protectible interest in the

28   information that would give rise to a right to injunctive relief.

**2.   Plaintiff Has Proven No Concrete Likely Injury—Past or Present.**

Nothing in the TRO papers or evidence demonstrates that anything of value belonging to Archetype was used for profit or to Archetype's detriment. Mere supposition, inuendo or allegations of the disclosure and improper use of trade secrets is itself insufficient. *See Bankers Life & Cas. Co. v. Sanchez*, No. 2:22-cv-1474, 2022 U.S. Dist. LEXIS 178594, at *3 (D. Nev. 2022) (denying TRO for lack of irreparable injury because "While plaintiffs need only show a likelihood—rather than a probability—of irreparable harm, their conclusory allegations of some unauthorized disclosure [of trade secrets] are unavailing.").

Nothing in the documents proves that the things Archetype complains of—funding, settlements, etc.—would not have happened but for Archetype's secret sauce. Given that Archetype never made a million dollars in a single year, and never made any money using these so-called "trade secrets," Archetype's evidence gap is more like a chasm to prove how its data (which it spent zero dollars creating or collecting) is suddenly worth tens of millions.

The notion is laughable.

And the fact that a defendant has a laptop that contains confidential information is not evidence of the type of misappropriation that risks imminent irreparable harm. *Sitrus Tech. Corp. v. Quynh Le*, 600 F. Supp. 3d 1106, 1111 (C.D. Cal. 2022) ("But restored laptops and 'missing' log files that may have never existed in the first place is not enough to show a likelihood of irreparable injury or that injury is imminent."). That is especially so here, where Mr. Schneider's laptop was his own property, used for his own business, and that he has already said that if specific proprietary documents and information were identified, he'd gladly delete it.

**D. If this Court Grants Any Injunctive Relief, It Should Require the Posting of a $5,000,000 Bond.**

Rule 65(c) requires sufficient bond or other security "that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Given the incredible breadth of the injunction, any grant should come with a bond sufficient to compensate Schneider, and all those enjoined, for their losses, damages and

14

attorneys' fees. Schneider estimates that this would be no less than $10 million but would likely exceed that amount substantially.

**V.**

**CONCLUSION**

For the foregoing reasons, the Motion should be denied.

Dated: October 29, 2025                    Respectfully submitted

**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**

*/s/ D. Chris Albright*
D. CHRIS ALBRIGHT #004904
801 South Rancho Drive, Suite D-4
Las Vegas, Nevada  89106
Tel: (702) 384-7111
dca@albrightstoddard.com


MAZIN A. SBAITI
*Pro Hac Vice* forthcoming
Texas Bar No. 24058096
MAS@SbaitiLaw.com
KEVIN N. COLQUITT
*Pro Hac Vice* forthcoming
Texas Bar No. 24075328
KNC@SbaitiLaw.com
**SBAITI & COMPANY PLLC**
2200 Ross Avenue, Suite 4900W
Dallas, Texas 75201
Tel: (214) 432-2899

*ATTORNEYS FOR DEFENDANT*
*ANDREW SCHNEIDER*