# EXHIBIT 1

## [2023-06-28 Operating Agreement of Archetype Capital Partners, LLC]

ole

# OPERATING AGREEMENT

## OF

## ARCHETYPE CAPITAL PARTNERS, LLC

### RESTRICTIVE LEGEND

THE INTERESTS EVIDENCED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION BUT HAVE BEEN ISSUED PURSUANT TO EXEMPTIONS UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, AND THE REGISTERED HOLDERS OF SAID INTERESTS HAVE EXECUTED AN INVESTMENT REPRESENTATION WITH RESPECT THERETO.  FURTHER, THE INTERESTS HAVE NOT BEEN REGISTERED WITH THE SECURITIES COMMISSIONER OF THE STATE OF NEVADA OR ANY OTHER JURISDICTION. ACCORDINGLY, THE SALE, TRANSFER, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF ANY OF SAID INTEREST IS RESTRICTED AND MAY NOT BE ACCOMPLISHED EXCEPT PURSUANT TO THE TERMS HEREOF.

13584839_5

## OPERATING AGREEMENT

### OF

## ARCHETYPE CAPITAL PARTNERS, LLC

This Operating Agreement (this "**Agreement**") is entered into by and among Archetype Capital Partners, LLC, a Nevada limited liability company (the "Company") and each of the Persons executing this Agreement or counterpart signature pages to this Agreement, as Members effective as of June 28, 2023 (the "**Effective Date**"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in Section I hereof or elsewhere in this Agreement.

### Recitals

WHEREAS, the Company came into existence on June 28, 2023, pursuant to a Articles of Domestication from a Florida Corporation to a Nevada Limited Liability Company ("**Articles of Domestication**") and pursuant to Articles of Organization filed on the same date;

WHEREAS, prior to the filing of the Articles of Domestication, the Company was a Florida corporation, originally incorporated on July 27, 2020;

WHEREAS, each of Andrew D. Schneider ("**Andrew**") and Douglas A. Mayer ("**Doug**"); obtained their equity prior to the filing of the Articles of Domestication;

WHEREAS, upon acceptance of the Articles of Domestication, Doug contributed 100% of his equity in Company to Green Oak Capital Investments, LLC ("**Green Oak**"), which contribution is authorized, confirmed, ratified and approved; and

WHEREAS, the parties hereto desire to set forth herein their understandings with respect to the governance of the Company and the transfer of ownership interests therein.

NOW, THEREFORE, for good and valuable consideration, the parties, intending legally to be bound, hereby agree as follows:

### Section I
### Defined Terms

The following capitalized terms shall have the meanings specified in this Section I. Other terms are defined in the text of this Agreement; and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

"*Act*" means the Nevada Limited Liability Company Act, as amended from time to time.

"*Adjusted Balance*" means the Capital Account balance of a Member, increased by any Minimum Gain or Member Nonrecourse Debt Minimum Gain allocable to such Member under Treasury Regulations Section 1.704-2.

"*Adjusted Capital Account Deficit*" means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i) the deficit shall be decreased by the amounts which the Interest Holder is deemed

obligated to restore pursuant to the penultimate sentences in Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii) the deficit shall be increased by the items described in Regulation Section 1.704-1(b)(2)(ii)-(d)(4), (5), and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"*Adjusted Capital Balance*" means, as of any day, an Interest Holder's total Capital Contributions (which includes those previously made by any preceding Member transferor, as the case may be) less all amounts actually distributed to the Interest Holder pursuant to Sections 4.1 through 4.3 hereof. If any Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Adjusted Capital Balance of the transferor to the extent the Adjusted Capital Balance relates to the Interest transferred.

"*Adjusted Capital Contribution*" means, as of any day, an Interest Holder's total Capital Contributions (including the Initial Capital Contribution and any and all other Capital Contributions) less all amounts actually distributed to the Interest Holder pursuant to Section 4.1. If any Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Adjusted Capital Contribution of the transferor to the extent the Adjusted Capital Contribution relates to the Interest transferred.

"*Affiliate*" or "*Affiliated*" means any other Person which directly or indirectly controls or is controlled by or is under common control with such Person, or any Person that is an employee of or an officer of or partner in or serves in a similar capacity or relationship with respect to a Person.

"*Agreement*" means this Operating Agreement, as amended from time to time.

"*Bankruptcy*" means, with respect to a Member, any of the following:

(i) the Member makes an assignment for the benefit of creditors;

(ii) the Member files a voluntary petition of bankruptcy;

(iii) the Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

(iv) the Member files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

(v) the Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's assets;

(vi) the Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (v);

(vii) any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, which continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is stayed, for one hundred twenty (120) days or, if the appointment is stayed, for

one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated.

"*BBA*" means the Bipartisan Budget Act of 2015, P.L. 114-74, as amended from time to time, or any replacement or successor law.

"*Capital Account*" means the account maintained by the Company for each Interest Holder in accordance with the following provisions:

(i) an Interest Holder's Capital Account shall be credited with the Interest Holder's Capital Contributions, the amount of any Company liabilities assumed by the Interest Holder (or which are secured by Company property distributed to the Interest Holder), the Interest Holder's distributive share of Profit and any item in the nature of income or gain specially allocated to such Interest Holder pursuant to the provisions of Section IV (other than Section 4.4.3); and

(ii) an Interest Holder's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Interest Holder, the amount of any liabilities of the Interest Holder assumed by the Company (or which are secured by property contributed by the Interest Holder to the Company), the Interest Holder's distributive share of Loss and any item in the nature of expenses or losses specially allocated to the Interest Holder pursuant to the provisions of Section IV (other than Section 4.4.3).

If any Interest is Transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor (whether that of a Member or an Interest Holder) to the extent the Capital Account is attributable to the transferred Interest. If the book value of Company property is adjusted pursuant to Section 4.4.3, the Capital Account of each Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. It is intended that the Capital Accounts of all Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

"*Capital Contribution*" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject.

"*Capital Proceeds*" means the gross receipts received by the Company from a Capital Transaction.

"*Capital Transaction*" means any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than Capital Contributions, including, but not limited to, a transaction or series of related transactions involving a Transfer of all or substantially all of the consolidated assets and/or Interests of the Company, including without limitation, by means of a merger or other form of corporate or company reorganization; other sales, exchanges or dispositions of Company property not in the ordinary course of business, financings, condemnations, recoveries of damage awards and insurance proceeds.

"*Cash Flow*" means all cash funds derived by the Company from operations of the Company (including interest received on reserves), without reduction for any non-cash charges, but less cash funds used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, repairs, capital expenditures as determined by the Managers; provided however, that Cash Flow shall not include Capital Proceeds. Cash Flow shall also be increased by the reduction of any reserve previously established not applied to operating expenses.

"*Code*" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

"Company" means Archetype Capital Partners, LLC; provided that when used in reference to duties or obligations of Members or Managers, the reference to Company shall be expanded to also refer to Company's Affiliates.

"Fair Market Value" means an amount as determined on no less than an annual basis by the Managers or determined by a qualified third-party appraiser. In the event that a Fair Market Value has not been set within the twelve (12) months prior to an applicable event requiring its use, the parties needing such Fair Market Value shall seek to agree on such valuation by engaging in good-faith negotiation for a period of ten (10) days. If such negotiations are unsuccessful at establishing an applicable value, such determination shall be made by a third-party appraiser jointly selected by the parties whose costs shall be split by the parties.

"Hypothetical Distribution" has the meaning set forth in the definition of Target Capital Account.

"Interest(s)" means a measurement of a Member's Membership Rights, as well as a Member's or Interest Holders' share of the Profits and Losses of, and the right to receive distributions from, the Company.

"Interest Holder" means any Person who holds an Interest, whether as a Member or as an unadmitted assignee of a Member.

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

(i) a Bankruptcy event;

(ii) if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

(iii) the death, incapacity, bankruptcy, retirement, resignation or expulsion of any Member;

(iv) if the Member is a corporation the dissolution of the corporation or the revocation of its charter;

(v) a Member's Interest is levied upon under execution or attached by process of law, or there is entered against a Member an order of any court of competent jurisdiction compelling the transfer of the beneficial ownership of any of such Member's Interest;

(vi) any court issues a decree or order that transfers, confirms, or awards Interests or any portion thereof to that Member's spouse in connection with a divorce or dissolution of the marriage of a Member; or

(vii) if the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the limited liability company.

"Just Cause" means (i) commission of a felony or a crime of moral turpitude against the Company, which causes serious economic injury to the Company, harm to the Company's reputation, prevents Company from obtaining ordinary course financing and/or prevents Company from operating in the ordinary course of business; (ii) commission of fraud or embezzlement directly against the Company; or (iii) intentional and/or material actions or misconduct which has caused serious and demonstrable injury to the Company as determined by the Managers in good faith.

"*Manager(s)*" means the Person or Persons designated as such pursuant to Section V, who manages the business and affairs of the Company, and any Person who becomes an additional, substitute or replacement Manager as permitted by this Agreement.

"*Member*" means each Person signing this Agreement and any Person who subsequently is admitted as a member of the Company, including a Manager, if said Manager is admitted as a member.

"*Member Minimum Gain*" has the meaning set forth in Regulation Section 1.704-(2)(d)(i) for "partner nonrecourse minimum gain."

"*Member Nonrecourse Debt*" means "partner nonrecourse debt" as defined in Treasury Regulation Section 1.704-2(b)(4).

"*Member Nonrecourse Debt Minimum Gain*" means "partnership nonrecourse debt minimum gain" as defined in Treasury Regulation Section 1.704-2(i)(2).

"*Membership Rights*" means all of the rights of a Member in the Company, expressed as a Percentage, including a Member's: (i) Interest; and (ii) right to inspect the Company's books and records.

"*Minimum Gain*" has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Interest Holder in a manner consistent with the Regulations under Code Section 704(b).

"*Negative Capital Account*" means a Capital Account with a balance of less than zero dollars ($0.00).

"*Nonrecourse Deductions*" has the meaning set forth in Regulation Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Regulation Section 1.704-2(c).

"*Nonrecourse Liability*" has the meaning set forth in Regulation Section 1.704-2(b)(3).

"*Percentage*" means, as to a Member, the percentage set forth opposite the Member's name on Exhibit A, as amended from time to time, and as to an Interest Holder who is not a Member, the Percentage of the Member whose Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Member's Interest.

"*Permanent Disability*" shall mean the inability of a Member to perform and give his complete and full attention to his duties for the Company due to illness, accident, injury, physical or mental incapacity, or other disabling cause for a period exceeding one hundred eighty (180) days.

"*Permitted Transferee*" means (i) with respect to a Member who is a natural person, the spouse, legally recognized domestic partner, lineal descendants (but not minor children), of the Member, any trust created solely for the benefit of such Member, the spouse, domestic partner, lineal descendants or of such Member or such Member's estate, any individual retirement account or other tax-deferred account created solely for the benefit of such Member, the spouse, legally recognized domestic partners, lineal descendants of such Member or such Member's estate, any corporation, limited liability company, partnership or other entity in which such Member, the spouse, legally recognized domestic partner, lineal descendants of such Member are the direct and beneficial owners of all of the equity interests (provided such Member, spouse, legally recognized domestic partners, lineal descendants agree in writing to remain the direct and beneficial owners of all such equity interests), or the personal representatives of such Member upon such Member's death for the purposes of administration of such Member's estate or upon such Member's adjudicated incapacity for purposes of the protection and management of the

assets of such Member; and (ii) with respect to a Member who is not a natural person, its Affiliates; provided, however, that any and all of the foregoing identified prospective transferees must meet the Conditions of Transfer.

"*Person*" means and includes any individual, corporation, limited partnership, partnership, association, limited liability company, trust, estate, or other entity.

"*Positive Capital Account*" means a Capital Account with a balance greater than zero.

"*Prime Rate*" means the rate announced from time to time in the Wall Street Journal, in the edition covering the State of Nevada, as its "Prime Rate" (or if the Wall Street Journal Prime Rate is not available on the relevant day, the Company will select a comparable index as a substitute).

"*Profit*" and "*Loss*" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed) the Company's taxable income or loss determined in accordance with the following Code adjustments:

(i) all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

(ii) any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

(iii) any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

(iv) gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes;

(v) in lieu of the depreciation, amortization or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(vi) notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 4.3 hereof shall not be taken into account in computing Profit or Loss.

"*Regulation*" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

"*Resignation*" means, with respect to a Manager or a Member who is also an employee, contractor or service provider to the Company: (i) formal notice to voluntarily cease to perform services on behalf of the Company, (ii) prolonged and unexcused absenteeism, or (iii) a willful dereliction of duties hereunder.

"*Secretary*" means the Secretary of State of the State of Nevada.

"*Target Capital Account*" means, with respect to any Member for any period, an amount (which may be either a positive or a deficit amount) equal to (i) the Hypothetical Distribution that such Member would receive, minus (ii) the Member's share of Minimum Gain determined pursuant to Treas. Reg. § 1.704-2(g) and (iii) the Member's share of Member Nonrecourse Debt Minimum Gain all computed immediately prior to the Hypothetical Distribution described below. The "*Hypothetical Distribution*" to a Member is equal to the amount that would be

received by such Member if all Company assets were sold on the last day of such period for cash equal to their book value, all Company liabilities were satisfied to the extent required by their terms (limited, with respect to each "partner nonrecourse liability" and "partner nonrecourse debt", as defined in Treas. Reg. § 1.704-2(b)(4), to the book value of the assets securing such liability), and the net assets of the Company were distributed in full to the Members as required in accordance with this Agreement, all as of the last day of such allocation period.

"*Transfer*" means, when used as a noun, any voluntary sale, hypothecation, pledge, assignment, attachment, or other transfer, and, when used as a verb, means, voluntarily to sell, hypothecate, pledge, assign, or otherwise transfer.

"*Voluntary Withdrawal*" means a Member's dissociation with the Company by means other than a Transfer or an Involuntary Withdrawal.

## Section II
## Formation and Name: Office; Purpose; Term

2.1. *Organization.* The parties have organized a limited liability company pursuant to the Act and the provisions of this Agreement and, for that purpose, have caused the Articles of Organization to be executed and filed for record with the Secretary.

2.2. *Name of the Company.* The name of the Company shall be "Archetype Capital Partners, LLC." The Company may do business under that name and under any other name or names upon which the Managers select. If the Company does business under a name other than that set forth in its Articles of Organization, then the Company shall comply with the Act.

2.3. *Purpose.* The Company is organized for any purpose as permitted under the Act.

2.4. *Term.* The term of the Company began upon the filing of the Articles of Organization by the Secretary and shall continue in existence perpetually, unless its existence is sooner terminated pursuant to Section VII of this Agreement.

2.5. *Principal Place of Business.* The principal office of the Company in the State of Nevada shall be located at any place which the Managers determine.

2.6. *Registered Agent.* The name and address of the Company's registered agent in the State of Nevada shall be Corporation Service Company, 112 North Curry Street, Carson City, NV 89703.

2.7. *Members.* The name, present mailing address, taxpayer identification number of each Member are set forth on the books and records of the Company.

2.8. *Issuance of Interests.* In connection with the issuance of Interests in the Company, the Members each severally make the following representations to the Company:

(a) he and/or it has sufficient legal capacity to execute this Agreement;

(b) he and/or it has carefully reviewed and understands the risks of, and other considerations relating to, the investment evidenced by the Interests;

(c) he and/or it has been furnished with all materials, if any, which the Member has requested relating to the Company, and the Interests;

(d) the Company has answered all inquiries, if any, that he has put to it concerning the Company or any other matters relating to the issuance of the Interests;

(e) he and/or it has knowledge and experience in financial and business matters

with respect to the Company such that he and/or it is capable of evaluating the merits and risks of the investment evidenced by the Interests and of making an informed investment decision;

(f) he and/or it has had sufficient opportunity to consult with personal advisors including, without limitation, attorneys and accountants;

(g) he and/or it acknowledges that the Interests are not marketable and he and/or it has no need for liquidity in this investment; and

(h) he and/or it is making this investment evidenced by the Interests solely for his and/or its own account and not for the benefit or account of any other person or entity and has no present agreement, understanding, intention or arrangement to sell, resell, assign, transfer or otherwise dispose of all or any part of the Interests to any other Person.

**Section III**
**Members; Capital; Capital Accounts**

3.1. *Capitalization of the Company.*

3.1.1. Upon the execution of this Agreement, the Members have contributed or will contribute to the Company such cash or other property as respectively set forth in the books and records of the Company.

3.1.2. The Interests in the Company shall initially consist of a single class. The Interests established hereby shall have the rights, privileges, preferences and limitations as set forth in this Agreement or in the Articles of Organization as amended from time to time.

3.1.3. The Managers, upon unanimous decision, are authorized and have the sole power and authority to initiate and implement a restructuring of the capitalization of the Company by means of Interest split, reverse split, change in the Interests authorized or outstanding, or other like restructuring, so long as the same does not have any material adverse effect that is prejudicial to the rights, privileges, and preferences of any single Member vis-à-vis the other Members.

3.2. *No Additional Capital Contributions Required.* No Member shall be required to contribute any additional capital to the Company, and no Member shall have any personal liability for any obligation of the Company.

3.3. *No Interest on Capital Contributions.* Interest Holders shall not be paid interest on their Capital Contributions.

3.4. *Return of Capital Contributions.* Except as otherwise provided in this Agreement, no Interest Holder shall have the right to receive the return of any Capital Contribution.

3.5. *Form of Return of Capital.* If an Interest Holder is entitled to receive a return of a Capital Contribution, the Interest Holder shall not have the right to receive anything but cash in return of the Interest Holder's Capital Contribution.

3.6. *Capital Accounts.* A separate Capital Account shall be maintained for each Interest Holder.

3.7. *Loans.* Any Member may, at any time, make or cause a loan to be made to the Company, and in turn the Managers may, on behalf of the Company, borrow monies from any Member, in any amount and on such terms upon which the Managers and the Member agree provided any such loans shall be made on commercially reasonable terms and on an arm's length basis. In addition, the Managers may, on behalf of the Company, borrow monies from third

parties in such amounts and upon such terms as the Managers and the third party agree.

## Section IV
## Distributions; Allocations of Profit and Loss

4.1. *Distributions of Cash Flow and Capital Proceeds.*

4.1.1. *Cash Flow.* Cash Flow, to the extent available, for each taxable year of the Company shall be distributed as determined by the Managers, in their sole discretion, to the Interest Holders on a pro rata basis as follows:

4.1.1.1. First, to all Members making Capital Contributions to the Company, on a pro rata basis in accordance with their respective Adjusted Capital Balances, in an amount equal to all such Capital Contributions;

4.1.1.2. Thereafter, to the Interest Holders in accordance with their respective Percentages.

4.1.2. *Capital Proceeds.* Capital Proceeds shall be distributed at such times as determined by the Managers, in their sole discretion, as follows:

4.1.2.1. First, to pay any outstanding debts, costs, expenses and obligations of the Company (excluding any debts owed to a Member or the Affiliate of a Member);

4.1.2.2. Second, to establish or add reserves in an amount which the Managers deem reasonably necessary to provide for contingent expenditures, contingent liabilities or obligations or maturing obligations with respect to which the Managers determines such reserves to be advisable;

4.1.2.3. Third, to pay principal and unpaid accrued interest on any loans or advances made to the Company by any Member or the Affiliate of any Member;

4.1.2.4. Fourth, one hundred percent (100%) to the Members making Capital Contributions in the amount of their unreturned Capital Contributions

4.1.2.5. Fifth, to the Interest Holders in accordance with their respective Percentages.

4.1.3. To the extent there is Cash Flow available, after taking into account reasonable reserves established by the Managers, the Company may, at the sole discretion of the Managers, make distributions of Cash Flow, if any, to the Members within a reasonable time following the end of any fiscal year of the Company, equal to its reasonable estimate of the cumulative product (for all fiscal years to the extent not distributed) of (i) the excess of (A) the total amount of net income allocated or to be allocated to such Member for each such fiscal year, over (B) the amount, if any, by which the sum of all items of net loss allocated to such Member pursuant to this Section IV for all fiscal years prior to such fiscal year exceeds the sum of all items of net income allocated to such Members for all such prior fiscal years (to the extent such net loss may be carried forward to the current fiscal year for federal income tax purposes assuming that such Member is an individual), multiplied by (ii) the maximum combined federal and state income tax rate in effect from time to time, as determined by the Managers, applicable to the Members (the "**Tax Distributions**") for such fiscal year. The Company may, at the Managers' sole and absolute discretion, remit such distributions quarterly instead of annually. The Managers may periodically establish reasonable reserves on the Company's financial statements for the purposes of assisting the Company to comply with this Section 4.1.3. Any distribution made under this Section 4.1.3 shall be applied to reduce the next distributions of Cash Flow that would otherwise be distributed to such Member without regard to this Section

4.1.3.

4.2. *General Allocation of Profits or Losses.* Profits and Losses shall be allocated among the Members so as to cause each Member's Adjusted Balance (as adjusted for all distributions of Cash Flow during such fiscal year) as of the end of such fiscal year to be, as nearly as possible, equal to the Target Capital Account such that the Hypothetical Distribution that would be distributed to such Member pursuant to this Section IV if, as of the end of such fiscal year, all of the assets of the Company were sold for their book value, all liabilities of the Company were paid in full, as of the end of such fiscal year, and the distributions described in Section 4.1.1 were made to the Members according to Section 4.1.2. The Company shall allocate items of Profit and Loss in the manner described herein for book accounting purposes, as well as for federal income tax purposes. No Member shall be allocated Losses to the extent such allocation causes that Member to have an Adjusted Capital Account Deficit.

4.3. *Liquidation and Dissolution.*

4.3.1    In the event of any liquidation, dissolution or winding up of the Company, either voluntary or involuntary, distributions to the Interest Holders shall be made in the same manner as distributions of Capital Proceeds pursuant to Section 4.1.2.

4.3.2.    No Interest Holder shall be obligated to restore a Negative Capital Account.

4.4. *Regulatory Allocations.*

4.4.1. *Qualified Income Offset.* If an Interest Holder receives (i) an allocation of loss or deduction (or item thereof) or (ii) any distribution, which causes the Interest Holder to have a deficit in his, her or its Adjusted Capital Account Balance at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Interest Holder, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible. This Section 4.4 is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

4.4.2. *Member Nonrecourse Debt.* Notwithstanding any other provision of this Agreement, any item of deduction or expenditures described in Code Section 705(a)(2)(B) that is attributable to a Member Nonrecourse Debt (as defined as "partner nonrecourse debt" in Treasury Regulation Section 1.704-2(b)(4)) of a Member shall be allocated to those Members that bear the economic risk of loss for such Member Nonrecourse Debt, and among such Members in accordance with the ratios in which they share such economic risk, determined in accordance with Treasury Regulation Section 1.704-2(i). If there is a net decrease for a Company taxable year in any Member Nonrecourse Debt Minimum Gain (as defined as "partner nonrecourse debt minimum gain" in Treasury Regulation Section 1.704-2(i)(2)) of the Company, each Member with a share of such Member Nonrecourse Debt Minimum Gain as of the beginning of such year shall be allocated items of gross income and gain in the manner and to the extent provided in Treasury Regulation Section 1.704-2(i)(4).

4.4.3. *Minimum Gain Chargeback.* Except as otherwise provided in Section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Section IV, if there is a net decrease in Company Minimum Gain during any fiscal year, each Interest Holder shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent years) in an amount equal to such Interest Holder's share of the net decrease in Company Minimum Gain, determined in accordance with Section 1.704-2(g) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Interest Holder pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations. This Section 4.4.3 is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

4.4.4.    *Member Minimum Gain Chargeback.* Notwithstanding any other provision of this Section IV except 4.4.2, if there is a net decrease in Member Minimum Gain attributable to a Member Nonrecourse Debt during any Company fiscal year, each Member who has a share of the Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulation Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such year (and if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulation Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to the Members pursuant thereto. The items to be so allocated shall be determined in accordance with Regulation Section 1.704-2(i)(4) and (j)(2). This Section 4.4.4 is intended to comply with the minimum gain chargeback requirement in Treasury Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

4.4.5    *Gross Income Allocation.* In the event that a Member has a deficit Capital Account at the end of any Company fiscal year which is in excess of the sum of (i) the amount the Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount the Member is deemed to be obligated to restore pursuant to Regulation Sections 1.704-2(g) and (i)(5), the Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible.

4.4.6. *Contributed Property and Book-Ups.* In accordance with Code Section 704(c) and the Regulations thereunder, as well as Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Interest Holders so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution). If the adjusted book value of any Company asset is adjusted in the sole discretion of the Manager, pursuant to Regulation Section 1.704-1(b)(2)(iv)(d), subsequent allocations of income, gain, loss, and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Code Section 704(c) and the Regulations thereunder. Allocations pursuant to this Section 4.4.6 are solely for tax purposes and shall not affect the Interest Holders' Capital Accounts.

4.4.7. *Code Section 754 Adjustment.* To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Interest Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that section of the Regulations.

4.4.8. *Nonrecourse Deductions.* Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Interest Holders in proportion to their Percentages.

4.4.9. *Member Loan Nonrecourse Deductions.* Any Member Loan Nonrecourse Deduction for any taxable year or other period shall be specially allocated to the Interest Holder who bears the risk of loss with respect to the loan to which the Member Loan Nonrecourse Deduction is attributable in accordance with Regulation Section 1.704-2(b).

4.4.10. *Withholding.* All amounts required to be withheld pursuant to Code Section 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Interest Holders for all purposes under this Agreement.

4.5. *General.*

4.5.1. Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the Managers.

4.5.2. If any assets of the Company are distributed in kind to the Interest Holders, those assets shall be valued on the basis of their fair market value, and any Interest Holder entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other Interest Holders so entitled. Unless the Managers otherwise agree, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by the Managers. The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 4.2 and shall be properly credited or charged to the Capital Accounts of the Interest Holders prior to the distribution of the assets in liquidation pursuant to Section 4.3.

4.5.3. All Profit and Loss shall be allocated, and all distributions shall be made, to the Persons shown on the records of the Company to have been Interest Holders as of the last day of the taxable year for which the allocation or distribution is to be made. Notwithstanding the foregoing, unless the Company's taxable year is separated into segments, if there is a Transfer or an Involuntary Withdrawal during the taxable year, the Profit or Loss shall be allocated between the original Interest Holder and the successor on the basis of the number of days each was an Interest Holder during the taxable year; provided, however, the Company's taxable year shall be segregated into two or more segments in order to account for Profit, Loss, or proceeds attributable to any extraordinary non-recurring items of the Company.

4.5.4. The Partnership Representative is hereby authorized, upon the advice of the Company's tax counsel, to amend this Section IV to comply with the Code and the Regulations promulgated under Code Section 704(b); provided, however, that no amendment shall materially affect distributions to an Interest Holder without the Interest Holder's prior written consent.

## Section V
## Management: Rights, Powers and Duties

5.1. *Management.*

5.1.1. *Managers.* The Company shall initially be managed by Doug Mayer (the **"Initial Manager"**). The Initial Manager and any subsequent Managers elected by the Members shall hold office until his, her or its death, Resignation or removal pursuant to Section 5.1.5 hereof. The Managers shall have full access to all of the Company's bank accounts and corresponding bank and financial records.

5.1.2. *General Powers.* The Managers shall have full, exclusive and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and all applicable laws, to manage, control, administer, and operate the business and affairs of the Company and its subsidiaries for the purposes herein stated, and to implement the Company's policies and decisions. The approval of a majority of the Managers shall be required with respect to all Major Decisions (as defined below), it being understood and agreed that any one Manager may act on behalf of the Company and its subsidiaries with respect to routine day to day matters of the Company and its subsidiaries and any decisions other than Major Decisions. Notwithstanding the foregoing, in the event the Managers fail to agree or reach a consensus on any Major Decisions requiring their approval ("**Deadlock**"), the Managers shall negotiate in good faith to resolve the Deadlock, and in the event they are unable to resolve the Deadlock for a period of thirty (30) days or a mutually-agreed upon longer or shorter period of time, the matter at issue shall be referred to an expert in the area of the dispute with a view to the matter being resolved as early as possible in the best interests of the Company, and such decision on the matter will be binding on the Managers. If it is not reasonable to appoint an expert to resolve the dispute or the parties are not able to agree on such expert, then so long as Doug Mayer remains a Manager, the position taken by Doug Mashall be deemed the determination of the Managers. The Managers, in keeping with the cordial relationship of good faith and mutual trust that exists between them, shall exercise their best efforts and use their best endeavors to resolve any

misunderstanding, disagreement or dispute in an amicable manner so as to eliminate any discord and avoid any conflict that may result in Deadlock.

5.1.3. *Major Decisions.* Each of the following shall constitute a "**Major Decision**" requiring the consent of a majority of the Managers:

5.1.3.1. Purchasing any stock, partnership interests or other equity interests in any other business or enterprise, or to purchase all or substantially all of the assets of another business or enterprise.

5.1.3.2. Issuance of additional Interests or creation of a new class of Interests.

5.1.3.3. Filing for a voluntary Bankruptcy.

5.1.3.4. Entering into a transaction with a Member, Manager or its Affiliates other than an extension, renewal or continuation of a transaction previously approved.

5.1.3.5. Making any material changes in the nature of the business.

5.1.3.6. Commitment of cash or other resources of the Company to an endeavor or activity other than the business (including but not limited to acquiring assets not reasonably required for the ordinary course of business or lending money other than in the ordinary course of business).

5.1.3.7. Modifying this Agreement.

5.1.3.8. Hiring or terminating any person with a contract that (i) requires more than thirty (30) days' notice to terminate or (ii) requires a penalty or severance compensation to be paid upon termination.

5.1.3.9. Borrowing or lending money other than in the ordinary course of business.

5.1.3.10. Discussing or negotiating a merger, acquisition or sale of all or substantially all of the assets of Company or any subsidiary.

5.1.3.11. Appointment of officers and entering into any contract therewith including compensation.

5.1.4. *Limitation on Authority of Members.*

5.1.4.1. No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.

5.1.4.2. This Section 5.1 supersedes any authority granted to the Members pursuant to the Act. Any Member who takes any action or binds the Company in violation of this Section 5.1 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

5.1.5. *Removal and Replacement of Manager.* An Initial Manager may only be removed by death or incapacity or for Just Cause. In the event there is a vacancy of a Manager, such vacancy may be filled, but otherwise the remaining Managers (if applicable) shall have the authority to manage the Company. In the event that the Initial Manager is unable or unwilling to serve as Manager, one or more Managers shall be appointed by the Members owning a majority

of the Percentages.

5.2. *Meetings of and Voting by Members.*

5.2.1. Meetings of the Members for the transaction of such business as may properly be brought before the Members shall be held on such dates and at such times as may be determined by the Managers. Except as required by non-waivable provisions of applicable law, the Managers shall not be required to convene any meetings of the Members. Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding not less than fifty-one percent (51%) of the Percentages then held by Members constitutes a quorum. A Member may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney in fact. The Members may also take action required or permitted of them without a meeting, without prior written notice and without a vote, if a consent in writing, setting forth such action taken, is signed by the Members holding not less than a majority of the Percentages.

5.2.2. The Members shall have no authority to take, consent to or approve of any action of the Company, other than as required by the non-waivable provisions of the Act or other statute or regulation.

5.3. *Personal Services.*

5.3.1. The Managers shall perform such services and devote such reasonable time to the business and affairs of the Company as is necessary and appropriate to carry out the Manager's duties as set forth in this Agreement; it being understood that the Managers may devote time to interests and activities other than the business of the Company. Upon substantiation of the amount and purpose thereof, the Managers shall be entitled to reimbursement for expenses reasonably incurred in connection with the activities of the Company.

5.3.2. The Managers may, in their discretion, elect officers of the Company (the "**Officers**") with such duties as the Managers, acting unanimously, may determine. An Officer shall remain an officer of the Company unless and until removed by the Managers (with or without cause) or their resignation, death or incapacity, subject to employment agreements and employment manuals. The Officers shall have such duties and powers as determined by the Managers. Designation of an Officer shall not, of itself, create any contractual or employment rights.

5.4. *Duties of Parties.*

5.4.1. Except as otherwise expressly provided in Section 5.4.2 and Section X, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, or of any Affiliate of any Member, to conduct any other business or activity whatsoever, and the Member shall not be accountable to the Company or to any Member with respect to that business or activity. The organization of the Company shall be without prejudice to their respective rights (or the rights of their respective Affiliates) to maintain, expand or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or the Member's Affiliates. The Company and the Members acknowledge and agree that each of the Members is free to, and may continue, to engage, invest and participate in, and otherwise conduct, other businesses and other businesses, both currently existing and in the future.

5.4.2. Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members and their Affiliates. In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms.

5.5. *Liability and Indemnification.*

5.5.1. *Right to Indemnification.* Subject to the limitations and conditions as provided in this Section V, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or arbitrative (hereinafter a "**Proceeding(s)**"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that such Person, or a Person of which such Person is the legal representative, is or was a Member or a Manager shall be indemnified by the Company to the fullest extent permitted by applicable law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, reasonable attorneys' and experts' fees) actually incurred by such Person in connection with such Proceeding, appeal, inquiry or investigation (each a "**Loss**"), unless such Loss shall have been the result of fraud or intentional misconduct by such Person, in which case such indemnification shall not cover such Loss to the extent resulting from such fraud or intentional misconduct. Indemnification under this Section V shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder.

The rights granted pursuant to this Section V shall be deemed contract rights, and no amendment, modification or repeal of this Section V shall have the effect of limiting or denying any such rights with respect to actions taken or any Proceedings, appeals, inquiries or investigations arising prior to any such amendment, modification or repeal.

5.5.2. *Liability of Managers.* Notwithstanding the foregoing, the Managers shall not be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any act performed by the Managers within the scope of the authority conferred on the Managers by this Agreement, except for fraud, willful misconduct, or an intentional breach of this Agreement. All Members acknowledge and agree that (i) the Managers shall have no duties (including any fiduciary duties) to the Company or the Members other than those duties expressly described herein and the Manager's implied contractual covenant of good faith and fair dealing and (ii) so long as the Managers act in a manner consistent with the implied contractual covenant of good faith and fair dealing and with the express provisions of this Agreement, the Managers shall not be in breach of their duties (including fiduciary duties) in respect of the Company and/or any Member otherwise applicable at law or in equity. The provisions of this Agreement, to the extent that they expand, restrict or eliminate the duties and liabilities of the Managers otherwise

13584839_5

existing at law or in equity, are agreed by the Members to replace fully and completely such other duties and liabilities of the Managers.

5.5.3. *Indemnification of Officers, Employees and Agents.* The Company, at the direction of the Managers, may indemnify and advance expenses to an Officer, employee or agent of the Company or any Affiliate to the same extent and subject to the same conditions under which it shall indemnify and advance expenses under Section 5.5.1.

5.5.4. *Nonexclusivity of Rights.* The right to indemnification and the advancement and payment of expenses conferred in this Section V shall not be exclusive of any other right that a Member or the Managers, or other Person indemnified pursuant to this Section V may have or hereafter acquire under any contract, law (common or statutory) or provision of this Agreement.

5.5.5. *Insurance.* The Company may obtain and maintain, at its expense, insurance to protect itself and the Managers, any Officer or agent of the Company who is or was serving at the request of the Company as a manager, representative, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Section V.

5.5.6. *Savings Clause.* If this Section V or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Person indemnified pursuant to this Section V as to costs, charges and expenses (including reasonable attorneys' fees and expenses), judgments, fines and amounts paid in settlement with respect to any such Proceeding, appeal, inquiry or investigation to the full extent permitted by any applicable portion of this Section V that shall not have been invalidated and to the fullest extent permitted by applicable law.

13584839_5

amounts paid in settlement with respect to any such Proceeding, appeal, inquiry or investigation to the full extent permitted by any applicable portion of this Section V that shall not have been invalidated and to the fullest extent permitted by applicable law.

## Section VI
### Transfer of Interests and Withdrawal of Members

6.1. *Transfers.*

6.1.1. *Conditions of Transfer.* Each Member agrees to not voluntarily withdraw from the Company or otherwise dispose of his or her Interest(s) except upon the terms of this Section VI. Except as otherwise provided in Section 6.3, no Person may Transfer all or any portion of or any ownership interest or rights in the Person's Membership Rights or Interests unless (a) the Manager has consented to any such Transfer, which consent may be granted or withheld in Manager's sole and absolute discretion (except in the case of a Permitted Transferee, in which event the Manager has received prior written notice of the intended Transfer and the transferee has complied with Section 6.1.4 below), and (b) the following conditions ("**Conditions of Transfer**") are satisfied:

6.1.1.1. The Transfer will not require registration of Interests or Membership Rights under any federal or state securities laws;

6.1.1.2. The transferee delivers to the Company a written instrument agreeing to be bound by the terms of Section VI of this Agreement.

6.1.1.3. The Transfer will not result in the termination of the Company pursuant to Code Section 708;

6.1.1.4. The Transfer will not result in the Company being subject to the Investment Company Act of 1940, as amended;

6.1.1.5. The transferor or the transferee delivers the following information to the Company: (i) the transferee's taxpayer identification number; and (ii) the transferee's initial tax basis in the Transferred Interest(s); and

6.1.1.6. The transferor complies with the provisions set forth in Section 6.1.4.

6.1.2. *Right to Transfer; Effect of Transfer.* If the Manager consents to such Transfer and the Conditions of Transfer are satisfied, then a Member or Interest Holder may Transfer all or any portion of that Person's Interest and such Person shall become a Member.

6.1.3. *Reasonableness of Prohibition.* Each Member hereby acknowledges the reasonableness of the prohibition contained in this Section 6.1 in view of the purposes of the Company and the relationship of the Members. The Transfer of any Membership Rights or Interests in violation of the prohibition contained in this Section 6.1 shall be deemed invalid, null and void, and of no force or effect. Any Person to whom Membership Rights or Interests are attempted to be transferred in violation of this Section shall not be entitled to vote on matters coming before the Members, participate in the management of the Company, act as an agent of the Company, to the maximum extent permitted by law, receive distributions from the Company or have any other rights in or with respect to the Membership Rights.

6.1.4. *Permitted Transfers.* Subject to the Conditions of Transfer and upon prior written notice to the Company and Manager, any Member may Transfer such Member's Interest(s), or any portion thereof, to any Permitted Transferee who agrees in a writing in form and substance satisfactory to the Company delivered to the Company to be bound by the terms of this Agreement (including, but not limited to, the restrictions on Transfers specified in this Section VI) for all purposes in the same manner as such Permitted Transferee's transferor and to assume the obligations of such transferor hereunder with respect to the transferred Interests.

Immediately after the receipt of the Interests, the Permitted Transferee shall be an Interest Holder for all purposes under this Agreement unless and until such Permitted Transferee becomes a substitute or additional Member under the conditions specified in Section 6.1.1.

6.2. *Voluntary Withdrawal.* No Member shall have the right or power to Voluntarily Withdraw from the Company and any Member who shall Voluntarily Withdraw shall be in intentional breach of this Agreement. No Member who shall Voluntarily Withdraw shall be entitled to receive, in liquidation of his or her Interest(s), pursuant to the Act or otherwise, the fair value of the Member's Interest(s) on the date of Voluntary Withdrawal.

6.3. *Involuntary Withdrawal.* Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawn Member shall thereupon become an Interest Holder but shall not become a Member. The successor Interest Holder shall have all the rights of an Interest Holder but neither the predecessor nor the successor Interest Holder shall be entitled to receive any distribution on account of the Involuntary Withdrawal. The successor Interest Holder may be admitted as a Member of the Company, succeeding to the same Membership Rights as held by the withdrawn Member provided (i) the successor Interest Holder meets all of the Conditions of Transfer; and (ii) the Manager has consented to such admission, which consent may be granted or withheld in Manager's sole and absolute discretion.

6.4. *Indemnification on Transfers.* Any Interest Holder who transfers (the "**Transferring Member**") his, her or its Interest(s), in part or whole, to any Person shall defend, indemnify and hold harmless the other Members (the "**Non-Transferring Members**") from and against any and all claims, causes of action, suits, liability and costs (including reasonable attorneys' fees), judgments and expenses of any kind or character, incurred or suffered by the Non-Transferring Members (or Interest Holders) or the Company relating to or in connection with any Transfer made by the Transferring Member or Interest Holder to any Person, regardless of whether such Transfer was made in contravention of the terms of this Agreement or with the consent of the Non-Transferring Members.

6.5. *Keyman Life Insurance.*

6.5.1. *Purchase and Maintenance of Insurance.* The Company may, to the extent available from nationally recognized insurance companies, if available, purchase insurance on the life of the Managers or any key officer, naming the Company as beneficiary, in an amount determined by the Manager. The Company shall pay all premiums due on the policy.

6.5.2. *Rights of Ownership in Policies.* The Company shall be the sole owner of policies purchased by it, and the Manager hereby agrees not to borrow against such policy, pledge such policy as collateral for loans or otherwise, cancel such policy or take any other actions with respect to such policy inconsistent with the provisions of this Agreement.

6.5.3. *Use of Insurance Proceeds.* The life insurance proceeds paid upon the death of the insured to the Company shall be used by the Company in the discretion of the Manager.

6.6. *Drag Along and Tag Along Rights.*

6.6.1.　　*Drag Along Rights.* Notwithstanding anything contained in this Agreement to the contrary, in the event that the Manager, in its sole discretion, determines that the Company (and accordingly, each and every Member and Interest Holder) shall sell all of the Interests and corresponding Membership Rights of the Company (and of each and every Member and Interest Holder, as the case may be) to a bona fide third party purchaser or purchasers ("**Rights Purchaser**") pursuant to an arm's length transaction, then the Manager shall have the right to require the Members and Interest Holders and any of their respective Permitted Transferees (collectively, the "**Selling Members**") to sell all of their respective Interests and corresponding Membership Rights in the Company to such Rights Purchaser, and the Selling Members shall have the obligation to sell such Interests and corresponding Membership Rights to the Rights Purchaser for a pro rata portion of the aggregate consideration. The Manager shall provide the Selling Members written notice not less than twenty (20) days prior to

any sale triggering this Section 6.6, which notice shall state the purchase price and/or other consideration for the Interests and Membership Rights, and the terms and conditions of the purchase, including payment terms, the closing date and the place and time for closing. By executing this Agreement, the Selling Members designate and irrevocably appoint the Manager as their true and lawful attorney-in-fact, to act on their behalf, in connection with the sale of Interests and Membership Rights pursuant to this Section 6.6.1.

6.6.2. *Tag Along Rights.* In the event that any Member(s) desires to sell any of their Interests and corresponding Membership Rights to a Rights Purchaser (whether or not on arms' length terms), then:

6.6.2.1. The selling Member(s) shall promptly furnish the Company and each other Member of the Company (the "**Remaining Member(s)**") with a "**Tag-Along Notice**", which shall include the terms and conditions of that offer (the "**Offer**").

6.6.2.2. The Remaining Members shall have the right and option (the "**Tag-Along Right**") to require the Rights Purchaser to purchase from each of them a portion of their respective Interests and corresponding Membership Rights, up to the maximum Interests the third party is willing to purchase from the selling Members and Remaining Members, for the same price and upon the same terms and conditions as the Offer, such Tag-Along Right being exercised by written notice to the selling Members given within ten (10) calendar days of the receipt of the Tag-Along Notice. Said exercise notice shall specify the Interests which each Remaining Member proposes to include in such Transfer to the Rights Purchaser and shall include an undertaking by such Remaining Member to Transfer such Interests upon the terms and conditions and on the earliest anticipated closing date set forth in the Offer.

6.6.2.3. Any Remaining Members who exercise Tag-Along Rights shall close any such Transfer within ninety (90) days following the date of the Tag-Along Notice, or the Transfer shall once again be subject to the provisions of this Section 6.6.2.

## Section VII
### Buy-Out Options upon Certain Events

7.1. *Purchase of Interests Upon a Voluntary Withdrawal.*

7.1.1. *Put Option.* Upon the death or Permanent Disability of a Member (a "**Departing Member**"), the personal representative of the Departing Member (and his Permitted Transferees', if any), may, at its option (exercisable by service of written notice ("**Put Notice**") upon the Members (and such Permitted Transferees', if any) within the 30-day period next following the date of the event giving rise to such option (the "**Departing Date**")), sell all or a portion of the Departing Member's (and such Permitted Transferees', if any) Interests, and the Company shall (exercisable by service of written notice upon the Departing Member (and such Permitted Transferees', if any) within the 30-day period next following the date of receipt of the Put Notice) either (i) redeem and purchase all or a portion of the Departing Member's (and such Permitted Transferees', if any) Interests, for an amount equal to the Fair Market Value of the Company multiplied by the Departing Member's (and such Permitted Transferees', if any) Percentage ("**Voluntary Withdrawal Purchase Price**") or (ii) dissolve the Company in the sole and absolute discretion of the Managers (or sole remaining Manager, as the case may be).

7.1.1.1 *Determination of Permanent Disability.* In the event the Departing Member and the other Managers or Members fail to agree regarding the Departing Member's Permanent Disability within sixty (60) days after the date the Departing Member (or other Managers or Members) first claims the Permanent Disability commenced, then the Members hereby agree to submit such dispute to the judgment of a panel of three medical doctors, selected as follows (the "**Panel**"): within thirty (30) days after the end of such period, the Departing Member and the other Managers or Members shall each select one (1) member of the Panel, and within three (3) days after their selection, the members shall agree and appoint the third member of the Panel. Within seven (7) days of the appointment of the third member, the Panel shall

conduct an investigation of the Departing Member's condition and render its opinion. The majority opinion of the Panel regarding the existence of a Permanent Disability shall be conclusive and binding on the parties. In the event the Panel determines that the Departing Member is Permanently Disabled, the Panel shall be required to provide written notice of its findings, including a statement which establishes and sets forth the date the Permanent Disability commenced and the nature of the Permanent Disability. All costs, fees and expenses of the Panel shall be borne equally by the Departing Member and the Company.

7.1.2. *Manner of Payment*. The Interests to be purchased upon a Voluntary Withdrawal pursuant to Section 7.1.1 shall be purchased with the insurance proceeds, if any, pursuant to Section 6.5 ("**Insurance Proceeds**"). The purchase of Interests shall be paid promptly upon receipt of said Insurance Proceeds in one lump sum. If, however, no insurance proceeds are available or paid or are insufficient, then the Voluntary Withdrawal Purchase Price shall be paid in a lump sum or in installments, at the option of the Company, provided that if the Voluntary Withdrawal Purchase Price is paid in installments, such Voluntary Withdrawal Purchase Price shall be paid as follows: (i) the amount of the Insurance Proceeds, if any, shall be paid at the Interest Closing (as defined below), (ii) 80% of the Voluntary Withdrawal Purchase Price of the remaining balance of the Voluntary Withdrawal Purchase Price after applying the Insurance Proceeds shall be paid in cash at the Interest Closing, and (iii) the balance of the Voluntary Withdrawal Purchase Price (after applying the Insurance Proceeds, if any) shall be paid in [twelve (12)] equal quarterly installments commencing upon the first day of the calendar quarter next following the date of the Interest Closing. The principal amount of the balance of the Voluntary Withdrawal Purchase Price remaining from time to time unpaid shall bear interest at the Prime Rate as in effect as of the date of the Interest Closing. The portion of the Voluntary Withdrawal Purchase Price which is not paid on the date of the Interest Closing shall be evidenced by a negotiable promissory installment note made by the Company or the purchasing Member, as the case may be. The Departing Member or his legal representative shall have all the remedies available to the Departing Member at law or in equity to enforce and protect the Departing Member's rights under the note and this Agreement. If, pursuant to this Section 7.1.2, an excess of Insurance Proceeds exists after payment of the Voluntary Withdrawal Purchase Price, the Company shall be entitled to all such excess.

7.2. *Purchase of Interests Upon a Just Cause Event.*

7.2.1. *Purchase Option.* If a Member who is also a Manager, officer, employee, contractor or consultant for the Company (an "**Engaged Person**") is terminated for Just Cause, then the Company shall have the option to purchase all of the Interests of said Engaged Person or its Affiliates (a "**Terminated Member**") (and its Permitted Transferees, if any), and the Terminated Member (and his Permitted Transferees, if any) shall be obligated to sell such Interests to the Company, for a purchase price equal to the lesser of: (i) 80%) of the [Fair Market Value] of the Company multiplied by the Terminated Member's (and such Permitted Transferees', if any) Percentage or (ii) the balance of the Terminated Member's (and such Permitted Transferees', if any) Capital Account as of the date which the Company's rights under this Section 7.2 arise, less any damages or expenses (including reasonable attorneys' fees, if any) incurred by the Company or any other Member as a result of such Just Cause acts committed by the Engaged Person who is a Terminated Member ("**Just Cause Purchase Price**"); provided, that any such purchase and sale in accordance with this Section 7.2 shall also constitute a full buy-out of all the Terminated Member's Interests. For no additional consideration (beyond the Just Cause Purchase Price), all Interests of the Terminated Member not otherwise covered by this Section 7.2.1 shall be assigned to the Members not associated with the Terminated Member.

7.2.2. *Manner of Payment.* The Interests to be purchased upon a Just Cause event pursuant to Section 7.2.1 shall be purchased as follows: 20%) of the Just Cause Purchase Price shall be paid in cash at the Interest Closing (as defined below), and the balance of the Just Cause Purchase Price shall be paid in [twenty (20)] equal quarterly installments, commencing upon the first day of the calendar quarter next following the date of the Interest Closing. The principal amount of the balance of the Just Cause Purchase Price remaining from time to time unpaid shall bear interest at the Prime Rate as in effect as of the date of the Interest Closing. The portion of the Just Cause Purchase Price which is not paid on the date of the Interest Closing shall be evidenced by a negotiable promissory installment note made by the Company. The Terminated Member shall have all the remedies available to the Terminated Member at law or in equity to

enforce and protect the Terminated Member's rights under the note and this Agreement.

7.3. *Purchase of Interests Upon Resignation.*

7.3.1. *Purchase Option.* Upon a Engaged Person's Resignation from the Company who is also a Member (a "**Resigning Member**"), then the Company shall have the option to purchase all of the Interests of the Resigning Member (and its Permitted Transferees, if any), and the Resigning Member (and its Permitted Transferees, if any) shall be obligated to sell such Interests to the Company, for a purchase price equal to [the lesser of: 80% of the Fair Market Value of the Company multiplied by the Resigning Member's (and such Permitted Transferees', if any) Percentage or (ii) the balance of the Resigning Member's (and such Permitted Transferees', if any) Capital Account as of the date which the Company's rights under this Section 7.3 arise] (the "**Resignation Purchase Price**").

7.3.2. *Manner of Payment.* The Interests to be purchased upon a Resignation pursuant to Section 7.3.1, with respect to a Resigning Member, shall be purchased as follows: 20%) of the Resignation Purchase Price shall be paid in cash at the Interest Closing (as defined below), and the balance of the Resignation Purchase Price shall be paid in [twenty (20) equal quarterly installments, commencing upon the first day of the calendar quarter next following the date of the Interest Closing. The principal amount of the balance of the Resignation Purchase Price remaining from time to time unpaid shall bear interest at the Prime Rate as in effect as of the date of the Interest Closing. The portion of the Resignation Purchase Price which is not paid on the date of the Interest Closing shall be evidenced by a negotiable promissory installment note made by the Company. The Resigning Member shall have all the remedies available to him or it at law or in equity to enforce and protect his or its rights under the note and this Agreement.

7.4. *Purchase of Interests Upon Involuntary Withdrawal.*

7.4.1. *Purchase Option.* Upon a Member's Involuntary Withdrawal from the Company (a "**Withdrawing Member**"), then the Company shall have the option to purchase all of the Interests of the Withdrawing Member (and its Permitted Transferees, if any), and the Withdrawing Member (and its Permitted Transferees, if any) shall be obligated to sell such Interests to the Company, for a purchase price equal to 80%) of the Fair Market Value of the Company multiplied by the Withdrawing Member's (and such Permitted Transferees', if any) Percentage, (the "**Involuntary Withdrawal Purchase Price**").

7.4.2. *Manner of Payment.* The Interests to be purchased upon an Involuntary Withdrawal pursuant to Section 7.4.1, with respect to a Withdrawing Member, shall be purchased as follows: 20% of the Involuntary Withdrawal Purchase Price shall be paid in cash at the Interest Closing (as defined below), and the balance of the Involuntary Withdrawal Purchase Price shall be paid in [twenty (20)] equal quarterly installments, commencing upon the first day of the calendar quarter next following the date of the Interest Closing. The principal amount of the balance of the Involuntary Withdrawal Purchase Price remaining from time to time unpaid shall bear interest at the Prime Rate as in effect as of the date of the Interest Closing. The portion of the Involuntary Withdrawal Purchase Price which is not paid on the date of the Interest Closing shall be evidenced by a negotiable promissory installment note made by the Company. The Withdrawing Member shall have all the remedies available to him or it at law or in equity to enforce and protect his or its rights under the note and this Agreement.

7.5. *Interest Closing.* In the event of a purchase of Interests pursuant to this Section VII, the Remaining Members, by written notice addressed to the withdrawn Member, shall fix a closing date for the purchase (the "**Interest Closing**"). The Interest Closing shall not be earlier than ten (10) days or later than sixty (60) days after the later of the date on which the withdrawal occurred or the date on which the Company received notice of the withdrawal.

7.6. *Termination of Status as Member.* From and after the date that a Member ceases to own any Interests, he shall no longer be deemed to be a Member for purposes of this Agreement and all rights he may have hereunder (including, without limitation, the right to exercise any option herein granted) shall terminate. All options herein granted are personal to the respective

optionees and are non-assignable. For the purposes of this Agreement, Interests owned by a Permitted Transferee shall be deemed to be owned by the last Member to own those Interests.

7.7. *Application of Options to Affiliates.* With respect to any Engaged Person who has an Affiliate that is a Member of the Company, the rights and options to purchase the Interests created pursuant to this Section VII shall be attributable to, and applied for the benefit of or against, as the case may be, the Member that is the Affiliate of each of them.

7.8. *Election of Option.* For the avoidance of doubt, the Managers (or such Manager's Affiliates) that is not the subject of any of the purchase options described in this Section VII shall determine, in such Managers' sole discretion, whether the Company shall exercise any of its options hereunder.

## Section VIII
## Dissolution, Liquidation, and Termination of the Company

8.1. *Events of Dissolution.* The Company shall be dissolved upon the happening of any of the following events:

8.1.1. upon the direction or approval of the Managers; and

8.1.2. upon a sale or disposition of all of the Company's assets.

8.2. *Procedure for Winding Up and Dissolution.* If the Company is dissolved, the Managers shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Members to whom bona fide debts are owed, in satisfaction of the liabilities of the Company; second, to the establishment of any reserves which the Managers may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company arising out of or in connection with the Company, which reserves may, at the option of the Managers, be paid over by the Company to an escrow agent, to be held by it for the purpose of disbursing such reserves in payment of any of the aforementioned contingencies, and, at the expiration of such period as the Managers shall deem advisable, for distributing the balance thereunder remaining in the manner hereinafter provided; and third, to the Members in accordance with Section 4.1.2.

8.3. *Filing of Articles of Dissolution.* If the Company is dissolved, the Managers shall promptly file the Articles of Dissolution with the Secretary. If there is no Manager, then the Articles of Dissolution shall be filed by the last Person to be a Member; if there is neither a Manager or a Person who last was a Member, the Articles of Dissolution shall be filed by the legal or personal representatives of the Person who last was a Member.

## Section IX
## Books, Records, Accounting and Tax Elections

9.1. *Bank Accounts.* All funds of the Company shall be deposited in a bank account or accounts maintained in the Company's name. The Managers shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

9.2. *Books and Records.*

9.2.1. The Managers shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company, a copy of the articles of organization and operating agreement and all amendments to the articles and operating agreement; a current list of the names and last known business, residence, or mailing addresses of all Members; and the Company's federal, state or local tax

returns.

9.2.2. The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours.

9.2.3. Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

9.3. *Annual Accounting Period.* The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Managers, subject to the requirements and limitations of the Code.

9.4. *Reports.* Within a reasonable time after the end of each taxable year of the Company, the Managers shall use its reasonable efforts to cause be sent to each Person who was a Member at any time during the accounting year then ended financial reports consistent with reports delivered to other Affiliates of the Managers prepared by the Company's accountants. In addition, within a reasonable time after the end of each taxable year of the Company, the Managers shall use its reasonable efforts to cause be sent to each Person who was an Interest Holder at any time during the taxable year then ended, that tax information concerning the Company which is necessary for preparing the Interest Holder's income tax returns for that year.

9.5. *Partnership Representative.*

9.5.1.     Doug, on behalf of Green Oak is designated as the "partnership representative" under Code Section 6223, as amended by the BBA, and the "tax matters partner" of the Company or any analogous position of the Company under any state, local, or non-U.S. law that is not governed by the BBA. The Person serving as the partnership representative or the tax matters partner of the Company, as applicable, is referred to as the "**Partnership Representative**". In the event, at any time, Doug resigns as Partnership Representative for the Company, the Members shall vote to determine who shall act as the subsequent Partnership Representative for the Company. The exercise and performance of the Partnership Representative's rights and obligations in such capacity shall be at the Company's expense. The Members specifically acknowledge and agree that the Partnership Representative shall not be liable, responsible, or accountable for damages or otherwise to the Company or any Member with respect to any action taken or omitted by the Partnership Representative in good faith in accordance with this Section 9.5.1. The Company shall indemnify and hold harmless the Partnership Representative from and against any loss, expense, damage, or injury suffered or sustained by the Partnership Representative by reason of any acts, omissions, or alleged acts or omissions arising out of the activities taken by the Partnership Representative in good faith on behalf of the Company as Partnership Representative in accordance with this Section 9.5.1.

9.5.2.     The Partnership Representative, with the approval of the Managers, shall have the right to make for the Company any and all elections and take any and all actions that are available to the Partnership Representative or the Company under the BBA (including, without limitation, an election under Code Section 6226, as amended by the BBA), and the Persons who are or formerly were Members shall take such actions requested by the Partnership Representative consistent with any such elections made and actions taken by the Partnership Representative, including, without limitation, filing amended tax returns and paying any tax due in accordance with Code Section 6225, as amended by the BBA. Without limiting the foregoing provisions of this Section 9.5.2, to the extent that the Partnership Representative does not make the election under Code Section 6226, as amended by the BBA, for the Company with respect to an imputed underpayment amount, the Partnership Representative may (i) make any modifications available under Code Section 6225(c), as amended by the BBA, and (ii) require any Person who is or formerly was a Member to file an amended federal income tax return, as

returns.

9.2.2. The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours.

9.2.3. Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

9.3. *Annual Accounting Period*. The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Managers, subject to the requirements and limitations of the Code.

9.4. *Reports*. Within a reasonable time after the end of each taxable year of the Company, the Managers shall use its reasonable efforts to cause be sent to each Person who was a Member at any time during the accounting year then ended financial reports consistent with reports delivered to other Affiliates of the Managers prepared by the Company's accountants. In addition, within a reasonable time after the end of each taxable year of the Company, the Managers shall use its reasonable efforts to cause be sent to each Person who was an Interest Holder at any time during the taxable year then ended, that tax information concerning the Company which is necessary for preparing the Interest Holder's income tax returns for that year.

9.5. *Partnership Representative.*

9.5.1.      Doug, on behalf of Green Oak is designated as the "partnership representative" under Code Section 6223, as amended by the BBA, and the "tax matters partner" of the Company or any analogous position of the Company under any state, local, or non-U.S. law that is not governed by the BBA. The Person serving as the partnership representative or the tax matters partner of the Company, as applicable, is referred to as the "**Partnership Representative**". In the event, at any time, Doug resigns as Partnership Representative for the Company, the Members shall vote to determine who shall act as the subsequent Partnership Representative for the Company. The exercise and performance of the Partnership Representative's rights and obligations in such capacity shall be at the Company's expense. The Members specifically acknowledge and agree that the Partnership Representative shall not be liable, responsible, or accountable for damages or otherwise to the Company or any Member with respect to any action taken or omitted by the Partnership Representative in good faith in accordance with this Section 9.5.1. The Company shall indemnify and hold harmless the Partnership Representative from and against any loss, expense, damage, or injury suffered or sustained by the Partnership Representative by reason of any acts, omissions, or alleged acts or omissions arising out of the activities taken by the Partnership Representative in good faith on behalf of the Company as Partnership Representative in accordance with this Section 9.5.1.

9.5.2.      The Partnership Representative, with the approval of the Managers, shall have the right to make for the Company any and all elections and take any and all actions that are available to the Partnership Representative or the Company under the BBA (including, without limitation, an election under Code Section 6226, as amended by the BBA), and the Persons who are or formerly were Members shall take such actions requested by the Partnership Representative consistent with any such elections made and actions taken by the Partnership Representative, including, without limitation, filing amended tax returns and paying any tax due in accordance with Code Section 6225, as amended by the BBA. Without limiting the foregoing provisions of this Section 9.5.2, to the extent that the Partnership Representative does not make the election under Code Section 6226, as amended by the BBA, for the Company with respect to an imputed underpayment amount, the Partnership Representative may (i) make any modifications available under Code Section 6225(c), as amended by the BBA, and (ii) require any Person who is or formerly was a Member to file an amended federal income tax return, as

described in Code Section 6225(c), as amended by the BBA, to reduce any taxes payable by the Company with respect to such imputed underpayment amount.

9.5.3.    If the Company pays, or is required to pay, any imputed adjustment amount under Code Section 6225, as amended by the BBA, and/or any associated interest or penalties, the Partnership Representative in its discretion may require each Person who is or formerly was a Member to reimburse and otherwise indemnify the Company for such Person's allocable share of such amounts as determined by the Partnership Representative.

9.5.4.    Without limiting the other provisions of this Section 9.5.4, upon demand made by the Partnership Representative, each Person who is or formerly was a Member shall be obligated to pay to the Company such Person's allocable share, as determined by the Partnership Representative, of any amount which the Company may become obligated to pay to any tax partnership in which the Company has an interest with respect to any income tax obligation of such tax partnership, including without limitation, any imputed adjustment amount under Code Section 6225, as amended by the BBA, and/or any associated interest or penalties.

9.6. *Tax Elections*. The Managers shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754. The decision to make or not make an election shall be at the Manager's sole and absolute discretion.

9.7. *Title to Company Property*. All real and personal property acquired by the Company shall be acquired and held by the Company in its name.

### Section X
### Confidentiality; Restrictive Covenants

10.1. *Confidentiality.*

10.1.1. During the term of this Agreement, each party shall, and shall cause its Affiliates, agents or representatives to, hold and keep in strictest confidence, and not use, without the prior written approval of the other party, for their own benefit or the benefit of any party, or disclose to any Person, any confidential or proprietary information of any kind relating to the Company, the Managers, the business of the Company and any and all concepts and creative work developed by the Managers or the Company ("**Confidential Information**"), including, without limitation, non-public intellectual property, information derived from reports, forecasts, financial statements profit and loss statements, research, trade secrets, plans, proposals, codes, marketing information, customer lists, supplier lists, distributor lists, financial projections, cost summaries, pricing formula, marketing studies relating to prospective business opportunities and all other concepts, ideas, materials, or information prepared or performed for or by the Company. The parties shall use Confidential Information solely to perform obligations under and abide by this Agreement and other agreements to which the parties are bound.    All Confidential Information shall remain the sole property of the Company.  The parties covenant to each other that so long as a party remains a Member or Interest Holder of the Company and thereafter for the longest time period permitted under applicable law, neither party shall disclose to any third party any information regarding the terms and provisions of this Agreement or any Confidential Information except as otherwise provided by law.

10.1.2. Notwithstanding the foregoing, the parties shall have no obligation under this Agreement with respect to any Confidential Information disclosed to it which (a) the subject party can demonstrate was already known to it at the time of its receipt hereunder, (b) is or becomes generally available to the public other than by means of the subject party's breach of its obligations under this Agreement, (c) is independently obtained from a third party whose disclosure violates no duty of confidentiality, (d) is independently developed by or on behalf of the subject party without access to or use of or reliance on any Confidential Information furnished to it under this Agreement, and such independent development can be reasonably

evidenced by the subject party, or (e) is disclosed pursuant to applicable law or regulation or by operation of law, provided that the subject party may disclose only such information as is legally required, and provided further that the subject party shall provide reasonable notice to the other party of such requirement and a reasonable opportunity to object to such disclosure.

10.1.3. Each party specifically recognizes that any breach of Section 10.1 hereof by the other will cause irreparable injury to the non-breaching party and the Company and that actual damages may be difficult to ascertain, and in any event, may be inadequate. Accordingly, each party agrees that, in addition to any remedies available pursuant to other agreements to which the parties are bound, in the event of any such breach, the non-breaching party shall be entitled to specific performance and/or injunctive relief, in addition to any and all other legal (monetary damages) and equitable remedies that may be available.

10.2. *Competition*. So long as a Person is a Member of the Company and for twelve (12) months following termination of the Member's ownership of equity in the Company, the Member shall not, directly or indirectly, have an ownership interest in, provide services to, be a director of or a lender to, promote or endorse a business that is competitive with or substantially similar to the Company; provided, however, holdings by a Member and its Affiliates, collectively, of up to a Two Percent (2%) interest in a company that is competitive with or substantially similar to the Company and whose stock is publicly traded shall not violate this provision and holdings in an enterprise that is an Affiliate of the Company shall not violate this provision.

10.3. *Solicitation of Employees, Contractors*. So long as a Person is a Member of the Company and for twelve (12) months following termination of the Member's ownership of equity in the Company, the Member shall not, directly or indirectly, solicit, induce, recruit or encourage any of the Company's employees or contractors to terminate their relationship with the Company or attempt to solicit, induce, recruit, encourage or take away employees or contractors of the Company, either for itself or for any other person or entity. The prohibition of this section shall not bar advertisements of general circulation to which any person may respond, provided the Member responsible for such advertisement took no action(s) to promote, circulate, distribute or, in general, notify the Company's employees or contractors of such advertisement or employment opportunity.

10.4. *Solicitation of Other Parties*. So long as a Person is a Member of the Company and for twelve (12) months following termination of the Member's ownership of equity in the Company, the Member shall not, directly or indirectly, take or make any actions or statements, in any form or medium, to influence any of the Company's clients, licensors, licensees or customers to not purchase the Company's products or services, conduct business or diminish the level of business with the Company or to solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services or contractual relations to any person, firm, company, institution or other entity that provides substantially the same goods or services as does the Company and/or its Affiliates.

10.5. *Non-Disparagement*. No party to this Agreement shall make statements or images, verbal or written, on or through any medium including but not limited to social media, about any other party or Member that disparage or are intended to cause the reputation and image of the subject of such statement or image to be diminished. The foregoing shall not apply to: (i) official filings, such as UCC-1 filings and legal filings in the event of litigation; (ii) internal Company communications between employees or between others working for or on behalf of the Company or (iii) external communications that are made (a) to actual or potential debt or equity investors through customary means, (b) in response to media inquiries, (c) in the ordinary course of business with existing or potential business counter-parties or (d) in the form of press releases concerning developments in the Company's business and operations in the ordinary course, in each case which are based on objective documentation (e.g., financial statements).

## Section XI
## General Provisions

11.1. *Assurances*. Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing and other acts as the Managers deems

appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

11.2. *Notifications.* Any notice, demand, consent, election, offer, approval, request, or other communication (collectively, a "**notice**") required or permitted under this Agreement must be in writing and either delivered personally sent by certified or registered mail, postage prepaid, return receipt requested sent by recognized overnight delivery service or by facsimile transmittal. A notice must be addressed to an Interest Holder at the Interest Holder's last known address on the records of the Company. A notice to the Company must be addressed to the Company's principal office. A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it is delivered. A notice that is sent by mail will be deemed given three (3) business days after it is mailed. A notice sent by recognized overnight delivery service will be deemed given when received or refused. A notice sent electronically shall be deemed given when sent .Any party may designate, by notice to all of the others, substitute e-mail addresses, addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute e-mail addresses, addresses or addressees.

11.3. *Amendments.* Except as otherwise stated to the contrary in this Agreement, the Managers shall not, without the approval of all of the Members, amend, modify, or supplement this Agreement in any manner that is materially adverse to the rights, preferences, priorities, and benefits afforded to the Members. Notwithstanding any provisions of this Agreement to the contrary, the following amendments to this Agreement shall be permitted and may be made by the Managers: (i) amendments which are of a clerical or inconsequential nature; (ii) amendments which may be required to comply with the Act, (iii) amendments which do not adversely affect the rights, obligations, benefits and burdens of the Members in any material respect; (iv) amendments which effectuate the terms and provisions of this Agreement or are otherwise required or contemplated by this Agreement, including, without limitation, amendments necessary to reflect the admission, substitution or withdrawal of a Member that is otherwise permitted by this Agreement or the change in the name of the registered agent, the address of the registered office or the address of the office at which Company records are kept; and (iv) amendments which are necessary in order to comply with laws, statutes, administrative rulings, rules, regulations, orders, decrees, judgments, arbitration awards and the like, which are applicable to the Company or its Members.

11.4. *Specific Performance.* The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

11.5. *Complete Agreement.* This Agreement constitutes the complete and exclusive statement of the agreement among the Members. It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty. Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

11.6. *Applicable Law.* All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Nevada.

11.7. *Section Titles.* The headings herein are inserted as a matter of convenience only, and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

11.8. *Binding Provisions.* This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

11.9. *Jurisdiction and Venue.* Any suit involving any dispute or matter arising under this Agreement involving the Members or Managers may only be brought in the state or federal courts located in Tampa, Florida. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

11.10. *Terms.* Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require.

11.11. *Separability of Provisions.* Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

11.12. *Counterparts.* This Agreement may be executed simultaneously in multiple counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart. Signatures provided by facsimile or email transmission shall be deemed to be and shall have the same force and effect and be binding on the party transmitting same, as an original.

11.13. *No Partnership Intended for Non-tax Purposes.* The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either the Nevada Revised Uniform Partnership Act or the Nevada Revised Uniform Limited Partnership Act, or any other partnership law. The Members do not intend to be partners to one another, or partners to any third party by virtue of entering into this Agreement. No Member, by word or action, shall represent to another person that any other Member is a "partner" or that the Company is a "partnership."

## {SIGNATURE PAGE FOLLOWS}

☐       IN WITNESS WHEREOF, the parties have executed, or caused this Operating Agreement to be executed as of the date set forth hereinabove.

COMPANY:                                        MEMBERS:

ARCHETYPE CAPITAL PARTNERS, LLC

By: _____               _____
Douglas A. Mayer, Manager                   Andrew D. Schneider

                                                Green Oak Capital Investments, LLC

                                                By: _____

Douglas A. Mayer, Manager

⬜

**ARCHETYPE CAPITAL PARTNERS, LLC**
**OPERATING AGREEMENT**

<u>**EXHIBIT A**</u>

**LIST OF MEMBERS AND PERCENTAGE INTERESTS**
(as of June 28, 2023)

| Members | Percentage Interest | Units |
|---|---|---|
| Andrew D. Schneider | 19% | 11.729 |
| Green Oak Capital Investments, LLC | 81% | 50 |

13584839_5