D. CHRIS ALBRIGHT, ESQ. (4904)
KYLE W. FENTON, ESQ. (16235)
**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**
801 South Rancho Drive, Suite D-4
Las Vegas, Nevada  89106
T: (702) 384-7111 / F:  (702) 384-0605
dca@albrightstoddard.com
kfenton@albrightstoddard.com

MAZIN A. SBAITI
*Pro Hac Vice* pending
KEVIN N. COLQUITT
*Pro Hac Vice* pending
Texas Bar No. 24072047
**SBAITI & COMPANY PLLC**
3102 Maple Avenue, Suite 400
Dallas, Texas 75201
Tel: (214)432-2899/Fax: (214)853-4367
mas@sbaitilaw.com
knc@sbaitilaw.com

***ATTORNEYS FOR DEFENDANT***
***ANDREW SCHNEIDER***

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ARCHETYPE CAPITAL PARTNERS, LLC,<br>A Nevada limited liability company,<br><br>  *Plaintiff*,<br><br>v.<br><br>BULLOCK LEGAL GROUP, LLC, a<br>Georgia limited liability company, and<br>ANDREW SCHNEIDER, an individual<br>residing in Texas,<br><br>  *Defendants*. | CASE NO. 2:25-CV-01686-JCM-BNW<br><br>**DEFENDANT ANDREW**<br>**SCHNEIDER'S MOTION TO**<br>**DISMISS UNDER RULE 12(b)(6)**<br>**AND RULE 9(b)** |

Albright Stoddard
Warnick & Albright

**TABLE OF CONTENTS**

I.    Introduction.................................................................................................................1

II.   Legal Standard ...........................................................................................................2

III,  Background ................................................................................................................3

IV.   Argument & Authorities ............................................................................................5

    A.   Count I Should be Dismissed—Schneider Owed No Fiduciary to Plaintiff ...............5

    B.   Count III for Breach of Contract Should be Dismissed ...............................................7

    C.   Counts VII and VIII for Trade Secret Violations Should be Dismissed.....................10

    D.   Counts IX and XI Should Be Dismissed ...................................................................14

    E.   Count X for Conspiracy Should Be Dismissed .........................................................16

V.    Conclusion ...............................................................................................................18

**TABLE OF AUTHORITIES**

**Cases**

*Althaus v. Hall*, 534 P.3d 137 (Nev. 2023) ..................................................................9

*Aristocrat Techs., Inc. v. Light & Wonder, Inc.*, No. 2:24-cv-00382, 2024 U.S. Dist. LEXIS 110410 (D. Nev. 2024) ..................................................................11

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................. *passim*

*Banq, Inc. v. Purcell*, No. 2:22-cv-00773-APG-DJA, 2025 U.S. Dist. LEXIS 145125 (D. Nev. July 29, 2025).................................................................................................. 11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................. *passim*

*Buzz Stew, LLC v. City of. Las Vegas*, 181 P.3d 670 (Nev. 2008) ................................. 16

*Custom Teleconnect, Inc. v. Int'l Tele-Services, Inc.*, 254 F.Supp.2d 1173 (D. Nev. 2003).........15

*Davidson v. Sprout Foods,* 106 F.4th 842 (9th Cir. 2024)...........................................3

*FLS Transp. Servs. v. Casillas*, 2017 U.S. Dist. LEXIS 150741 (D. Nev. Sept. 18, 2017) ..........14

*Frantz v. Johnson*, 116 Nev. 455, 464-65, 999 P.2d 352 (2000).....................................14

*Guzman v. Johnson*, 483 P.3d 531 (Nev. 2021)..............................................................5

*IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581 (7th Cir. 2002)...........................11, 12

*Imax Corp. v. Cinema. Techs., Inc.*, 152 F.3d 1161 (9th Cir. 1998)........................11, 12

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653 (9th Cir. 2020) ...................10,11, 12

*Jordan v. State ex rel. DMV & Pub. Safety*, 121 Nev. 44 (Nev. 2005) .........................16

*Menalco v. Buchan*, 2010 WL 428911 (D. Nev. 2010) ..............................................14, 15

*Montgomery v. eTreppid Tech., LLC*, 2008 WL 942524 (D. Nev. 2008)...................................15

*Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983 (S.D. Cal. 2012) ......................................11

Sciara v. Micamp Sols., LLC, Case No. A-20-824100-B, 2022 Nev. Dist. LEXIS 379 (Nev. Dist. Ct. Feb. 24, 2022)..............................................................................16

*Sky L. Grp. v. Pllc.*, No. 2:23-cv-1793-CDS-MDC, 2025 U.S. Dist. LEXIS 83577 (D. Nev. Feb. 25, 2025)........................................................................................14

*Zookin v. CSAA Gen. Ins. Co.*, No. 2:24-cv-00914-GMN-MDC, 2025 U.S. Dist. LEXIS 51210 (D. Nev. Mar. 19, 2025)..........................................................................................10

**Statutes**

18 U.S.C. §§ 1839.........................................................................................................................11

Nev. R. Stat. Ann. § 86.298..........................................................................................................5

**Rules**

Fed. R. Civ. P. 8(a)(2).....................................................................................................................2

Fed. R. Civ. P. 9(b) ...........................................................................................................3, 16, 17

Fed. R. Civ. P. 12(b)(6)..........................................................................................................2, 10, 11

Albright Stoddard
Warnick & Albright

## I.    INTRODUCTION

Defendant Andrew Schneider respectfully moves to dismiss the entire Complaint under Rule 12(b)(6).[1] Plaintiff's sprawling pleading and TRO papers attempt to recast a business divorce as a trade-secret and tort case. Looking to the narrative as pled, the claims against Andrew Schneider are long on conclusions and short on actionable facts. They all fail Rule 8 and *Twombly/Iqbal* because the Complaint never identifies any protectable trade secret, how it derives independent value for the company, or how Schneider improperly acquired or used it.

Instead, Plaintiff conclusory points to vague "systems," "frameworks," intake checklists, injury tiers, and settlement templates that are commonplace in the mass-tort bar, publicly available, pre-existing, and would constitute Schneider's own *legal* work product if they had been deployed. Mass tort cases are filed in public courts, the criteria for a compensable case is well known and public. Defendants settle for the risk they perceive. The key to a mass torts case is no secret: one needs a strong scientific foundation for general and specific causation, a diagnosis, good evidence of exposure and injury, effective advocacy and a viable defendant—these carry the day every time. The idea that there is a "secret sauce" is laughable. For this Complaint to claim that a supposed *funder* of law firms—but who never funded a thing—should get credit for a successful tort matter that was already in actual litigation, and to suggest that its trade secret "formulas" caused another funder to dispense money it otherwise would not have loaned out, is patently absurd. In short, there is no plausible inference that these supposed secret information were not publicly known, that Archetype derived "independent value" from them, or misappropriation or use to support a trade secret claim.

Where specificity does appear, it undermines the claims: Archetype alleges Schneider put an NDA in place before sharing information with Bullock Legal, acted with Mayer's knowledge to facilitate collaboration, and memorialized roles through standard agreements—facts that sound in authorized conduct, not actionable wrongdoing. The materials attached to the TRO further underscore this point.

---

[1] This motion is made without prejudice to, and only in the event that the Motion to Dismiss for Improper Venue or Transfer Venue, filed contemporaneously herewith, is denied for any reason.

The non-trade-secret claims fare no better. The contract claims do not identify a specific unauthorized disclosure or use in violation of a defined covenant that "caused" any injury or loss. Under Nevada law and the Operating Agreement, Schneider was a Member—not a Manager—and the agreement's confidentiality language does not create an extra-contractual fiduciary duty. The fiduciary duty claim is duplicative of the contract claim and barred by the economic loss rule. The implied covenant claim is likewise redundant of the express contract claim. And to the extent Plaintiff relies on a 12-month non-compete/non-solicitation against a practicing lawyer, that restraint is not only not contemplated by the Operating Agreement's plain terms, it is unenforceable as a matter of public policy. The contract, interference and conspiracy counts are preempted by the Nevada Uniform Trade Secrets Act because they rest on alleged misuse of confidential information and, in any event, are pleaded in conclusory fashion without any identified prospective relationship, wrongful means independent of the trade-secret theory, or non-speculative harm. And the fraud-based conspiracy count lacks the who, what, when, where, and how Rule 9(b) demands.

Plaintiff's remedial allegations confirm the pleading defects. The Complaint invokes RICO's civil remedy in its jurisdictional paragraph despite pleading no RICO count. And the damages theory is the sort of conjectural "lost opportunity" narrative that *Twombly* and *Iqbal* do not permit—particularly given that Archetype never closed a single mass-tort funding deal and cannot plausibly claim millions in losses for funding opportunities it did not even have the money on hand to close and fund.

For these reasons, the Complaint should be dismissed under Rule 12(b)(6) and Rule 9(b), with prejudice.

## II. LEGAL STANDARD

The Federal Rules of Civil Procedure requires a plaintiff to plead "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal is appropriate under Rule 12(b)(6) when a pleader fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). A pleading must give fair notice of a legally cognizable claim and the grounds on which it rests, and although a court must take all factual allegations as true, legal

-2-

conclusions couched as factual allegations are insufficient. *Twombly*, 550 U.S. at 555. Accordingly, Rule 12(b)(6) requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

Rule 9(b) requires that a plaintiff "alleging fraud or mistake…state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) requires that a party plead fraud with particularity, which means that the complaint must identify the who, what, when, where, and how of the misconduct charged as well as the specific statement, that is was relied on, and what is false or misleading about the purportedly fraudulent statement and why. *Davidson v. Sprout Foods,* 106 F.4th 842, 853 (9th Cir. 2024).

### III.   BACKGROUND

Andrew Schneider co-founded Archetype Capital Partners in 2020 with Douglas Mayer and, throughout his association with the company, balanced company work with his separate legal practice as settlement counsel in mass torts. Schneider's role was as a Member—not a Manager—under the Operating Agreement, and his participation in outside ventures was expressly contemplated by the Agreement § 5.4.1, which preserved members' rights to engage in other business activities subject to confidentiality limitations. Compl. ¶¶ 27, 29.

Archetype's business was supposed to be a litigation funder to law firms, primarily in the mass tort space. As the Court is aware, the mass tort space involves thousands, sometimes tens of thousands, of personal injury cases consolidated into a few venues. The cases are publicly filed, and the leading firms are keen to be referred more cases for settlement—meaning, they generally and freely share the criteria that they adopt for a compensable case. These criteria are derived from scientific research into general and specific causation and latency, damages associated with

-3-

particular injuries, among other things. While firms may vary in their risk tolerances, the core issues of which cases are likely to be successful passing *Daubert* and at trial, and what damages can be expected for which cases tend to coalesce in the market—as one would expect.

Schneider's separation from Archetype began in December 2024. He resigned on December 22, 2024, tendering his interest and informing Mayer he would retain his laptop because it contained his own legal work product. Although Archetype later asserted that it did not accept his voluntary withdrawal until February 18, 2025, the contemporaneous communication and timing of his resignation are undisputed in the Complaint. Compl. ¶ 42.

Against that backdrop, Schneider is alleged to have worked to formalize relationships with Bullock Legal Group ("BLG"), a mass tort form in Georgia, from whom he obtained execution of a Non-Disclosure Agreement in May 2024. Compl. ¶¶ 44–47, 49–50, 52–55. The Complaint further admits that Mayer approved Schneider serving as "Settlement Counsel" to BLG, understanding that Schneider's insider perspective could help Archetype remain involved in BLG's funding and claims review processes. Compl. ¶ 60. Consistent with that authorization, Schneider and BLG memorialized his settlement-focused role in a Joint Venture Agreement on September 27, 2024, that delineated narrowly tailored "Settlement Counsel Activities," including preparing a settlement framework, participating in negotiations, and strategic modeling—quintessential legal work in furtherance of settlement, Compl. ¶¶ 61–62.

The Complaint's narrative also alleges that BLG—an independent law firm—pursued and secured its own financing arrangements. It alleges BLG executed a term sheet with Calumet Capital for $20 million in November 2024 and that multiple term sheets totaling more than $100 million were exchanged with other funders, ultimately resulting in BLG signing with Calumet. Compl. ¶ 74. That account demonstrates BLG's autonomous funding path and undermines any suggestion that Archetype was the indispensable source of financing. The Complaint fails to aver that but-for anything Schneider did, BLG would have signed with Archetype (as opposed to one of the other suitors) and that Archetype would have had the funds to do the BLG deal.

The Complaint further claims that BLG's settlement negotiations and fees entitle it to damages because those resulted from misuse of its proprietary information and materials. Nothing

-4-

in the Complaint suggests or explains how anything that would have belonged exclusively to Archetype *caused* BLG to enter into settlement discussions with a mass-tort defendant—or how those would or could have affected the outcome of those negotiations.

The Complaint further asserts that SimplyConvert, BlueKey Tek, Litpro, and Milestone were engaged by BLG to provide intake, data processing, lien resolution, and qualified settlement fund administration, respectively, as part of BLG's end-to-end settlement operations—services that competed with what Archetype *hoped* to build but had not commercialized in the least. Compl. ¶¶ 66–73, 77–81.

## IV.    ARGUMENT& AUTHORITIES

### A. COUNT I SHOULD BE DISMISSED—SCHNEIDER OWED NO FIDUCIARY DUTY TO PLAINTIFF

Count I of the Complaint alleges that Schneider breached fiduciary duties to Plaintiff. The elements of a claim for breach of fiduciary duty under Nevada law are: "(1) existence of a fiduciary duty, (2) breach of the duty, and (3) damages as a result of the breach." *Guzman v. Johnson*, 483 P.3d 531, 538 (Nev. 2021). Here the Complaint fails to adequately plead the first element.

While the Complaint does aver that Schneider owed a fiduciary duty to Plaintiff, the allegation is based on a misreading of the Operating Agreement and a misapplication of the law.

In the context of a limited liability company, Nevada law imposes fiduciary duties only on managers and managing members. Nev. R. Stat. Ann. § 86.298. The Complaint alleges that Schneider was a member of Archetype partners, not a manager nor managing member. Complaint, ¶ 9, 13. The Operating Agreement itself confirms this. Thus, no duty is imposed by law.

The Complaint contends that Sections 5.4 and 10 "expressly prescribe" the fiduciary duties of "utmost good faith and loyalty, confidentiality, and non-use of Archetype Partners' Trade Secrets and Confidential Information" on Schneider. *See* Complaint, ¶ 85. Not true.

*First*, the terms "utmost," "good faith," and "loyalty" appear no where in the Operating Agreement, let alone in sections 5.4 and 10. In fact, the only "fiduciary" obligations referenced in the Operating Agreement are in Section 5.5.2, where the duties of the "Managers"—not Members—are set forth, and on page 6, where an "Involuntary Withdrawal" is defined to include "the distribution of the fiduciary of the estate's entire interest in the limited liability company" "if the

-5-

member is an estate," which is not in any way implicated by the allegations in the Complaint.

Count I alleges that Plaintiff owed a fiduciary duty to put the interest of Archetype ahead of his own, to bring business opportunities to the Archetype, and to preserve and enhance Archetype's earning power even if doing so conflicted with Plaintiff's personal interests. But nothing in the Agreement says that. And Section 5.4.1 permits Schneider to engage in other businesses and not share those opportunities, or the profits derived therefrom with Archetype. The fiduciary duties that Plaintiff claims were breached simply don't exist.

Instead, the "duties" that Plaintiff relies on (confidentiality and a non-compete) are purely contractual in nature and not fiduciary. Because the Complaint does not adequately plead facts that provide a plausible basis for the existence of a fiduciary duty, Count I should be dismissed.

Moreover, the Complaint also does not plausibly allege a breach of any fiduciary duty during a period when such duties were owed. Plaintiff concedes Schneider tendered his resignation on December 22, 2024, and that his withdrawal was "formally" accepted on February 18, 2025. *See* Complaint, ¶ 42. But the Complaint nowhere pleads particularized facts tethering any alleged act of "self-dealing," "usurpation," or "diversion" to the period before February 18, 2025, when fiduciary duties allegedly existed. Instead, it offers generalized timetables and labels. For example, it alleges that in "late September and early October 2024" Schneider "began sending" information to Bullock Legal, and that in "October and November 2024" he sent "additional" methodologies. Complaint, ¶¶ 58, 64.

But it does not identify a single concrete opportunity that was presented to Schneider while a fiduciary, that belonged to Archetype, that he rejected on Archetype's behalf, and then personally exploited. The centerpiece business arrangements—Bullock Legal's November 2024 refinancing, the November 23, 2024, and January 7, 2025, SimplyConvert agreements, and Schneider's January 2025 underwriting services for SimplyConvert—either post-date or straddle the resignation window, and are pleaded as authorized, NDA-protected collaboration or post-withdrawal acts, not fiduciary self-dealing. Complaint, ¶¶ 44–49, 60, 65–72, 77–79. Absent well-pled facts showing a specific, pre-withdrawal corporate opportunity within Archetype's line of business that Schneider appropriated for himself, the usurpation/loyalty theory is not plausible.

**B.** **C**OUNT **III** FOR **B**REACH OF **C**ONTRACT **S**HOULD **B**E **D**ISMISSED

Count III cites four contractual covenants—non-solicitation, non-compete, confidentiality, and non-disclosure, Complaint, ¶ 102, but the pleaded facts do not plausibly show a claim based upon the breach of any of them.

### 1. Solicitation

Section 10.3 bars soliciting Archetype's employees and contractors. The Complaint alleges none. Section 10.4 prohibits influencing any "client[], licensor[], licensee[] or customer[]" to divert business to an entity that "provides substantially the same goods or services" as Archetype. The only alleged diversion is to SimplyConvert, Complaint, ¶¶ 66–67, which the Complaint itself describes as "a technology platform for client data housing, document housing and settlement administration[.]" Complaint, ¶ 66. Archetype, by contrast, is a litigation funder—which the Complaint very charitably describes as providing "models for underwriting and reviewing litigation, claims, and lending for mass tort litigation[.]" Complaint, ¶ 21. To whom has it ever provided one of these? It never says. Has it ever made a dime providing such models? Not once. In any event, absent well-pled facts that SimplyConvert provides "substantially the same goods or services" as Archetype, Section 10.4 is not implicated. The solicitation theory therefore fails.

### 2. Non-Compete

Section 10.2 prohibits a Member from having an ownership interest in, providing services to, serving as a director or lender to, or promoting/endorsing a business that is "competitive with or substantially similar to" Archetype. The Complaint points to two entities: SimplyConvert and Bullock Legal. As to SimplyConvert, the Complaint's own description of it as a data/document/settlement-administration platform does not plausibly render it "competitive with or substantially similar to" Archetype's alleged underwriting and lending-model business. As to Bullock Legal, it is a law firm, and the Complaint nowhere alleges that Archetype practices law or offers legal services. The pleading thus fails to allege facts showing either entity is a competitor or substantially similar to Archetype, which is a necessary predicate to any Section 10.2 violation.

It also does not allege the elements enumerated by Section 10.2—e.g., that Schneider held an ownership stake in SimplyConvert or Bullock Legal, served as a director or lender, or "promoted

or endorsed" a competitor in any specific way while he was a Member.

On these allegations, the non-compete theory is not plausible.

### 3. Confidentiality/Non-Disclosure

Even crediting the Complaint's narrative, the confidentiality claim is pleaded at too high a level of generality to satisfy *Twombly*/*Iqbal*. The pleading recites that Section 10 required Schneider to hold "Confidential Information" in strict confidence and not use or disclose it without Mayer's prior written approval, Complaint, ¶ 26, and then asserts—without specifying the content, timing, audience, or permission status—that Schneider "wrongfully disclos[ed] Archetype Partners' Trade Secrets and Confidential Information to Bullock Legal and other third parties." Complaint, ¶ 104(a).

Again, what confidential information is this? The Complaint vaguely avers "systems," "frameworks," intake checklists, injury tiers, and settlement templates that are commonplace in the mass-tort bar and are publicly available. These mass tort cases are publicly filed. The Complaint fails to aver a plausible basis for inferring how the information is confidential, what the "systems" and "frameworks" actually are, and how these are not commonplace to those in the mass tort space. Spoiler alert: they are very well known. One need only Google the mass tort, call one of two dozen mass tort marketing outfits, or even call a mass tort firm and simply ask for the criteria.

Setting that aside, the Complaint also alleges that, as Archetype's representative, Schneider required Bullock Legal to execute an NDA before sharing any information and then "began working with Bullock Legal and providing information" under that NDA. Complaint, ¶¶ 53–55, 44–49. Therefore, how did Schneider breach a duty?

It also alleges that after Schneider withdrew, Mayer agreed Schneider "should work with Bullock Legal as Settlement Counsel" and contemplated that having Schneider "as an insider would also help Archetype Partners stay involved[.]" Complaint, ¶ 60. Against that backdrop, the Complaint never pleads the essential fact that any particular disclosure to any identified recipient occurred "without the prior written approval of Mayer," much less identifies the document, date, or circumstance showing a lack of authorization. The absence of concrete allegations tying a specific communication, containing identified confidential content, to a lack of required written approval leaves the Court with conclusory labels rather than plausible facts.

The Complaint's effort to fill this gap by invoking broad, catch-all categories of "trade secrets and confidential information" underscores the deficiency. The definition it relies on sweeps in dense and heterogeneous materials—customer and investor lists, methodological frameworks, pre-use presentations and marketing materials, and investment memoranda prepared for distribution. Complaint, ¶ 23(a)–(n). But the pleading never alleges what Schneider disclosed, when, to whom, and under what contractual regime (e.g., under the Bullock Legal NDA or a similar protective arrangement).

For example, the allegation that "in late September and early October 2024, Schneider began sending Bullock Legal Archetype Partners' Trade Secrets and Confidential Information[,]" Complaint, ¶ 58, is pure conclusion. It is silent as to the specific documents or data sent, whether those materials had already been shared under the NDA, whether Mayer's written approval was sought or obtained, or how the alleged sharing exceeded the scope of the NDA that Schneider himself put in place. Complaint, ¶¶ 44–49, 53–55. Likewise, the conclusory assertion that Schneider "continued to use his Archetype Partners' computer" and "fail[ed] to return" information, Complaint, ¶¶ 79, 104(b)–(c), alleges possession, not a breach of the confidentiality covenant's non-use/non-disclosure obligations.

Finally, the Complaint never identifies an injury proximately caused by any disclosure. The Complaint claims damages from lost funding opportunities—but never ties them to the alleged breach. The Complaint does not even allege a basis to conclude that but-for the breach, Archetype would have been selected as the funder and would have had the money available to loan out the funds—and that those funds would have returned with a profit. *Althaus v. Hall*, 534 P.3d 137 (Nev. 2023) (noting that in Nevada, breach of contract requires proof of proximate cause—cause in fact or but-for causation, and foreseeability). Similarly, Archetype does not plead a basis for causation and damages—other than wishful speculation—arising from the alleged disclosure to Bullock Legal.

Without non-conclusory facts delineating a concrete unauthorized disclosure or use in violation of Section 10, the Court cannot conclude th distinguish contractually permitted collaboration from breach.

-9-

#### 4. Good Faith & Fair Dealing

Count IV recites the implied covenant but does not allege the necessary predicate that Schneider "literally complied" with the Operating Agreement while deliberately frustrating its spirit. Under Nevada law, the implied covenant addresses conduct that, though not forbidden by any express term, nonetheless "deliberately contravenes the intention and the spirit of the contract." *Zookin v. CSAA Gen. Ins. Co.*, No. 2:24-cv-00914-GMN-MDC, 2025 U.S. Dist. LEXIS 51210, at *5 (D. Nev. Mar. 19, 2025). The Complaint pleads the opposite: it asserts express breaches of the very provisions governing the relationship—non-solicitation, non-compete, confidentiality, and non-disclosure, Complaint, ¶¶ 26, 102–107, not acts that complied with those terms yet subverted their purpose. It never identifies any instance where Schneider acted within the literal bounds of Section 10 but, through "arbitrary or unfair" conduct, deprived Archetype of its contractual benefits. That omission is dispositive. *See Zookin* at *5–6 (dismissing where "literal compliance" theory was not alleged).

The implied covenant claim is also impermissibly duplicative. It repackages the same facts as Count III (e.g., alleged disclosures, solicitation, competition) and seeks the same contract-based damages, Complaint, ¶¶ 104–110, while the pleading elsewhere admits that Schneider required an NDA "before sharing" information and worked with Bullock Legal with Mayer's knowledge. Complaint, ¶¶ 44–49, 53–55, 60. An implied covenant cannot be used to impose new duties or enlarge negotiated restrictions where the contract already addresses the subject matter. Here, the Operating Agreement squarely governs confidentiality, non-use, non-solicitation, and competition; any dispute about those subjects rises or falls under express terms, not an implied overlay. Because Count IV neither alleges literal compliance plus bad-faith subversion nor identifies conduct independent of the asserted contract breaches, it fails to state a claim and should be dismissed.

#### C. COUNTS VII AND VIII FOR TRADE SECRET VIOLATIONS SHOULD BE DISMISSED

Counts VII and VIII allege violations of the Defense of Trade Secrets Act ("DTSA") and Nevada's Uniform Trade Secrets Act ("NUTSA"). To survive Rule 12(b)(6), a DTSA complaint must allege (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused damage to the plaintiff. *InteliClear, LLC v.*

Albright Stoddard
Warnick & Albright

*ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020) (citing 18 U.S.C. §§ 1839(3), (5)).

**1. There are No Plausible Allegations of a Protectable Trade Secret**

The Complaint alleges in a perfunctory manner the existence of "information" and efforts to maintain general confidentiality (but not as to those specific information elements), it is devoid of allegations that plausibly support the notion that the information amounts to a "trade secret." Two key elements of a trade secret is information secrecy—e.g., the information is not publicly available, and that the owner "derives independent economic value" from the information not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).[2]

Under *Twombly*/*Iqbal*, conclusory recitations that information is "not generally known" and "derives independent economic value" from the trade secrets are insufficient; a plaintiff must plead concrete facts showing why the particular information is valuable because Archetype owns and uses it, while others *do not know it*. *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020) (citing 18 U.S.C. §§ 1839(3), (5)). To survive 12(b)(6), a "plaintiff should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Imax Corp. v. Cinema. Techs., Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998). The complaint should "clearly refer to tangible trade secret material" instead of referring generically to a "system which potentially qualifies for trade secret protection." *Id*. at 1167 (emphasis in original). The trade secret has to be distinguishable enough "to permit the defendant to ascertain at least the boundaries within which the secret lies." *Aristocrat Techs., Inc. v. Light & Wonder, Inc.*, No. 2:24-cv-00382, 2024 U.S. Dist. LEXIS 110410, at *11 (D. Nev. 2024) (quoting *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012)). The use of generic descriptions and "catchall" phrases is insufficient. *Imax Corp.*, 152 F.3d at 1167. "[U]nless the plaintiff engages in a serious effort to pin down the secrets" then a trade secret claim has not been pled. *IDX Sys. Corp. v. Epic Sys. Corp.*,

---

[2] Because NUTSA's regulatory scheme and definitions are substantially similar to DTSA's, Courts analyze these claims together. *Banq, Inc. v. Purcell*, No. 2:22-cv-00773-APG-DJA, 2025 U.S. Dist. LEXIS 145125, at *6 (D. Nev. July 29, 2025) (citing *InteliClear*, 978 F.3d at 657).

-11-

285 F.3d 581, 583 (7th Cir. 2002) (Easterbrook, J.) (rejecting allegations of general areas of information containing unspecified content as sufficient to allege trade secret violations).

Here, the Complaint never alleges what the trade secrets are, nor any facts that would plausibly show how Archetype derives independent economic value from its trade secrets. Instead, the Complaint tracks the elements, and offers only a conclusory list of generalized, formulaic assertions that Archetype's vast, catch-all categories of information "are not generally known by or available to the general public, and have derived independent economic value from not being generally known." Complaint, ¶ 24. This, while expressly declining to identify the allegedly secret content and promising a more particular description "later in the litigation[.]" Complaint, ¶ 23 n.1. That approach is incompatible with plausibility pleading because it prevents the Court from assessing whether any specific method, dataset, or framework is actually unknown and whether any alleged advantage flows from that secrecy rather than from ordinary utility or effort.

Archetype's assertion of proprietary dominion over large swaths of information runs headlong into the core problem: The information is totally public and the Complaint does nothing to "separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Imax*, 152 F.3d at 1164. Mass torts are filed publicly. There is a ton of information about them in the public arena between PACER, the internet, marketing firms, and law firms working on the cases.

the methodological items—"valuation frameworks," "causation analysis," "overlapping injury matrices," and "integrated claims-processing workflows[,]" Complaint, ¶ 23(f)–(j), (q), are described at the vaguest and most conclusory level. There are no facts alleged to show that Archetype invested in money in developing them, that they reflect anything that is actually useful, or that Archetype derived any economic value from them, nor showing that these are not generally known to competitors who could not independently develop similar approaches on their own. *See InteliClear*, 978 F.3d at 658 (explaining that a plaintiff must "clearly refer to tangible trade secret material instead of referring to a system which potentially qualifies for trade secret protection"). Nothing remotely suggests that Archetype's competitive advantage depends on outsiders' ignorance rather than on ordinary expertise.

-12-

In short, all of Archetype's case is a house of cards. Archetype's fancy labels aren't even creative. Things like "overlapping injury matrices" are not proprietary because they are used by *everyone* to make sure that one is not filing a case for an injury that has multiple causes or is of unknown etiology. That is table stakes for a plaintiff law firm to use. What makes Archetype's different and more valuable because its differences are unknown to those skilled in the field? Plaintiff never says. Valuations are likewise used by everyone—but only firms who have already settled and settled confidentially (which Archetype cannot claim to be) have actual valuation numbers for their frameworks; the rest is conjecture, estimation, and speculation. How Archetype derives unique economic value from its version of speculation as to how much cases are worth cannot be presumed or taken at face value; it is an absurd notion. Likewise, "causation analyses" are done by all law firms and people in mass torts, based upon publicly available peer reviewed scientific evidence and scientific expert analysis. What makes Archetype's different and more valuable because its differences are unknown to those skilled in the field? Plaintiff never says. Archetype does not allege that it hired scientific experts to do their own proprietary research and analysis, arrived at different conclusions than everyone else, and which led to any positive financial outcome in a case. The house of cards is all deuces and blind draws.

The problem is further compounded by the generality and breadth of the listed categories—which sweep in "pre-use" sales materials, investor memoranda, customer and investor lists, and "vendor outlines and proposals[,]" Complaint, ¶ 23(l), (n), (p), all of which, by their nature, are typically disseminated to third parties and thus not plausibly "valuable because unknown." Likewise, "pre-use presentations," "marketing materials," and "investment memoranda[,]" are alleged to have been prepared for distribution to potential customers and investors. Complaint, ¶ 23(l), (n). They were in fact used to solicit customers, apparently without imposing confidentiality on them before dissemination which is antithetical to secrecy-driven value. Complaint, ¶¶ 65–76.

Further, the Complaint's own categories and usage allegations negate the "derive independent value" element for several reasons. "Customer names, lists, [and] contact information" and "investor lists[,]" Complaint, ¶ 23(a)–(b), are precisely the type of information that is readily ascertainable in the litigation-funding market via public websites, conference materials, and

-13-

industry outreach—yet the Complaint pleads no facts distinguishing its lists from such publicly or readily obtainable information. There is nothing proprietary about these customers—what they are into, need, pricing, etc.

Archetype has pled that it has a lot of "stuff" it wanted to use to make money. But Archetype cannot even plausibly plead that it made any money at all using these things. Archetype does not even plead specific facts to show that Schneider used any of the trade secret protected things.

### 2. There are No Plausible Allegations of Causation and Damages

The Complaint purely posits, with no factual development, that Schneider used the above trade secrets and that is why funding was granted and settlements were reached *because of the trade secrets*. There is literally nothing alleged to show why the funding opportunities would have come to Archetype otherwise—nor how Archetype would have been able to secure the opportunity for itself. And even more bizarre is the allegation that a lawsuit that was pending years prior somehow was settled—and but-for Archetypes trade secrets—would not have settled (or would not have settled for as much). The Complaint is bereft a single, solitary factual averment to support causation and damages on these or any of the other theories claimed.

In short, the Complaint relies on labels and breadth rather than specific, nonconclusory facts tying identified trade secret content to actual secrecy-based value, causation and damages. It therefore fails to plausibly plead the "derives independent economic value" element under the DTSA and NUTSA, as well as causation and damages. Accordingly, Counts VII and VIII should be dismissed with prejudice.

### D. COUNTS IX AND XI SHOULD BE DISMISSED

Count IX for conversion and Count XI for Intentional Interference should be dismissed under the economic loss doctrine and preemption. Under Nevada law, the economic loss doctrine bars tort claims that are duplicative of contract claims. *Sky L. Grp. v. Pllc.*, No. 2:23-cv-1793-CDS-MDC, 2025 U.S. Dist. LEXIS 83577, at *6 (D. Nev. Feb. 25, 2025) (citing *FLS Transp. Servs. v. Casillas*, 2017 U.S. Dist. LEXIS 150741, at *13 (D. Nev. Sept. 18, 2017)). Similarly, NUTSA preempts other state law causes of action premised on the same underlying facts and transactions. *Frantz v. Johnson*, 116 Nev. 455, 464-65, 999 P.2d 352, 357 (2000); *Menalco v. Buchan*, 2010 WL

-14-

428911 (D. Nev. 2010); *Montgomery v. eTreppid Tech., LLC*, 2008 WL 942524 (D. Nev. 2008); *Custom Teleconnect, Inc. v. Int'l Tele-Services, Inc.*, 254 F.Supp.2d 1173 (D. Nev. 2003).

Counts IX (conversion) and XI (intentional interference) arise from the identical nucleus of operative facts and seek the same relief as the breach of contract and trade secrets claims against Schneider, rendering them duplicative. The conversion claim rests entirely on Schneider's alleged refusal to return Archetype's computer that has trade secret/confidential information on it, and his continued use of that information. Complaint, ¶¶ 43, 79–82. Those same acts are expressly charged as breaches of the Operating Agreement and trade secret violations—"failing to return Archetype Partners' Trade Secrets and Confidential Information," "failing to return Archetype Partners' property, including the computer," and wrongfully disclosing and using confidential information. Complaint, ¶¶ 102–107, 104(b)–(c). Count IX merely re-labels that contract breach as "dominion" and "interference" with Archetype's property. Complaint, ¶¶ 157–161, and it seeks the same injunctive, return, and damages relief already sought under the contract claim. Complaint, ¶¶ 107–110, 162–163. Because the property at issue and the injury model are coextensive, conversion adds no distinct facts, duties, or damages beyond the contract.

The intentional interference claim likewise duplicates the contract claim and trade secret claim by repackaging Schneider's contractual non-solicitation, non-compete, and confidentiality breaches as "interference". The Complaint pleads that the Operating Agreement imposed post-termination non-compete and non-solicitation and strict confidentiality obligations, Complaint, ¶¶ 26–31, 27–29, and it lists the breaches: soliciting Archetype's customers and investors, competing through his own vehicle and the Schneider/Bullock joint venture, facilitating the SimplyConvert arrangement that excluded Archetype, and using/disclosing Archetype's trade secrets to secure funding and divert opportunities. Complaint, ¶¶ 104(a), (d)–(j), 105–110.

Count XI asserts the same conduct—contacting Archetype's customers and investors (including Calumet Capital, Contingency Capital, and Kerberos), using misappropriated information to divert deals, and harming Archetype's relationships. Complaint, ¶¶ 169–175. It then seeks the same damages already claimed under the contract and trade-secret theories. Complaint, ¶¶ 107, 176. In short, Count XI depends on the very contractual duties that define Schneider's

-15-

wrongful acts and duplicates the same alleged harm, making it coextensive with the breach of contract claim and trade secret claims.

Therefore, Counts IX and XI should be dismissed under the economic loss doctrine and preemption doctrines.

## E. COUNT X FOR CONSPIRACY SHOULD BE DISMISSED

Count X alleges a conspiracy. Specifically, the Complaint alleges that "Defendants devised a scheme to defraud and steal from Archetype Partners." Complaint, ¶ 165. "To state an actionable claim for civil conspiracy to defraud, a plaintiff must allege: (1) a conspiracy agreement formed by the defendants to unlawfully harm the plaintiff, (2) an act of fraud in furtherance thereof, and (3) resulting damages to the plaintiff." *Sciara v. Micamp Sols., LLC*, Case No. A-20-824100-B, 2022 Nev. Dist. LEXIS 379, *28 (Nev. Dist. Ct. Feb. 24, 2022) (citing *Jordan v. State ex rel. DMV & Pub. Safety*, 121 Nev. 44, *74-75 (Nev. 2005).[3] Allegations sounding in fraud must be plead with particularity under Rule 9(b). FED. R. CIV. P. 9(b).

The pleading falls short on each element. There is no allegation of any specific false statement or reasonable reliance. The Complaint repeatedly characterizes defendants' conduct as a "scheme to defraud," but it never even reaches the point of showing that a fraud occurred—as opposed to it merely be attempted but failed. It never identifies any particular misrepresentation, its falsity, the speaker, the audience, contemporaneous knowledge of falsity, or reliance—elements indispensable to the underlying fraud needed to support conspiracy. Complaint, ¶¶ 1–6, 56–66, 73, 165–168.

And the only direct allegation of an agreement is the conclusory assertion that "Defendants had a meeting of the minds regarding the scheme to defraud and steal from Archetype Partners and worked in concert with each other to carry out the scheme," followed by a list of ordinary business arrangements—the Schneider/Bullock joint venture agreement, an email granting Schneider contracting authority, and the Video Game Addiction platform agreement between Bullock Legal and SimplyConvert. Complaint, ¶ 166. None of those instruments is alleged to contain fraudulent

---

[3] *Jordan* was abrogated on other grounds by *Buzz Stew, LLC v. City of. Las Vegas*, 181 P.3d 670, 672 n.6 (Nev. 2008).

misrepresentations, and none is tied to any deceitful statement made to Archetype or to any third party.

At most, the pleading claims Schneider "entered into the Schneider/Bullock JVA under false pretenses," without stating what the pretenses were, when they were made, to whom, and how Archetype relied to its detriment Complaint, ¶ 88. The complaint appears to assume that if Schneider was going to work with Bullock—something the Operating Agreement fully allows in section 5.4—then Schneider was obligated to disclose such an arrangement. Nothing in the Operating Agreement requires that. Therefore, silence is not fraudulent.

Rule 9(b) independently requires that allegations "sounding in fraud," including conspiracy to defraud, specify the time, place, content of the misrepresentation, and the identities of the parties to it. The Complaint substitutes "upon information and belief" and knowledge qualifiers ("knew or should have known") for particularized facts across its conspiracy narrative, including the core allegations that defendants "devised a scheme to defraud," "formed a conspiracy," and "worked closely" to "implement" Archetype's methodologies. Complaint, ¶¶ 63, 68, 71, 73, 165–167. It does not identify a single false statement by Schneider, Bullock Legal, BlueKey Tek, or SimplyConvert to Archetype or any lender, let alone when, where, and how those statements were communicated. The cited November 14, 2024, email merely "grant[ed] contracting and negotiating authority" for a vendor agreement; the January 7, 2025, platform agreement formalized vendor roles; and the September 27, 2024, joint venture described "Settlement Counsel Activities[.]" Complaint, ¶ 166(a)–(c), 62. None of these is pleaded as a fraudulent communication.

Likewise, the allegation that Schneider told Mayer he could not show the Settlement Counsel agreement "as it was privileged" is not alleged to be false, to have been relied upon, or to have caused specific injury. Complaint, ¶ 60. The damages assertions are global and undifferentiated—"in excess of $100 Million"—and are not linked to any identified fraudulent statement or act in furtherance of the supposed conspiracy. Complaint, ¶¶ 83, 168. Because the Complaint neither particularizes an agreement to defraud nor pleads the underlying fraud with the specificity Rule 9(b) demands, Count X's conspiracy claim fails.

-17-

## V.    CONCLUSION

Defendant Andrew Schneider respectfully requests the Court to dismiss Plaintiff's Complaint against him in its entirety and grant him any other relief that justice so requires.

DATED this 14th day of November, 2025.

**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**

*/s/ D. Chris Albright*
D. CHRIS ALBRIGHT #004904
801 South Rancho Drive, Suite D-4
Las Vegas, Nevada  89106
Tel: (702) 384-7111
dca@albrightstoddard.com

MAZIN A. SBAITI
*Pro Hac Vice* forthcoming
Texas Bar No. 24058096
KEVIN N. COLQUITT
*Pro Hac Vice* forthcoming
Texas Bar No. 24072047
**SBAITI & COMPANY PLLC**
3102 Maple Avenue, Suite 400
Dallas, Texas 75201
Tel: (214)432-2899/Fax: (214)853-4367
mas@sbaitilaw.com
knc@sbaitilaw.com

***ATTORNEYS FOR DEFENDANT
ANDREW SCHNEIDER***

-18-

**Albright Stoddard Warnick & Albright**

**AS**

## CERTIFICATE OF SERVICE

I certify that I am an employee of Albright, Stoddard, Warnick & Albright, and that on the 14th day of November, 2025, I caused a true and correct copy of the foregoing **DEFENDANT ANDREW SCHNEIDER'S MOTION TO DISMISS UNDER RULE 12(b)(6) AND RULE 9(b)** to be electronically filed with the Clerk of the Court and served via the United States District Court CM/ECF system on all parties or persons requiring notice, as follows:

Kevin N. Anderson, Esq.
**FABIAN VANCOTT**
2275 Corporate Cir., Suite 220
Henderson, NV 89074
kanderson@fabianvancott.com
*Attorneys for Plaintiff*

Pat Lundvall (NSBN 3761)
Chelsea Latino (NSBN 14227)
Laena St-Jules (NSBN 15156)
**McDONALD CARANO LLP**
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
plundvall@mcdonaldcarano.com
clatino@mcdonaldcarano.com
lstjules@mcdonaldcarano.com
*Attorneys for Defendant Bullock Legal Group, LLC*

*/s/ Andrea Brebbia*

_____
An employee of Albright, Stoddard, Warnick & Albright

-19-