# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| ARCHETYPE CAPITAL PARTNERS, LLC, | Case No.: 2:25-cv-01686-GMN-BNW |
| Plaintiff, | **ORDER GRANTING, IN PART, MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | |
| BULLOCK LEGAL GROUP, LLC, *et al.*, | |
| Defendants. | |

      Pending before the Court are Plaintiff Archetype Capital Partners, LLC's Motion for Temporary Restraining Order ("TRO"), (ECF No. 8), and Motion for Preliminary Injunction, (ECF No. 9).[1]  Defendant Andrew Schneider filed a Response, (ECF No. 22), to which Archetype replied, (ECF No. 29).  Defendant Bullock Legal Group, LLC filed a separate Response, (ECF No. 24), to which Archetype replied, (ECF No. 32).  Further pending before the Court are several unopposed Motions to Seal, (ECF Nos. 10, 26, 31, 34).

      For the reasons discussed below, the Court GRANTS, in part, and DENIES, in part the Motion for Preliminary Injunction and the Court DENIES as MOOT the Motion for Temporary Restraining Order.[2]  Further, the Court DENIES without prejudice the Motion to Seal, (ECF No. 10), and GRANTS, in part, and DENIES, in part, without prejudice the remaining Motions to Seal, (ECF No. 26, 31, 34).

---

[1] Under LR 7-3(c), Archetype filed a Motion for Leave, (ECF No. 7), to file excess pages for its Motion for Temporary Restraining Order and Motion for Preliminary Injunction.  For good cause appearing, and because the motion is unopposed, *see* LR 7-2(d), the Court GRANTS Archetype's Motion for Leave.

[2] Because the Court finds that some preliminary relief is warranted in this matter, the Motion for Temporary Restraining Order is DENIED as MOOT.

# I.    **BACKGROUND**

This case arises out of Defendants Andrew Schneider and Bullock Legal Group's alleged misappropriation of Plaintiff Archetype Capital Partners, LLC's trade secrets and breaches of contracts. (*See generally* Compl., ECF No. 1).  Douglas Mayer and Andrew Schneider founded Archetype in 2020 "with a vision to develop innovative litigation finance solutions for law firms." (Mayer Decl. ¶ 2, Ex. A to Mot. Prelim. Inj., ECF No. 10-2).  From July 27, 2020, through February 18, 2025, Schneider served as an officer, director, or member of Archetype. (*Id.* ¶ 3).  On June 28, 2023, Mayer and Schneider executed the Operating Agreement of Archetype Capital Partners, LLC, (the "Operating Agreement"), which controls their business relationship. (*Id.* at ¶ 4).  Archetype alleges that it developed its own models for underwriting and reviewing litigation, claims, and lending solutions specific to mass tort litigation, such as video game addiction ("VGA") litigation. (*Id.* ¶ 5).  Archetype further alleges that as a result of its investment and efforts, it created valuable trade secrets at issue in this lawsuit. (*Id.* ¶ 7).

## A.  Mass Tort Claim Review Services

Archetype alleges it developed and documented a proprietary framework for delivering comprehensive mass tort claim review services in July 2024, which included:

> creation of holistic claim packets tailored to all phases of mass tort litigation; proprietary guidelines for early, middle, and late-stage cases; targeted documentation requests designed to maximize efficiency; a standardized set of files that delivered all necessary claimant information and proof of injury in a scalable format; specialized screening protocols enabling identification of overlapping claims and comorbidities (for example, the connection between VGA and other mass tort allegations); use of proprietary information to accurately value cases earlier than competitors; and processes ensuring the right information was collected at intake and proactively surfacing issues that could affect a firms' mass tort portfolio.

(*Id.* ¶ 25).  Around the same time, Archetype created a Vendor Outline that formalized Archetype's intake qualification, claims verification, and claims processing systems. (*Id.* ¶ 28).

As part of the comprehensive mass claim review process, Archetype expanded its proprietary systems into additional mass tort areas, including VGA, RealPage, Paraquat, Abbott Heavy Metals NEC, Camp Lejeune, and Asbestos litigation. (*Id.* ¶ 26). To expand the reach of these proprietary systems, Archetype contracted with a marketing firm. (*Id.* ¶ 29). This contract enabled Archetype to integrate its claim review framework with the marketing firm's lead generation and intake capabilities, broadening application and increasing effectiveness while allowing Archetype to retain control over its alleged trade secret methodologies. (*Id.*). Archetype then marketed this combined solution to potential business opportunities. (*Id.* ¶ 30). In one such outreach, Schneider emailed a potential client describing Archetype's new claim review methodology:

> The most difficult part of mass torts is file review. . . . The experience in the space allows [Archetype] to provide a package that is more comprehensive than any of the current offerings on the market; and [Archetype] ha[s] the systems in place to handle the volume efficiently. The efficiency is gained from knowing the right questions to ask during intake. . . . It also allows [Archetype] to provide screening questions that your competitors do not have. . . . What we can offer is a comprehensive review with a standardized deliverable that removes the guesswork from the purchasers. . . . Depending on the stage of the mass tort; [Archetype] may also include the matrices and the claim value.

(July 2–25, 2024, Email Chain at 4, Ex. 6 to Mot. Prelim. Inj., 10-3). In another email exchange, Schneider explained what made Archetype standout from its competitors:

> The most important thing that [Archetype] do[es] differently from anybody else is provide a comprehensive claim packet that is ready for submission to a claims administrator. . . . [Archetype] provides [its] outlines of what would be considered a 'compensable' claim in each of the mass torts that [it] works in. If the Firm purchasing the retainers wishes to use [Archetype's] guidelines, they do not need to create the document requests because we already have the[m]. . . . Because of the spectrum of cases that [Archetype has] handled; [it] notices overlap in allegations and class members that can be detrimental to firms before they do.

(Email Re Proprietary Framework for Comprehensive Mass Tort Claim Review Services at 1, Ex. 3 to Mot. Prelim. Inj., ECF No. 10-3). Archetype alleges that these frameworks, protocols,

and vendor systems represented the core of its trade secrets and its competitive edge in the mass tort industry. (Mayer Decl. ¶ 33, Ex. A to Mot. Prelim. Inj.).

**B. Archetype's RealPage and VGA Materials**

In June 2024, Archetype identified RealPage as a high-priority litigation opportunity. (*Id.* ¶ 37). In August 2024, Archetype began developing proprietary intellectual property and processes tailored to the RealPage antitrust litigation and related opportunities. (*Id.* ¶ 38). As part of this effort, Archetype compiled a comprehensive database, covering all defendants and their properties in the RealPage litigation. The database included a cross-litigation overlap built from previous work on other mass torts and multi-district litigations, allowing Archetype to screen RealPage claimants for other tort opportunities by leveraging demographic, geographic, and facility data while maintaining claim-specific damage segregation. (*Id.* ¶¶ 39–41). Archetype states it had nearly completed its comprehensive defendant property database and step-by-step processing methodology for RealPage litigation by the end of November 2024. (*Id.* ¶ 42).

Archetype also created a "Video Game Addiction Litigation Overview" document in July 2024, integrating VGA into its broader mass tort claim assessment program. (*Id.* ¶ 34). Shortly thereafter, Archetype formally updated its Mass Tort Program to include VGA claims as a distinct area of focus. (*Id.* at ¶ 34). By October 2024, Archetype finalized its service package for VGA litigation. This package included: (a) provider network integration; (b) scalable processing system; (c) a document for medical records collection titled "Document List to Confirm Injury by Tier and Process," which systematically categorized claimants by injury severity; and (d) a "Settlement Values by Range" document, which set out detailed valuation ranges for VGA claims. (*Id.* at ¶ 35). Archetype alleges it further memorialized its methodology by creating the "Step by Step Video Game Addiction Litigation Review" in November 2024, which outlined Archetype's process for evaluating and reviewing VGA

1    claims. (*Id.* at ¶ 36).

2    ## C. Archetype and Bullock Legal Group's Relationship

3    Bullock Legal Group litigates complex mass tort and medical malpractice cases.

4    (Bullock Legal Group ("BLG") Memo to Calumet Capital at 1, Ex. 18 to Mot. Prelim. Inj.,

5    ECF No. 10-3).  The law firm serves as plaintiffs' counsel for a large VGA case and is

6    responsible for overseeing the VGA case settlement with Defendant X.[3] (*Id.*).  In May 2024,

7    while Schneider was still working for Archetype, he connected with Bullock Legal Group when

8    the law firm approached Archetype as a potential customer seeking Archetype's services in

9    relation to funding its VGA litigation. (BLG Email to Archetype re Services at 1, Ex. 19 to

10    Mot. Prelim. Inj., ECF No. 10-3).  Bullock Legal Group and Archetype then executed a Non-

11    Disclosure Agreement ("NDA"). (*See generally* BLG NDA, Ex. 20 to Mot. Prelim. Inj., ECF

12    No. 10-3).  Bullock Legal Group did not end up utilizing Archetype's services.

13    ## D. Alleged Misappropriation

14    Archetype alleges that in May, June, or July 2024, while still working for Archetype,

15    Schneider emailed Bullock Legal Group various documents and communications that

16    Archetype claims consisted of trade secrets and confidential information. (Mayer Decl. ¶¶ 52–

17    74, Ex. A to Mot. Prelim. Inj.).  In early November 2024, Bullock Legal Group hired

18    Schneider. (*Id.* ¶ 82).  Archetype contends that Schneider continues to use Archetype's trade

19    secrets and confidential information in his role with Bullock Legal Group. (*Id.* ¶¶ 83–111).

20    Archetype further alleges that Bullock Legal Group has likewise used Archetype's trade secrets

21    and confidential information to expand its litigation practice, and specifically to benefit its

22    settlement with Defendant X. (*Id.* ¶ 112–132).  Archetype avers that the use of its trade secrets

23    and confidential information was still ongoing as of September 2025. (Mot. Prelim. Inj. 25:4–

24

25

[3] The Court refers to the principal corporate defendant in the VGA litigation as "Defendant X" to preserve confidentiality.

7).

Archetype commenced this action in September 2025 and a month later filed its Motion for Temporary Restraining Order and Motion for Preliminary Injunction.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs preliminary injunctions. Fed. R. Civ. P. 65. Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). A plaintiff seeking a preliminary injunction must establish four elements: (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Id.* at 20. "[C]ourts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24 (internal quotation marks omitted).

## III.    DISCUSSION

Before the Court turns to the Motion for Preliminary Injunction, it first address the pending Motions to Seal.

### A. Motions to Seal

The public has a presumptive right to inspect and copy judicial records and documents. *See Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006). Consequently, a party seeking to seal a judicial record under Federal Rule of Civil Procedure 26(c) "bears the burden of overcoming this strong presumption." *Id.* The Ninth Circuit has recognized that two different standards may apply when a request to seal a document is made in connection with a motion—namely the "compelling reasons" standard or the "good cause" standard. *Ctr. For Auto Safety v. Chrysler Grp.*, LLC, 809 F.3d 1092, 1096–97 (9th Cir. 2016). The compelling reasons standard applies to any sealing request made in connection with a

motion that is "more than tangentially related to the merits of a case." *Id.* at 1099, 1101.  Under the compelling reasons standard, a court may seal a record only if it finds a "compelling reasons" to support such treatment and articulates "the factual basis for its ruling, without relying on hypothesis or conjecture." *Ctr. For Auto Safety*, 809 F.3d at 1096–97.  Compelling reasons exist when "such court files might have become a vehicle for improper purposes, such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Id.* at 1097 (internal quotations and citations omitted).

The compelling reasons must be "supported by specific factual findings," that outweigh "the general history of access and the public policies favoring disclosure, such as the public interest in understanding the judicial process." *Kamakana*, 447 F.3d at 1178–79 (internal quotations and citations omitted).  The Ninth Circuit has rejected efforts to seal documents under the "compelling reasons" standard based on "conclusory statements about the contents of the documents—that they are confidential" and that, in general, their disclosure would be harmful to the movant. *Id.* at 1182.  Furthermore, any "requests to seal documents must be 'narrowly tailored' to remove from the public sphere only the material that warrants secrecy." *Florence v. Cenlar Fed. Sav. & Loan*, No. 2:16-cv-00587, 2017 WL 1078637, (D. Nev. Mar. 20, 2017) (internal citations omitted).

Archetype filed a Motion to Seal, (ECF No. 10), seeking to seal Exhibit A, and its accompanying attachments Exhibits 1–82, to its Motion for Temporary Restraining Order and Motion for Preliminary Injunction.  Archetype moves to seal Exhibit A and Exhibits 1–82 because it argues they contain Archetype's confidential business information, alleged trade secrets, and models developed over time.  In the alternative, Archetype requests the opportunity to redact sensitive information before making the records publicly available.  Archetype's conclusory statements about the contents of the documents fail to meet the compelling reasons standard. *See Kamakana*, 447 F.3d at 1182.  Accordingly, this Motion to Seal is DENIED

without prejudice so Archetype can refile a Motion to Seal that meets the compelling reasons standard and redact sensitive information from the exhibits.

Bullock Legal Group filed a Motion to Seal, (ECF No. 26), seeking to seal Exhibits 1–19 to its Response because it argues the exhibits contain confidential litigation strategy discussions pertaining to lawsuits in active litigation, including but not limited to causation challenges, mediation strategy, and confidential settlement resolution details.  The Court agrees with Bullock Legal Group that Exhibits 1 and 2 which provide settlement fund account details should be sealed because public disclosure of those amounts would leak confidential settlement values.  But the remaining exhibits do not warrant being sealed in their entirety because Bullock Legal Groups fails to meet the compelling reasons standard.  Accordingly, this Motion to Seal is GRANTED, in part, and DENIED, in part without prejudice.

Archetype filed a Motion to Seal, (ECF No. 31), seeking to seal Exhibits 4–7 to its Reply to Schneider's Response because they consist of Excel spreadsheets containing alleged trade secrets and related email correspondence transmitting those files.  The Court has reviewed the exhibits and finds that Exhibits 5 and 7 should be sealed for compelling reasons because they appear to contain spreadsheets of people's names, birthdates, and addresses.  But the Court does not find that Exhibits 4 and 6 should be sealed in their entirety.  Accordingly, this Motion to Seal is GRANTED, in part, and DENIED, in part without prejudice and with leave to refile.

Archetype filed a Motion to Seal, (ECF No. 34), seeking to seal Exhibits 2–5 to its Reply to Bullock Legal Group's Response because they contain confidential and trade secrets, including Bullock Legal Group's initial injury-tier framework for the Videogame Addiction litigation; Archetype's pricing and claim-review models; texts messages reflecting detailed information about Bullock Legal Group's confidential settlement negotiations and ongoing settlement discussions with Defendant X; and an internal document outlining injury tiers and document requests used in the VGA litigation claim workup.  For compelling reasons, the

Court agrees that Exhibit 2 should be sealed because it contains proprietary information.  But the Court does not find that Exhibits 3–5 should be sealed in their entirety.  Accordingly, this Motion to Seal is GRANTED, in part, and DENIED, in part without prejudice and with leave to refile.  Now the Court turns to the Motion for Preliminary Injunction.

### B.  Motion for Preliminary Injunction

Archetype's Motion for Preliminary Injunction is based on its claims for trade secret misappropriation and breaches of contracts. (*See generally* Mot. Prelim. Inj., ECF No. 9).  But before the Court can address the merits of Archetype's arguments, it must first determine whether it has personal jurisdiction over Bullock Legal Group. *Glob. Verge, Inc. v. Rodgers*, No. 2:10-CV-01360, 2011 WL 70611, at *8 (D. Nev. Jan. 7, 2011) ("The Court cannot issue a temporary restraining order or a preliminary injunction against parties over which it does not have personal jurisdiction.").

### 1.  Personal Jurisdiction

Bullock Legal Group argues the Court cannot exercise personal jurisdiction over it because (a) it does not have continuous and systematic contacts in Nevada to make it "at home" in this jurisdiction and (b) it has not purposefully availed itself to this jurisdiction. (BLG Resp. 10:13–15, ECF No. 24).  Archetype contends that the Court has personal jurisdiction over Bullock Legal Group because it conducted business with Archetype partners in Nevada and signed an agreement containing a forum selection clause. (Reply to BLG 2:4–9, 3:10–11, ECF No. 32).

### a.  Forum Selection Clause

The Court begins with Plaintiff's forum selection clause argument.  Courts apply federal law when interpreting a forum-selection clause. *Simonoff v. Expedia, Inc.*, 643 F.3d 1202, 1205 (9th Cir. 2011).  A forum-selection clause "may give rise to waiver of objections to personal jurisdiction," "provided that the defendant agrees to be so bound." *Holland Am. Line Inc. v.*

1    *Wartsila N. Am., Inc.*, 485 F.3d 450, 458 (9th Cir. 2007) (citing *Polar Shipping Ltd. v. Oriental*

2    *Shipping Corp.*, 680 F.2d 627, 632 (9th Cir. 1982)) (holding that the scope of a forum selection

3    clause is a matter of contract). "The plain language of the contract should be considered first,

4    with the understanding that the common or normal meaning of language will be given to the

5    words. . . unless circumstances show that in a particular case a special meaning should be

6    attached to it." *Simonoff*, 643 F.3d at 1205 (internal citations and quotation marks omitted).

7        Archetype is correct that Bullock Legal Group signed an NDA, which states that

8    "Nevada shall have exclusive jurisdiction to hear and decide any suit, action or proceedings,

9    and to settle any disputes, which *may arise out of or relate to this letter agreement*. . . The

10    parties irrevocably submit to the jurisdiction of said courts and agree not to object to the

11    jurisdiction of such courts." (BLG NDA at 3, Ex. 20 to Mot. Prelim. Inj., ECF No. 10-3)

12    (emphasis added). But Archetype's assertion that the NDA confers personal jurisdiction over

13    Bullock Legal Group is incorrect because the forum selection clause is not triggered.

14        Archetype argues that the NDA was mutual, meaning both it and Bullock Legal Group

15    were bound to its confidentiality provisions and a breach of such provisions would trigger the

16    forum selection clause. It points to Schneider's email sending the NDA to Tina Bullock of

17    Bullock Legal Group wherein the email subject line refers to the document as a "Mutual

18    NDA." (Archetype Email to BLG re NDA, Ex. 19 to Mot. Prelim. Inj., ECF No. 10-3). But the

19    plain language of the NDA only requires Archetype to keep Bullock Legal Group's information

20    confidential, not vice versa.

21        The NDA defines "Confidential Information" as only that information shared *by* Bullock

22    Legal Group *to* Archetype. The NDA states: "In connection with the consideration by

23    [Archetype] of certain investment opportunities (collectively, the "Opportunity") with Bullock

24    Legal Group and its affiliates (collectively, "BLG"), (together, the "Parties"), BLG will provide

25    to Archetype certain documents and information and exchange written and oral

communications (collectively, the "Confidential Information") relating to the Opportunity."
(BLG NDA at 1, Ex. 20 to Mot. Prelim. Inj.).  The NDA further explains: "In consideration for
the party disclosing the Confidential Information (the "Disclosing Party") agreeing to make
available the Confidential Information to the party who receives the Confidential Information
(the "Receiving Party"), the Receiving Party hereby agrees not to disclose, or allow disclosure
of, all or any portion of the Confidential Information. . . ." (*Id.*).

Per the terms, one can only be a "Disclosing Party" if it discloses "Confidential
Information," and "Confidential Information" is defined as documents, information, and
exchanged communication that Bullock Legal Group will provide to Archetype.  The Court
agrees with Bullock Legal Group that the confidentiality protections of this NDA inure to the
benefit of only Bullock Legal Group.  The forum selection clause is not triggered here because
Archetype's claims do not arise out of or relate to the NDA.  This is because the NDA does not
protect Archetype's purported trade secrets or confidential information and therefore cannot
form the basis for its claims against Bullock Legal Group.  The Court therefore declines to
exercise personal jurisdiction over Bullock Legal Group based on the NDA's forum selection
clause and will move on to Plaintiff's additional specific jurisdiction arguments.[4]

### b.  Specific Jurisdiction

When no federal statute applies to the determination of personal jurisdiction, the law of
the state in which the district court sits applies. *Schwarzenegger v. Fred Martin Motor Co.*, 374

---

[4] Archetype does not provide authorities to support its claim that the Court has personal jurisdiction over Bullock
Legal Group, nor does it cite any evidence to support a finding that Bullock Legal Group has continuous and
systemic ties to Nevada to justify general jurisdiction.  Archetype's assertion that Bullock Legal Group
conducted business with Archetype Partners in Nevada seems to go to a specific jurisdiction argument, which the
Court discusses below.  To the extent, if any, that Archetype contends this Court has general jurisdiction over
Bullock Legal Group, Archetype fails to meet its burden. *Glencore Grain Rotterdam B.V. v. Shivnath Rai
Harnarain Co.*, 284 F.3d 1114, 1124 (9th Cir. 2002) (explaining that to establish general jurisdiction, the
plaintiff must demonstrate the defendant has sufficient contacts to "constitute the kind of continuous and
systematic general business contacts that approximate physical presence.").

F.3d 797, 800 (9th Cir. 2004). Because Nevada's long-arm statute reaches the outer limits of federal constitutional due process, courts in Nevada need only assess constitutional principles of due process when determining personal jurisdiction. *See* Nev. Rev. Stat. ("NRS") 14.065; *Galatz v. Eighth Judicial Dist. Court*, 683 P.2d 26, 28 (Nev. 1984). Due process requires that a non-resident defendant have minimum contacts with the forum such that the "maintenance of the suit will not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Minimum contacts can give rise to either general or specific jurisdiction. *LSI Indus., Inc. v. Hubbell Lighting, Inc.*, 232 F.3d 1369, 1375 (Fed. Cir. 2000). Specific jurisdiction exists where claims "arise out of" or "relate to" the contacts with the forum, even if those contacts are "isolated or sporadic." *Id.*

Specific jurisdiction is established if a plaintiff can show: (1) the defendant has performed some act or transaction within the forum or purposefully availed himself of the privileges of conducting activities within the forum; (2) the plaintiff's claim arises out of or results from the defendant's forum-related activities; and (3) the exercise of jurisdiction over the defendant is reasonable. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801–02 (9th Cir. 2004). "The plaintiff bears the burden of satisfying the first two prongs of the test," and then, if the plaintiff successfully does so, the burden "shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* at 802 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78, (1985).

Archetype does not provide authorities to support its claim that the Court has personal jurisdiction over Bullock Legal Group, nor does it use the term "specific jurisdiction." But beginning with prong one of the *Schwarzenegger* standard, Archetype seems to advance an argument that Bullock Legal Group purposefully availed itself of the privileges of conducting

activities within the forum when it signed an NDA with a Nevada forum selection clause.[5] And while the inclusion of a choice-of-law provision in the NDA is not enough to confer jurisdiction on its own, it is relevant to the Court's purposeful availment argument. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 482 (1985).  However, the record is devoid of any evidence that supports a finding that Archetype's claims "arise out of" or "relate to" Bullock Legal Group's contacts with the forum.  That is, as discussed above, Archetype's claims do not arise out of the NDA so Archetype cannot establish prong 2 of the *Schwarzenegger* standard. Archetype therefore fails to satisfy the *Schwarzenegger* standard. 374 F.3d at 801–02. Accordingly, the Court does not have specific jurisdiction over Bullock Legal Group.  And because Archetype fails to establish that the Court has personal jurisdiction over Bullock Legal Group, it is DISMISSED as a party to this action.

### 2. Likelihood of Success on the Merits

The Court now addresses Archetype's likelihood of success on the merits of its trade secret misappropriation and breach of contract claims against Schneider only.

### a. Misappropriation of Trade Secrets

To demonstrate a likelihood of success on the merits, Archetype must show "a fair chance of success" on its claim that Schneider used or disclosed its trade secrets in contravention of a "duty not to disclose." *See Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (*en banc*); *Indep. Techs., LLC v. Otodata Wireless Network, Inc.*, 836 F. App'x 531, 533 (9th Cir. 2020).  Archetype brings its trade secret misappropriation claims under the federal Defend Trade Secrets Act ("DTSA") and the Nevada Uniform Trade

---

[5] There are no facts in the record to support a finding that Bullock Legal Group performed some act or transaction within the forum.  Archetype summarily, and somewhat ambiguously, asserts that Bullock Legal Group conducted business with Archetype in Nevada, but does not affirmatively state whether Bullock Legal Group was physically present in the forum for any act or transaction.  For instance, Archetype does not assert that the NDA was signed by Bullock Legal Group in Nevada.  In fact, the NDA was emailed to Bullock Legal Group for signature, so it is unknown to the Court where the NDA was signed. (*See* Archetype Email to BLG re NDA, Ex. 19 to Mot. Prelim. Inj., ECF No. 10-3).

1   Secrets Act ("NUTSA"). "To succeed on a claim for misappropriation of trade secrets under the

2   DTSA, a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the

3   defendant misappropriated the trade secret; and (3) that the misappropriation caused or

4   threatened damage to the plaintiff." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d

5   653, 657 (9th Cir. 2020); *see* 18 U.S.C. § 1839(5).  The NUTSA requires similar elements: (1)

6   a valuable trade secret, (2) misappropriation, and (3) breach of a contract or misappropriation

7   by a party with a duty not to disclose. *Frantz v. Johnson*, 999 P.2d 351, 358 (Nev. 2000).  Thus,

8   the Court analyzes the claims together.

9                              **i.    Existence of a Valuable Trade Secret**

10     "[T]he definition of trade secret consists of three elements: (1) information, (2) that is

11   valuable because it is unknown to others, and (3) that the owner has attempted to keep secret."[6]

12   *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020) (citing 18

13   U.S.C. §§ 1839(3), (5)).  To prove ownership of a trade secret, plaintiffs "must identify the

14   trade secrets and carry the burden of showing they exist." *MAI Sys. Corp. v. Peak Computer,*

15   *Inc.*, 991 F.2d 511, 522 (9th Cir. 1993).  "The plaintiff 'should describe the subject matter of

16   the trade secret with sufficient particularity to separate it from of general knowledge in the

17   trade or of special knowledge of those persons. . . skilled in the trade.'" *Imax Corp. v. Cinema*

18   _____

19   [6] Schneider does not put forth an argument that Archetype did not attempt to keep its purported trade secrets
     secret.  "The failure of an opposing party to file points and authorities in response to any motion. . . constitutes a

20   consent to the granting of the motion." LR 7-2(d).  Notwithstanding this deficiency, the Court finds that
     Archetype did attempt to keep its purported trade secrets secret.  Archetype maintains comprehensive security

21   and data privacy controls, consistent with industry standards, to ensure access to sensitive systems and data is
     limited to authorized members only. (Mayer Decl. ¶ 16, Ex. A to Mot. Prelim. Inj.); (*see also id.* ¶ 17 (describing

22   the protections in detail)).  Archetype conducts regular security awareness training coupled with simulated
     phishing campaigns. (*Id.* ¶18).  Archetype also has an Incident Response Plan that outlines lawful investigation,

23   documentation, and incident reporting steps. (*Id.* ¶ 19).  Moreover, the Operating Agreement Schneider entered
     into expressly safeguarded "trade secrets, plans, proposals, codes, marketing information," among other

24   confidential materials. (Operating Agreement at Section 10.1.1, Ex. 1 to Mot. Prelim. Inj., ECF No. 10-3).
     Lastly, Archetype avers that it ensured protection of trade secrets at the employee level.  As an example, it

25   explains that Schneider was provided a company-issued laptop so that sensitive data would not be stored on
     personal devices. (Mot. Prelim. Inj. 24:4–6).  Accordingly, Archetype has demonstrated that it took reasonable
     steps to keep its information secret.

1    *Techs., Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998).  Whether information is a trade secret is a

2    question of fact for the factfinder. *Frantz*, 999 P.2d at 358.  Relevant factors to consider include

3    the extent to which others outside the business know of the information, the ease or difficulty

4    with which others could acquire the information properly, whether the information was

5    confidential or secret, and the measures the plaintiff took to guard the information's secrecy. *Id.*

6    at 358–59.

7        After reviewing the attached declarations and arguments from the parties, the Court

8    finds that Archetype has provided sufficient detail for Schneider to understand the alleged trade

9    secrets and confidential information.  Archetype contends that its trade secrets consist of a

10   comprehensive suite of proprietary systems, methodologies, and intellectual property for

11   various mass tort litigations, such as VGA, RealPage, PFAS, and Mastercard/Visa, that it

12   developed at significant expense and effort, including but not limited to: settlement frameworks

13   and valuation models; proprietary claim qualification criteria and intake protocols; case

14   inventory and growth analytics; claims processing infrastructure and workflow systems;

15   funding models and requirements; cross-litigation overlap discovery methodologies;

16   confidential databases and analytical tools; and strategic business relationships and vendor

17   systems. (Mot. Prelim. Inj. 23:10–17).  This level of detail is sufficient to put Schneider on

18   notice of Archetype's alleged trade secrets. *Fujikura Composite Am., Inc. v. Dee*, No. 24-CV-

19   782 JLS (MSB), 2024 WL 3261214, at *7 (S.D. Cal. June 28, 2024) ("the reasonable

20   particularity standard does not require explication of the trade secrets down to the finest detail

21   or require a mini-trial on misappropriation," but rather "ensures defendants have sufficient

22   information to prepare a rebuttal.") (citation modified).

23       Archetype further contends that each of the categories of its trade secrets derives

24   independent economic value from secrecy. (Mot. Prelim. Inj. 23:17).  And together, they

25   enabled Archetype to uniquely qualify claims, anticipate defenses, maximize settlement

leverage, and scale litigation portfolios more effectively than competitors. (*Id.* 23:18–19).  But Schneider counters that Archetype adduced no evidence that it expended any money into developing its alleged trade secrets or that it derived pecuniary gain due to those things being kept secret or confidential. (Schneider Resp. 22:8–10, ECF No. 22).  The Court disagrees.  The record demonstrates that "significant financial investment" went into creating Archetype's trade secrets which "derive independent economic value from not being generally known." (Mayer Decl. ¶ 14, Ex. A to Mot. Prelim. Inj.).

Schneider argues that under the Operating Agreement his "legal work on client matters" does not belong to Archetype and as such cannot be a trade secret. (Schneider Resp. 13:1 (citing Operating Agreement at Section 5.4, Ex. 1 to Mot. Prelim. Inj., ECF No. 10-3)).  He contends that Section 5.4 of the Operating Agreement "expressly permitted [him] to participate in other ventures, such as his legal practice." (*Id.* 13:2–3).  But Section 5.4 permitted outside ventures only if they did not compete with Archetype. (Operating Agreement at Section 5.4, Ex. 1 to Mot. Prelim. Inj.); (*see also id.* at Section 10.2 ("So long as a Person is a Member of the Company and for twelve (12) months following termination. . . the Member shall not, directly or indirectly, have an ownership interest in, provide services to, be a director of or a lender to, promote or endorse a business that is competitive with or substantially similar to the Company. . . .")).  And Archetype alleges that Schneider's outside venture did compete because he allegedly used Archetype's proprietary data and models to compete in the same mass-tort market space. (Reply to Schneider 11:18–19, ECF No. 29).  Moreover, Section 10.1.1 of the Operating Agreement specifies that "[a]ll confidential information shall remain the sole property of [Archetype]." (Operating Agreement at Section 10.1.1, Ex. 1 to Mot. Prelim. Inj.).

Additionally, Archetype informs the Court that Schneider's ability to practice law is, or at least during his employment with Archetype was, restricted by the New Jersey Bar in such a way that Schneider could not "engage in the solo practice of law" and was "not permitted to

open his own law practice or to become a partner in any law practice."[7]  Significantly, Schneider purported to the New Jersey Bar that he was "working in finance," not practicing law, during the relevant period. (Schneider Emails to New Jersey State Bar, Ex. 3 to Reply to Schneider, ECF No. 29-4).  The Court cannot square the arguments in Schneider's Response because he was either performing legal work as stated by counsel in his Response, potentially in violation of his restrictions, or he was only working in a finance capacity, as stated by Schneider to the New Jersey Bar, which contradicts the arguments Schneider's counsel made to this Court that he created legal work product.  Regardless, the record supports the finding that Schneider performed financial work, not legal work, and any confidential information was the property of Archetype.

Lastly, Schneider summarily contends that all of Archetype's purported trade secrets are publicly available information in the mass tort space or common knowledge in the industry. (Schneider Resp. 13:11–13).  Of course, "[i]nformation that is public knowledge or that is generally known in an industry cannot be a trade secret." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984).  But in reply, Archetype avers that it has specifically identified its trade secrets and that while individual components may be publicly known, the combination and integration of those elements is not. (Reply to Schneider 10:16–17).  Indeed, a trade secret may consist of a compilation of data, public sources, or a combination of proprietary and public sources. *See United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016), *overruled in part on other grounds by Lagos v. United States*, 584 U.S. 577 (2018); *see also* Restatement (Third) of Unfair Competition § 39 cmt. f (1995) ("[I]t is the secrecy of the claimed trade secret as a

---

[7] Schneider had stipulations on his New Jersey Bar license where he was not allowed to "engage in the solo practice of law" (but could practice law under the supervision of another attorney) and was "not permitted to open his own law practice or to become a partner in any law practice." (*See* Stipulation, Ex. 1 to Reply to Schneider, ECF No. 29-2).  As of October 31, 2024, it appears that Schneider complied with the stipulation by submitting quarterly certifications to the New Jersey Bar. (*See* Quarterly Certifications, Ex. 2 to Reply to Schneider, ECF No. 29-3).  The Court is unaware of Schneider's current status with the New Jersey Bar.

whole that is determinative.  The fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements.").  Thus, the Court finds that Archetype's trade secrets were not public knowledge.

In sum, the Court finds that Archetype has met its burden of establishing it possesses valuable trade secrets.

### ii.    Misappropriation

Misappropriation under the DTSA or NUTSA requires a showing of (1) acquisition of a trade secret by a defendant that knows or has reason to know was acquired by improper means, or (2) disclosure or use of a trade secret by a defendant that knew or had reason to know that the trade secret was (i) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret; or (ii) derived from or through a person who owed a duty to maintain the secrecy of the trade secret. *See* 18 U.S.C. § 1839(5)(A), (B)(ii)(II)–(III); NRS 600A.030(2)(a), (c)(2)(II)–(III).  "Improper means" expressly encompasses theft, misrepresentation, and the breach or inducement of a breach of a duty to maintain secrecy or contract. 18 U.S.C. § 1839(6); NRS 600A.030(1).  Misappropriation therefore includes violations of contractual confidentiality, non-solicitation, and non-use provisions. *See* 18 U.S.C. § 1839(6) (defining improper means to include "breach or inducement of a breach of a duty to maintain secrecy"); NRS 600A.030(d)–(e) ("Willful breach or willful inducement of a breach of a duty to maintain secrecy" and "imposed by. . . contract. . . .").

Schneider denies using or misappropriating Archetype's purported trade secrets, (Schneider Decl. ¶ 9, ECF No. 23), but Archetype has shown a fair chance of success on its trade secret misappropriation claim by demonstrating that Schneider disclosed trade secrets acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret.  Archetype identifies several instances in which Schneider misappropriated its trade secrets.

First, on June 17, 2024, Schneider gave Bullock Legal Group the core proprietary solution to overcoming alternative causation problems in the VGA litigation by providing Archetype's unique approach to offsets rather than exclusions. (Mayer Decl. ¶ 52, Ex. A to Mot. Prelim. Inj.); (*see also* ADS Email to TB Re Detailed Analysis of BLG's VGA Claims, Ex. 21 to Mot. Prelim. Inj., ECF No. 10-3).  Second, in October 2024, the Defendant X was critiquing Bullock Legal Group's inability to substantiate its claims. (Mayer Decl. ¶ 72–74, Ex. A to Mot. Prelim. Inj.); (*see also* Defendant X Letter to BLG, Ex. 44 to Mot. Prelim. Inj.).  The next month, Schneider participated in a design call to implement Archetype's methodology on behalf of Bullock Legal Group which improved the status of the Defendant X settlement. (Mayer Decl. ¶ 88, Ex. A to Mot. Prelim. Inj.); (*see also* Video SimplyConvert & A. Schneider Design Call Implementing Archetype's Methods, Ex. 52 to Mot. Prelim. Inj., manual filing).  And third, on January 7, 2025, Schneider circulated Archetype's intake criteria forms and engaged vendors and co-counsel to process claims using Archetype's proprietary methodologies. (Mayer Decl. ¶ 98, Ex. A to Mot. Prelim. Inj.).

This information was disclosed by Schneider, who knew or had reason to know that the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret because as part of the Operating Agreement, Schneider contracted not to disclose Confidential Information. (Operating Agreement at Section 10.1, Ex. 1 to Mot. Prelim. Inj.).  Confidential information was defined to include trade secrets among other information, and the contract prohibited the "use" or disclosure of trade secrets. (*Id.*).  This confidentiality agreement remained in effect even after Schneider resigned from Archetype. (*Id.* ("The parties covenant to each other that so long as a party remains a Member. . . of the Company and thereafter for the longest time period permitted under the applicable law, neither party shall disclose to any third party any information regarding . . . any Confidential Information except as otherwise provided by law.")).  It appears that Schneider was in breach of the Operating

1  Agreement.[8]  Thus, for the reasons discussed above, the Court finds that Archetype is likely to

2  succeed on establishing the misappropriation element.

3                                    **iii.    Damages**

4         Archetype contends it has suffered, and will continue to suffer, significant damage as a

5  result of Schneider's misappropriation.  For the reasons discussed in depth below in Section 3,

6  the Court finds that this element is likely satisfied.  Thus, the Court finds that Archetype is

7  likely to succeed on its trade secret misappropriation claims under the DTSA and NUTSA

8  against Schneider.

9                              **b.  Breach of Contract**

10        The Court now turns to Archetype's claim for breach of contract arising out of the

11  Operating Agreement.[9]  A claim for breach of contract begins with an allegation that an

12  enforceable contract exists. *See* Restatement (Second) of Contracts § 203 (2007); *Calloway v.*

13  *City of Reno*, 993 P.2d 1259, 1263 (Nev. 2000), *overruled on other grounds*.  Under Nevada

14  law, an enforceable contract requires: (1) an offer and acceptance, (2) meeting of the minds,

15  and (3) consideration. *May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005).  To prove a breach

16  of contract, a plaintiff must show: "(1) the existence of a valid contract, (2) a breach by the

17  defendant, and (3) damage as a result of the breach." *Rivera v. Peri & Sons Farms, Inc.*, 735

18  F.3d 892, 899 (9th Cir. 2013).  Further, with respect to the element of breach, a breach of a

19  contract is "a material failure of performance of a duty arising under or imposed by

20  agreement." *Bernard v. Rockhill Dev. Co.*, 734 P.2d 1238, 1240 (Nev. 1987).

21  _____

22  [8] Schneider puts forth an argument that he owed no duty of loyalty to Archetype because he was only a Member
    under the Operating Agreement, rather than a Manager. (Schneider Resp. 2:24–27.)  To the extent that this
23  argument applies to this discussion, it is clear from the Operating Agreement's terms that Schneider was a
    "party" to the Operating Agreement because he signed it and as a party, he was bound to the confidentiality
24  provisions.
    [9] The Court notes that Schneider does not directly respond to Archetype's breach of contract claim.  "The failure
25  of an opposing party to file points and authorities in response to any motion. . . constitutes a consent to the
    granting of the motion." LR 7-2(d).  Notwithstanding this deficiency, the Court addresses the merits of
    Archetype's claim for breach of contract.

### i.    Existence of a Valid Contract

Archetype avers that the Operating Agreement is a valid contract.  Schneider states that he "cannot admit to the authenticity of the operating agreement." (Schneider Resp. 2:24–25).  But he does not put forth evidence to refute the authenticity or otherwise respond to Archetype's assertion that the Operating Agreement, signed by Schneider, was a valid contract.  Thus, the Court finds for the purposes of this preliminary injunction that Archetype has shown that the Operating Agreement is a valid contract. LR 7-2(d) ("The failure of an opposing party to file points and authorities in response to any motion. . .  constitutes a consent to the granting of the motion.").

### ii.    Breach

Now the Court address the element of breach.  "Failure to perform one's obligations within the express terms of an agreement constitutes a literal breach of contract." *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 923 (D. Nev. 2006).  Section 10 of the Operation Agreement imposed binding confidentiality, non-disclosure, non-compete, and non-solicitation provisions. *See Marina Dist. Dev. Co. v. AC Ocean Walk, LLC*, 2020 WL 8608166 (D. Nev. 2020) (finding defendant in breach of agreement by violating its non-competition provision).  For the reasons discussed above in the trade secret misappropriation section, it is likely Schneider breached the Operating Agreement when he disclosed trade secrets and confidential information to others.

### iii.    Resulting Damage

Archetype contends that as a result of the breach, Schneider enabled Bullock Legal Group to grow its "VGA case portfolio from approximately 2,590 cases to more 148,000 cases in just months, ultimately closing a billion-dollar settlement and generating tens of millions in vendor revenue." (Mot. Prelim. Inj. 28:24–29:1); (*see also* Mayer Decl. ¶ 114, Ex. A to Mot. Prelim. Inj.).  Archetype avers that Schneider deliberately "excluded [it] from the market that it had built through years of investment and innovation." (Mot. Prelim. Inj. 29:2–3).  It further

1    alleges that this wrongful conduct "deprived [Archetype] of revenue, destroyed its competitive

2    position, and eroded goodwill with clients and partners." (*Id.* 29:3–4).  For the reasons

3    discussed here, and in more depth below in Section 3, the Court finds that Archetype can likely

4    satisfy this element.

5         In sum, Archetype is likely to succeed on its breach of contract claim against Schneider.

6                              **3.  Irreparable harm**

7         Now that the Court has determined Archetype is likely to succeed on its claims for

8    misappropriation of trade secrets and breach of contract, the Court turns to whether Archetype

9    has established irreparable harm.  Archetype must "demonstrate a likelihood of irreparable

10   injury—not just a possibility—in order to obtain preliminary relief." *Winter*, 555 U.S. at 21.

11   Archetype must provide evidence and reasoned analysis that the "remedies available at law,

12   such as monetary damages, are inadequate to compensate for that injury." *eBay Inc. v.*

13   *MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  "Alleged harm that is remote or speculative

14   will not be considered irreparable; rather, the movant must demonstrate that the threatened

15   harm is imminent." *Lilith Games (Shanghai) Co. v. UCool, Inc.*, No. 15-CV-01267-SC, 2015

16   WL 5591612, at 10 (N.D. Cal. Sept. 23, 2015) (citing *Colorado River Indian Tribes v. Town of*

17   *Parker*, 776 F.2d 846, 849–851 (9th Cir. 1985)).

18        Archetype first argues that it has suffered irreparable harm because Schneider remains in

19   possession of a company issued laptop.[10] (Mot. Prelim. Inj. 29:9–10).  It explains that the

20   laptop contains a comprehensive list of Archetype's actual and prospective clients, as well as

21   a repository of Archetype's trade secrets and confidential information. (Mot. Prelim. Inj. 29:10–

22   12).  Archetype contends that, because it has been deprived of access to its own property, the

23   _____

24   [10] Schneider maintains that the laptop is his own property, used for his own business, (Schneider Resp. 14:20–
     21), but does not put forth any evidence to support his assertion.  Even so, the record supports the finding that the
25   laptop is not his own property because it was purchased by Archetype. (Laptop Receipt, Ex. 8 to Reply to
     Schneider, ECF No. 29-9) (billing the laptop invoice to Archetype Consulting Group, Doug Mayer and shipping
     the laptop to Archetype Consulting Group, Doug Mayer).

1  files and data on that computer are effectively lost to Archetype while available to Schneider.

2  (*Id.* 29:13–15). Archetype ultimately argues that the harm is ongoing. (*Id.* 29:17). Schneider

3  contends that his mere possession of a laptop that contains confidential information is not

4  evidence of the type of misappropriation that risks imminent irreparable harm. (Schneider

5  Resp. 14:15–16). The Court agrees. This line of argument from Archetype, without more

6  evidence, is too speculative to form the basis for irreparable harm.

7      Archetype next argues that it has been irreparably harmed because Schneider

8  misappropriated its trade secrets and breached the Operating Agreement. (*See* Mot. Prelim. Inj.

9  30:10–11). But Schneider contends that damages are a sufficient remedy, and irreparable harm

10  is not met. (Schneider Resp. 10:7). As other judges in this district have recognized, loss of a

11  property interest in and diminution in value of trade secrets and confidential information are the

12  types of harms that "are not readily addressed through payment of economic damages. . . [and

13  are thus] sufficient to meet the irreparable injury requirement" for a temporary restraining order

14  or preliminary injunction. *Saini v. Intern. Game Tech.*, 434 F.Supp.2d 913, 919 (D. Nev.

15  2006). Indeed, "[p]ublic disclosure of a trade secret destroys the information's status as a trade

16  secret." *Id.* (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984)). "This harms the

17  trade secret owner by both depriving him of a property interest and by allowing his competitors

18  to reproduce his work without an equivalent investment of time and money." *Id.* (internal

19  citation omitted) (citing *Ruckelshaus*, 467 U.S. at 1002–03; *Winston Research Corp. v.

20  Minnesota Min. & Mfg. Co.*, 350 F.2d 134, 142 (9th Cir. 1965)). Similarly, disclosure of non-

21  trade secret confidential information is also recognized as a serious harm. *Union Pacific R.R.

22  Co. v. Mower*, 219 F.3d 1069, 1071 n. 1 (9th Cir. 2000)). Because the Court finds that

23  Archetype is likely to succeed on its claims for trade secret misappropriation and breach of

24  contract, the Court considers this as one factor establishing the likelihood of irreparable harm.

25  *See FireClean LLC v. Tuohy*, No. CV1600604TUCJASEJM, 2018 WL 1811712, at *9 (D.

Ariz. Apr. 17, 2018) (quoting *In re Remington Arms Co., Inc.*, 952 F.2d 1029, 1033 (8th Cir. 1991) ("[O]nce the information is wrongfully released, the trade secret is lost forever and no sanction imposed on the violator can retrieve it.").

Moreover, "the loss of one's [business] does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of [losses]." *Am. Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009).  Additionally, "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001).  Archetype argues, and the record supports, that through Schneider's misappropriation and breach, Bullock Legal Group has expanded their case inventory from 2,590 to over 148,000 cases. (Mayer Decl. ¶ 114, Ex. A to Mot. Prelim. Inj.).  Further, within months of using Archetype's systems, Bullock Legal Group secured a multi-billion-dollar settlement with the Defendant X that directly mirrored Archetype's frameworks, (*Id.* ¶¶ 54, 122), and positioned Bullock Legal Group to generate recurring vendor revenue exceeding $20 million annually, (*Id.* ¶ 130). (Mot. Prelim. Inj. 31:7–10).  Archetype avers that it has been cut out of its own market because firms across the industry now access and apply Archetype's systems through SimplyConvert, bypassing Archetype entirely. (*Id.* 31:18–19).  The Court finds that this evidence further supports a finding of irreparable harm.

Lastly, Archetype contends that the Operating Agreement confirms the inadequacy of legal remedies. (*Id.* 37:10).  Section 10.1.3 of the Operating Agreement provides: "Each party specifically recognizes that any breach. . . will cause irreparable injury to the non-breaching party and the Company and that actual damages may be difficult to ascertain, and in any event, may be inadequate." (Operating Agreement at Section 10.1.3, Ex. 1 to Mot. Prelim. Inj.).  It further states: "[I]n the event of any such breach, the non-breaching party shall be entitled to

1  specific performance and/or injunctive relief, in addition to any and all other legal (monetary

2  damages) and equitable remedies that may be available." (*Id.*).  The fact that the Operating

3  Agreement contains language that Archetype may be entitled to injunctive relief based upon

4  breaches of its trade secrets and confidential information "is not controlling." *See Giftango,*

5  *LLC v. Rosenberg*, 925 F. Supp. 2d 1128, 1140 (D. Or. 2013) ("Furthermore, the fact that the

6  Confidentiality Agreements contain language that any violation of the non-solicitation

7  provision constitutes irreparable harm is not controlling."); *see also Inspection Mgmt. Sys., Inc.*

8  *v. Open Door Inspections, Inc.*, No. 2:09–cv–00023–MCE–GGH, 2009 WL 805813, at *4–5

9  (E.D. Cal. Mar. 26, 2009) ("Plaintiff cannot rely on the contractual provisions of the [licensing

10  agreement] to show irreparable harm.  Instead, the court must make an independent

11  determination of whether such harm is present"); *but see Int'l Ass'n of Plumbing & Mech.*

12  *Officials v. Int'l Conference of Bldg. Officials*, No. 95–55944, 1996 WL 117447, at *2 n.3 (9th

13  Cir. 1996) (stating that a contractual provision is evidence of irreparable injury but it does not

14  abrogate a court's obligation to make a finding of irreparable harm).  Thus, while Section

15  10.1.3 alone does not establish irreparable harm, the Court is persuaded by *International*

16  *Association of Plumbing* and finds that the provision constitutes further evidence of such harm.

17      In sum, the Court finds that Archetype has demonstrated a likelihood of irreparable harm

18  if Schneider is allowed to profit from revenue generated with the misappropriation of

19  Archetype's trade secrets and his breach of the Operating Agreement.[11]

20

---

21  [11] Schneider lastly argues that Archetype's year long delay in bringing this lawsuit, and then waiting over a
    month to file its Motions for Temporary Restraining Order in December 2022 rebuts any inference of
22  irreparable harm. (Schneider Resp. 11:7–8).  He relies on *Hundred Acre Wine Grp. Inc. v. LeRner*, No. 22-cv-
    07305, 2024 U.S. Dist. LEXIS 46739, at *5 (N.D. Cal. 2024) to support his argument.  *In Hundred Acre Wine*
23  *Group*, the court held that a roughly four-month delay from obtaining knowledge of theft in summer of 2022 to
    filing a Motion for Temporary Restraining Order in December 2022 rebutted inference of imminent irreparable
24  harm.  However, "delay is but a single factor to consider in evaluating irreparable injury; courts are 'loath to
    withhold relief solely on that ground.'" *Arc of California v. Douglas*, 757 F.3d 975 (9th Cir. 2014) (quoting *Lydo*
25  *Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984).  Although a plaintiff's failure to seek
    preliminary relief can imply a lack of urgency, "such tardiness is not particularly probative in the context of
    ongoing, worsening injuries," like the ones here. *Id.*  Thus, the Court does not find that Archetype's delay

1

### 4.  Balance of Hardships

2

Archetype contends that the balance of hardships tips sharply in its favor.  (Mot. Prelim.

3

Inj. 38:8).  Apart from the black letter law and recitation of the *Winter* elements, Schneider

4

does not provide any arguments or case law to rebut this.  Nevertheless,"[i]n cases where a

5

plaintiff has shown a defendant is likely misappropriating a trade secret, courts have routinely

6

held that the degree of hardships favors the plaintiff." *ImageKeeper LLC v. Wright Nat'l Flood*

7

*Ins. Servs. LLC*, No. 2:20-CV-01470-GMN-VCF, 2020 WL 4677299, at *4 (D. Nev. Aug. 12,

8

2020).  Archetype has made a sufficient showing that it is likely to succeed on its claims that

9

Schneider is using Archetype's trade secrets and confidential information to benefit himself and

10

his employer.  Imposing this preliminary injunction will not harm any of Schneider's legitimate

11

actions and will only protect Archetype's rights in its trade secrets.  Thus, the Court finds that

12

the balance of hardships favors Archetype.

13

### 5.  Public Interest

14

Public interest also weighs in favor of granting the preliminary injunction.  "The public

15

interest analysis for the issuance of [injunctive relief] requires [district courts] to consider

16

whether there exists some critical public interest that would be injured by the grant of

17

preliminary relief." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir.

18

2011) (citation omitted).  "The public interest inquiry primarily addresses [the] impact on non-

19

parties rather than parties." *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir.

20

2002).  As another judge in this district has held, "there is a strong public interest in protecting

21

trade secrets, as evidenced by the existence of the DTSA and [NUTSA]." *Protection Techs.,*

22

*Inc. v. Ribler*, No. 3:17-cv-00144-LRH-WGC, 2017 WL 923912, at *3 (D. Nev. Mar. 8, 2017).

23

Schneider argues that an injunction would directly interfere with his practice of law and

24

his representation of his clients.  He contends that an injunction is against public policy under

25

negates the evidence of irreparable harm.

ABA Model Rule 5.6 which states in full:

> A lawyer shall not participate in offering or making:
>
> (a) a partnership, shareholders, operating, employment, or other similar type of agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement; or
> (b) an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy.

The Court finds Schneider's arguments unpersuasive for two reasons. First, this argument concentrates on the harm to Schneider, a party, which is not the focus of the public policy element. Second, none of the cases Schneider cites to support this argument involve a temporary restraining order, preliminary injunction, or any other type of injunctive relief in relation to Rule 5.6. (*See* Schneider Resp. 7:1–4). They all analyze agreements. The cases simply reaffirm that *agreements* cannot run afoul to Rule 5.6 and such *agreements* are void against public policy. The cases are not controlling, and the Court is unpersuaded by Schneider's argument. Moreover, the injunction sought does not restrict the legitimate practice of law. The Court therefore agrees with Archetype and finds that public interest weighs in favor of granting it relief.

In sum, the Court finds that each *Winter* element is met, and preliminary relief is warranted in this matter.

### C. Scope of Injunction

Now that the Court has determined Archetype is entitled to preliminary relief, it must address the scope of such relief. Archetype seeks a Preliminary Injunction to immediately halt Schneider's ongoing misuse and dissemination of Archetype's confidential and proprietary information. Specifically, Archetype requests that the Court: (1) enjoin Schneider and those acting in concert with him from using, disclosing, or transmitting Archetype's trade secrets and confidential information; (2) compel Schneider to return all Archetype property and materials

containing such information, including the company-issued laptop; (3) preserve and restrain the distribution of attorney fees and other funds derived from the use of Archetype's misappropriated trade secrets; (4) require Schneider to preserve all evidence relevant to this action; (5) enjoin Schneider from soliciting or interfering with Archetype's customers, vendors, or partners through the use of misappropriated information; and (6) restrain Schneider from engaging in any business activities that violate the restrictive covenants imposed by the Operating Agreement. (Mot. Prelim. Inj. 2:20–3:7).

Schneider is generally opposed to an injunction issuing. He argues that the requested relief fails FRCP 65(d)'s core requirements of specificity and proper scope. (Schneider Resp. 12:6–7). FRCP 65(d) states that "[e]very order granting an injunction and every restraining order must: state the reasons why it issued; state its terms specifically; and describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." The rule limits who may be bound by an injunction to parties, their agents, and non-parties "in active concert or participation" after actual notice. Fed. R. Civ. P 65(d). The Court address each of Archetype's requested forms of relief in turn.

First, Archetype seeks to enjoin Schneider and those acting in concert with him from using, disclosing, or transmitting Archetype's trade secrets and confidential information. To the extent that Schneider argues this relief lacks specificity, (*see* Resp. 7:1–20), the Court is unpersuaded. The Court has articulated in great detail why the preliminary injunction is issuing and will state the injunction's terms specifically and in reasonable detail in compliance with FRCP 65(d) by the end of this Order. This requested relief is therefore GRANTED.

Second, Archetype asks the Court to compel Schneider to return all Archetype property and materials containing trade secrets and confidential information, including the company-issued laptop. Schneider argues that this provision is a mandatory injunction, and plaintiff must "must establish that the law and facts *clearly favor* [its] position, not simply that [it] is likely to

succeed." *Garcia v. Google*, Inc., 786 F.3d 733, 740 (9th Cir. 2015).  The Court agrees that this relief is a mandatory injunction, because it "orders a responsible party to 'take action.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citation omitted).  The Ninth Circuit has cautioned that a mandatory injunction "goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (internal citations omitted). Archetype does not reply to this argument.[12]  The Court has already determined that Archetype is likely to succeed on the merits of its trade secret misappropriation and breach of contract claim against Schneider.  The Court further finds that Archetype meets its burden of establishing that the law and facts *clearly favor* its position on at least the breach of contract claim.  Accordingly, this requested relief is GRANTED.

Third, Archetype requests an order to preserve and restrain the distribution of attorney fees and other funds derived from the use of Archetype's misappropriated trade secrets.  More specifically, Archetype seeks to preserve and restrain the distribution of attorney fees and other funds derived from Bullock Legal Group's settlement with Defendant X.  This settlement consists of two distinct Qualified Settlement Funds ("QSF"), QSF #1 and QSF #2, with separate functions.  QSF #1, held at one bank, receives all funds from the estimated $5.6 billion Defendant X settlement and is responsible for disbursing payments to claimants, as well as case costs, administrative costs, and attorney fees. (Mayer Decl. ¶ 122, Ex. A to Mot. Prelim. Inj.). QSF #2, held at a different bank, receives transfers of attorney fee payments exclusively from QSF #1 and serves to segregate and distribute those fees among Bullock Legal Group, Schneider, and Bullock Legal Group's co-counsel network. (*Id.*).

---

[12] While Archetype does not reply to this argument, it states in its Motions for Temporary Restraining Order and Preliminary Injunction, that the Operating Agreement requires Schneider to return, delete, or destroy Archetype's trade secrets and confidential information. (Mot. Prelim. Inj. 39:1–2).  But Archetype does not point to which provision of the Operating Agreement supports this assertion.

To the extent that Archetype requests all distribution of settlement funds be halted, the Court denies that request. The Court does not find justification to halt the distribution of settlement funds to claimants, administrative costs, and attorney fees for Bullock Legal Group's co-counsel network. There is no evidence in the record to support a finding that these people and entities acted in active concert with Schneider's misconduct. However, Archetype has established the likelihood that the multi-billion-dollar Defendant X Settlement was structured on Archetype's proprietary methodologies through Schneider's disclosure of trade secrets and confidential information to Bullock Legal Group.[13] The share of those funds belonging to Schneider and any party acting in concert with him (like Bullock Legal Group), and funneled from QSF #1 to QSF #2, should be preserved to maintain the status quo. Thus, Archetype's request to preserve and restrain the distribution of attorney fees is GRANTED, in part, and DENIED, in part.[14]

Lastly, apart from Schneider's general opposition to a preliminary injunction issuing and his specificity argument, he offers no specific argument against the remaining parts of the injunction to: require Schneider to preserve all evidence relevant to this action; enjoin Schneider from soliciting or interfering with Archetype's customers, vendors, or partners

---

[13] Schneider contends that Archetype does not establish a nexus between the funds to be frozen and the relief sought. (*See* Resp. 9:18–22). The Court disagrees. The DTSA and the NUTSA expressly authorize equitable recovery of unjust enrichment and disgorgement. 18 U.S.C. § 1836(b)(3)(B)(i)(II); NRS 600A.050(2). Those remedies establish the required equitable nexus between the relief sought and the funds at issue—specifically, the portion of the attorney-fee pool within QSF #2 assignable to Schneider and those acting in concert with him, represent proceeds likely derived from the alleged misappropriation of Archetype's trade secrets and confidential information.

[14] Schneider also argues that the requested freeze on QSFs and distributions raises acute comity and jurisdictional concerns. (Schneider Resp. 8:20–21). The Court has narrowly cabined the requested relief to only impact Schneider and those acting in concert with him. Schneider's concerns about the impact a nationwide injunction would have on claimants is moot. Schneider also argues that this asset freeze component is independently barred by equitable limits recognized by the Supreme Court in *Grupo Mexicano v. All. Bond Fund*, 527 U.S. 308, 310, 333 (1999). *Grupo Mexicano* held that a preliminary injunction may not issue to preserve assets to which a party does not yet have a legal claim. *Id.* at 318–33. However, *Grupo Mexicano* "exempts from its proscription against preliminary injunctions freezing assets. . . cases in which equitable relief is sought." *In re Focus Media Inc.*, 387 F.3d 1077, 1084 (9th Cir. 2004). Because Archetype seeks equitable relief, *Grupo Mexicano* does not bar the asset freeze requested.

1   through the use of misappropriated information; and restrain Schneider from engaging in any

2   business activities that violate the restrictive covenants imposed by the Operating Agreement.

3   As such, the Court GRANTS the remaining relief requested.

4   **D. Bond**

5       Under the Federal Rules of Civil Procedure, "[t]he court may issue a preliminary

6   injunction. . . only if the movant gives security in an amount that the court considers proper to

7   pay the costs and damages sustained by any party found to have been wrongfully enjoined."

8   Fed. R. Civ. P. 65(c).  But "[d]espite the seemingly mandatory language, 'Rule 65(c) invests

9   the district court 'with discretion as to the amount of security required, *if any*.'" *Johnson v.*

10  *Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906,

11  919 (9th Cir. 2003)) (emphasis in original).  District court's thus "may dispense with the filing

12  of a bond when it concludes there is no realistic likelihood of harm to the defendant from

13  enjoining his or her conduct." *Id.* (quoting *Jorgensen*, 320 F.3d at 919).

14      Archetype asks that the Court not require a bond citing *San Francisco A.I.D.S. Found.*

15  *v. Trump*, 786 F. Supp. 3d 1184 (N.D. Cal. 2025). (Mot. Prelim. Inj. 38:6–7).  *In San Francisco*

16  *A.I.D.S. Foundation*, because the court found that the plaintiffs were likely to succeed on the

17  merits of their claims, the court found that a preliminary injunction was unlikely to pose any

18  harm to the defendants by preventing them from enforcing the provisions found to be unlawful.

19  *San Francisco A.I.D.S. Found.*, 786 F. Supp. 3d at 1134.  The court further explained that

20  waiving bond is particularly appropriate in the matter because the plaintiffs are nonprofit

21  organizations suing in large part because they are suffering monetary harm from the unlawful

22  provisions that withheld federal funding critical to their everyday operations. *Id.*  Because of

23  these findings, the court ordered the plaintiffs to post a nominal bond in the amount of

24  $1,000.00. *Id.*  In *Miller v. Carlson*, 768 F. Supp. 1331, 1341 (N.D. Cal. 1991), the court issued

25  a preliminary injunction without bond because the plaintiffs were indigent persons who rely

upon government aid for the necessities of life.

The Court understands why a nominal bond was required in *In San Francisco A.I.D.S. Foundation* and no bond in *Miller,* based on the plaintiffs' circumstances, but it finds no apparent reason to issue a preliminary injunction without bond in this case. Archetype is not a nonprofit organization, nor an indigent person; it is a for-profit company. Archetype cites no cases where a court issued a preliminary injunction without bond or only a nominal bond where the plaintiff was a for-profit company. As such, the Court finds that a bond posting is required in this matter and must determine the appropriate amount.

Schneider asks that the Court order Archetype to post a $5,000,000 bond. (Schneider Resp. 14:22–23). He argues that this amount would be sufficient to compensate himself, and all those enjoined, for their losses, damages, and attorney's fees in the event he is found to be wrongfully enjoined. (*Id.* 14:24–15:2). He estimates that such damages exceed $10,000,000 but does not cite any evidentiary support for this assertion. Archetype does not reply to Schneider's arguments regarding the bond amount. Here, as explained above, Schneider has shown no evidence of a likelihood of harm. His only contention is that he would be restricted from practicing law. But Schneider is free to continue his practice without using Archetype's trade secrets and confidential information. The fact that he may lose some opportunity because of an injunction's issuance, due to his own previous misconduct, is not a relevant harm. Out of an abundance of caution, however, the Court will require Archetype to post a $10,000 bond. This amount is more than ample to account for any relevant harm that *could* accrue to Schneider because of the injunction's issuance.

**IV.**    **CONCLUSION**

**IT IS HEREBY ORDERED** that Archetype's Motion for Leave, (ECF No. 7), is **GRANTED**.

**IT IS FURTHER OREDERED** that Archetype's Motion for Temporary Restraining Order, (ECF No. 8), is **DENIED as MOOT.**

**IT IS FURTHER OREDERED** that Archetype's Motion for Preliminary Injunction, (ECF No. 9), is **GRANTED, in part, and DENIED, in part as follows:**

- It is **DENIED** as to Defendant Bullock Legal Group because the Court lacks personal jurisdiction over it.

- It is **GRANTED, in part,** as to Defendant Schneider as follows:

  (1) Schneider and those acting in concert with him are enjoined from using, disclosing, or transmitting Archetype's trade secrets and confidential information;

  (2) Schneider is compelled to return all Archetype property and materials containing such information, including the company-issued laptop;

  (3) The distribution of Bullock Legal Group and Schneider's share of the Defendant X settlement must be restrained and preserved.

  (4) Schneider must preserve all evidence relevant to this action;

  (5) Schneider is enjoined from soliciting or interfering with Archetype's customers, vendors, or partners through the use of misappropriated information; and

  (6) Schneider is restrained from engaging in any business activities that violate the restrictive covenants imposed by the Operating Agreement.

**IT IS FURTHER ORDERED** that the preliminary injunction shall not issue or be effective until the posting of a bond by Archetype in the amount of $10,000.

**IT IS FURTHER ORDERED** that Archetype's Motion to Seal, (ECF No. 10), is **DENIED** without prejudice. But because of the likelihood that the exhibits contain some sensitive information, the Clerk of Court is kindly directed to keep ECF No. 10 sealed.

**IT IS FURTHER ORDERED** that Bullock Legal Group's Motion to Seal, (ECF No. 26), is **GRANTED, in part,** and **DENIED, in part** without prejudice. The Court cannot order Bullock Legal Group to refile its Motion to Seal because it lacks personal jurisdiction over the defendant. But because of the likelihood that the exhibits contain some sensitive information, the Clerk of Court is kindly directed to keep ECF No. 25 sealed.

**IT IS FURTHER ORDERED** that Archetype's Motion to Seal, (ECF No. 31), is **GRANTED, in part,** and **DENIED, in part** without prejudice. But because of the likelihood that the exhibits contain some sensitive information, the Clerk of Court is kindly directed to keep ECF No. 30 sealed.

**IT IS FURTHER ORDERED** that Archetype's Motion to Seal, (ECF No. 34), is **GRANTED, in part,** and **DENIED, in part** without prejudice. But because of the likelihood that the exhibits contain some sensitive information, the Clerk of Court is kindly directed to keep ECF No. 33 sealed.

**IT IS FURTHER ORDERED** that Archetype shall have 21 days from the date of this Order to refile its Motions to Seal. Failure to do so will result in ECF Nos. 10, 30, and 33 being unsealed. Moreover, Archetype is instructed to file future exhibits in compliance with LR IC 2-2(a)(3) and LR IA 10-3.

**IT IS FURTHER ORDERED** that Bullock Legal Group is **DISMISSED** as a party to this action. The Clerk of Court is kindly directed to recaption the case as follows: Archetype Capital Partners, LLC v. Andrew Schneider.

**IT IS FURTHER ORDERED** that Bullock Legal Group's Motion to Dismiss, (ECF No. 42), is **DENIED as MOOT**.

**DATED** this ___5___ day of December, 2025.

_____
Gloria M. Navarro, District Judge
UNITED STATES DISTRICT COURT