Kevin N. Anderson
Nevada State Bar No. 4512
**FABIAN VANCOTT**
2275 Corporate Cir., Suite 220
Henderson, NV 89074
Telephone:     (702) 233-4444
kanderson@fabianvancott.com

Hilary R. Adkins (admitted *pro hac vice*)
Utah State Bar No. 18296
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111
Telephone: (801) 531-8900
hadkins@fabianvancott.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ARCHETYPE CAPITAL PARTNERS, LLC, a Nevada limited liability company, | **FIRST AMENDED COMPLAINT** |
| Plaintiff, | |
| vs. | Case No. 2:25-cv-01686-GMN-BNW |
| BULLOCK LEGAL GROUP, LLC, a Georgia limited liability company, and ANDREW SCHNEIDER, an individual residing in Texas, | Judge Gloria M. Navarro |
| Defendants. | |

Plaintiff Archetype Capital Partners, LLC ("**Archetype**") files this First Amended Complaint against Defendants Bullock Legal Group, LLC ("**BLG**") and Andrew Schneider ("**Schneider**") (collectively, "**Defendants**") and alleges as follows:

1

**INTRODUCTION**

1.    This case arises from Defendants' scheme to steal Archetype's property; misappropriate Archetype's valuable trade secrets and confidential information to gain an unfair competitive advantage in the specialized litigation finance and mass tort markets; and divert millions of dollars' worth of business opportunities away from Archetype.

2.    Defendants—through calculated, deceptive, and unlawful means—conspired to steal Archetype's proprietary intellectual property for its methods for evaluating and funding specialized mass tort litigation, including, but not limited to, video game addiction ("**VGA**") cases.

3.    Defendants also conspired to steal Archetype's proprietary intellectual property, including, but not limited to: methods for systematic overlap discovery methodologies linking RealPage claimants to PFAS, Camp Lejeune, asbestos, and other torts through occupation-based and demographic screening protocols, and the underwriting and funding of same.

4.    In carrying out their scheme, Defendants misappropriated Archetype's trade secrets, violated numerous contractual obligations, breached fiduciary duties, converted company property, and committed federal violations including theft of trade secrets.

5.    Simultaneously, Defendants cultivated and created significant business relationships and opportunities using the stolen property, trade secrets, and confidential information to steal business opportunities from Archetype for Defendants' use, significantly harming Archetype in the process.

6.    Archetype brings this action to remedy the harm caused by Defendants' unlawful conduct and to prevent further misappropriation of its proprietary trade secrets and confidential information.

**PARTIES, JURISDICTION, AND VENUE**

7.    Since June 28, 2023, Archetype has been a Nevada limited liability company.

8.    BLG is a Georgia limited liability company with its principal place of business in Atlanta, Georgia.

9.    Schneider was a member of Archetype. Upon information and belief, Schneider is a resident of New Caney, Texas.

10.    This Court has subject matter jurisdiction under 18 U.S.C. § 1836(b) for violations of federal law relating to the misappropriation of trade secrets, and 18 U.S.C. § 1964(c) based upon a pattern of racketeering activity.

11.    This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Archetype's state law claims as those claims are so related to the federal claims that they form the same case or controversy and derive from a common nucleus of operative facts.

12.    Venue is proper in the United States District Court, District of Nevada, under 28 U.S.C. § 1391(b)(2) because Archetype suffered the consequences of Defendants' misappropriation and conversion of trade secrets and confidential information and breaches of contractual and fiduciary duties in Nevada; because such wrongful conduct that are the subject of this Complaint occurred in Nevada; and because the relevant contractual arrangements and fiduciary relationships were entered into in Nevada. Archetype was damaged in Nevada, and the claims alleged in this action arose in Nevada.

13.    All Defendants are subject to personal jurisdiction of this Court. Schneider was a member of Archetype, conducted business in Nevada, and the subject agreements are governed by Nevada law. BLG intentionally targeted clients in Nevada through the exploitation of Archetype's trade secrets, intentionally pursued co-counsel to represent those Nevada clients, maintains ongoing relationships with those Nevada clients, has exclusive settlement authority for such Nevada clients, and derives substantial economic benefit from its representation of those Nevada clients. Moreover, Defendants aimed their intentional acts at and caused harm that Defendants

knew would be suffered in Nevada. Defendants have had sufficient contact with Nevada, including through conduct in this litigation, such that they have availed themselves of the laws of Nevada.

## GENERAL ALLEGATIONS

### *Archetype Partners*

14. Archetype was co-founded by Douglas Mayer ("**Mayer**") and Schneider in 2020. Schneider was a Member of Archetype until February 18, 2025. Since 2021, Mayer was the majority member of Archetype and Schneider a minority member.

15. On June 28, 2023, Mayer and Schneider executed the Operating Agreement of Archetype Capital Partners, LLC ("**Operating Agreement**") to further document their relationship with respect to Archetype.

16. Under the Operating Agreement, Archetype was converted from a Florida corporation to a Nevada limited liability company.

17. Under the Operating Agreement, Archetype is established and governed by Nevada law.

18. Schneider was never authorized to practice law for Archetype[1] and admitted he "wasn't practicing law and working in finance" while at Archetype.

19. While at Archetype, Schneider had access to, was exposed to, received, and was entrusted with large amounts of Archetype's Trade Secrets and Confidential Information.[2]

---

[1] Schneider had stipulations on his New Jersey Bar license, where he was not allowed to "engage in the solo practice of law" and "not permitted to open his own law practice or to become a partner in any law practice." As of October 31, 2024, Schneider still purported to comply with the stipulation by submitting quarterly certifications to the Bar.

[2] Archetype's Trade Secrets and Confidential Information at issue are described in more detail below in, for example, paragraphs 27-45.

20.     During his time at Archetype, Schneider was a party to and bound by the Operating Agreement, Incident Response Plan, Information Security Policy & Data Privacy Program, and other contractual protections that impose fiduciary duties on Schneider.

21.     Schneider helped draft and enforce the confidentiality provisions of the Operating Agreement and Incident Response Plan & Data Security Plan.

22.     Schneider resigned and attempted to surrender his membership interest on December 22, 2024. However, Archetype did not accept his voluntary withdrawal under the Operating Agreement until February 18, 2025. Before this formal acceptance date, Schneider was a member and partner of Archetype, and all work product created during this period remained Archetype's property.

23.     Schneider wrongfully retained Archetype's computer and ignored requests to return the computer, including all the information contained on the computer.[3]

### *Archetype's Trade Secrets and Confidential Information*

24.     Mayer and Schneider founded Archetype with the vision of developing innovative litigation finance solutions for law firms.

25.     Archetype developed its own models for underwriting and reviewing litigation, claims, and lending for mass tort litigation, such as VGA and RealPage cases.

26.     Archetype developed its own trade secrets that are the subject of this lawsuit.

27.     Archetype trade secrets include, but are not limited to, (without publicly revealing herein the secret information)[4] the following:

      a.  actual and prospective customer names, lists, contact information in the litigation funding market, including customers seeking litigation funding;

---

[3] It was not until January 23, 2026 that Schneider returned his Archetype computer.

[4] To avoid public disclosure of the trade secret, a more particular description of Archetype's Trade Secrets will be provided later in the litigation under a protective order entered by the Court.

b. actual and prospective investor list and contact information;

c. actual and prospective defendant-specific databases for claims analysis;

d. research and development strategies and efforts in creating a lending model to cater to the needs of customers and the market;

e. specialized process, procedures, and compiled research regarding the creation of the lending models;

f. multi-tiered valuation framework;

g. causation framework;

h. alternative causation strategies and framework;

i. multi-litigation overlapping injury matrices and evaluation;

j. integrated claims processing workflow;

k. lender-specific financing terms;

l. pre-use customers' and potential customers' presentations and marketing materials;

m. customers' and potential customers' financing terms;

n. Archetype investment memoranda for distribution to investor/lenders related to VGA and other multi-district litigations;

o. systematic process for potential plaintiff intake and determining the qualification of each potential plaintiff, verifying the potential plaintiff's claims, valuing the potential plaintiff's injury and dollar value of injury, developing an injury matrix regarding the value of the injury, and developing a complete claim processing methodology;

p. vendor outlines and proposals to use with partnering with identified potential partners; and

q. technologies and methodologies for underwriting and identifying claims in large scale mass tort, class action and multi-district litigation, including, but not limited to, RealPage antitrust litigation, PFAS litigation, Camp Lejeune litigation, asbestos litigation, and other litigation opportunities.

28. In July 2024, Archetype completed its proprietary framework for delivering comprehensive mass tort claim review services that includes: creation of holistic claim packets tailored to phases of mass tort litigation; guidelines for early, middle, and late-stage cases; targeted documentation requests designed to maximize efficiency; a standardized set of files that delivers claimant information and proof of injury in a scalable format; specialized screening protocols enabling identification of overlapping claims and comorbidities (for example, the connection between VGA and Social Media Addiction and other mass tort allegations); use of proprietary

information to value cases earlier than competitors; and processes ensuring the right information was collected at intake and surfacing issues that could affect a firm's mass tort portfolio.

29.    Around the same time, Archetype created a Vendor Outline that formalized Archetype's intake qualification, claims verification, and claims processing systems.

30.    As part of the comprehensive mass claim review process, Archetype expanded its proprietary systems into additional mass tort areas, including VGA,[5] RealPage,[6] Paraquat, Abbott Heavy Metals NEC, Camp Lejeune, and Asbestos litigations.

31.    To expand the reach of these proprietary systems, Archetype contracted with a marketing firm, enabling Archetype to integrate its claim review framework with the marketing firm's lead generation and intake capabilities, broadening application and increasing effectiveness while ensuring Archetype retained control over its trade secret methodologies.

32.    When marketing Archetype's new claim review methodology, Schneider emphasized that Archetype's industry expertise enabled it to deliver claim review packages superior to competitors, citing its efficient intake protocols, reduced document requests, and proprietary screening questions:

> The most difficult part of mass torts is file review . . . The experience in the space allows [Archetype] to provide a package that is more comprehensive than any of the current offerings on the market and [Archetype] ha[s] the systems in place to handle the volume efficiently. The efficiency is gained from knowing the right questions to ask during intake . . . It also allows [Archetype] to provide screening questions that [] competitors do not have . . . What we can offer is a comprehensive review with a standardized deliverable that removes the guesswork from the purchasers . . . Depending on the stage of the mass tort; [Archetype] may also include the matrices and the claim value.

---

[5] VGA, or Internet Gaming Disorder, is a recognized behavioral addiction marked by impaired control over gaming and significant life consequences. Lawsuits have named over twenty defendants involved in manufacturing and distributing the games and products at issue.

[6] RealPage is a technology company that provides data analytics to apartment property management companies for resident screening and rent pricing optimization. The litigation alleges landlords used RealPage information to inflate rents.

33.    Schneider explained that this streamlined process would reduce the number of people involved, accelerate turnaround times, and enable Archetype to provide scalable, high-quality medical reviews under a single banner. Clients would continue to receive Archetype's proprietary work product through a unified framework for evaluating large case inventories, identifying overlapping claimants across litigations, and leveraging integrated intake and marketing systems.

34.    These frameworks, protocols, and vendor systems represented the core of Archetype's Trade Secrets and its competitive edge in the mass tort industry. In short:

> The most important thing that [Archetype] do[es] differently from anybody else is provide a comprehensive claim packet that is ready for submission to a claims administrator . . . [Archetype] provides [their] outlines of what would be considered a 'compensable' claim in each of the mass torts that [they] work in. If the Firm purchasing the retainers wishes to use [Archetype's] guidelines, they do not need to create the document requests because we already have . . . Because of the spectrum of cases that [Archetype has] handled; [they] notice overlap in allegations and class members that can be detrimental to firms before they do.

**A.    Archetype's VGA Materials (July – December 2024)**

35.    Part of Archetype's Trade Secrets and Confidential Information included materials and information focused on evaluating, funding, and developing VGA claims.

36.    For example, in July 2024, Archetype created a "Video Game Addiction Litigation Overview" document, integrating VGA into its broader mass tort claim assessment program. Archetype then updated its Mass Tort Program to include VGA claims as a distinct area of focus.

37.    In September 2024, Archetype created a "Marketing Graphics VGA" tool as part of the intake questionnaire for use with firms and marketing companies to acquire new leads. This tool helps analyze and develop the total potential market for claimants meeting minimum criteria for a VGA claimant. It identified targeted demographics within geographic areas to identify prioritized states for marketing purposes. Seven total states were identified by Archetype in this

analysis as either "Key Focus States" or "Secondary Focus States" for prioritizing marketing efforts, including Nevada.

38.     Nevada was "prioritiz[ed]" due to higher incidences of ADHD and divorced parents among males aged 7-25, which are associated with VGA:

**State Overlap Prioritization:**

- **Key Focus States**: Louisiana and Mississippi, since they show overlap in multiple categories (high dropout, ADHD, and significant homeschooling/divorce rates).
- **Secondary Focus States**: New Mexico, Texas, California (for dropout rates), along with Nevada and Idaho (for divorce and ADHD).

This made Nevada and Nevada citizens key elements of the VGA strategy, even though Nevada has only .9% of the United States population.

39.     By October 2024, Archetype finalized its service package for VGA litigation. This package included: (a) provider network integration; (b) scalable processing system; (c) a document for medical records collection titled "Document List to Confirm Injury by Tier and Process," which categorized claimants by injury severity; and (d) a "Settlement Values by Range" document, which specifies valuation ranges for VGA claims.

40.     In November 2024, Archetype memorialized its methodology by creating the "Step by Step Video Game Addiction Litigation Review," a document outlining Archetype's proprietary process for evaluating and reviewing VGA claims.

**B.     Archetype's RealPage Materials (June – December 2024)**

41.     In June 2024, Archetype identified RealPage as a high-priority litigation opportunity.

42.     In August 2024, Archetype began developing proprietary intellectual property and processes tailored to the RealPage antitrust litigation and related opportunities. Archetype compiled a comprehensive database, covering all defendants and their properties in the RealPage

litigation. The database included a cross-litigation overlap built from previous work on other mass torts and multi-district litigations, allowing Archetype to screen RealPage claimants for other tort opportunities by leveraging demographic, geographic, and facility data while maintaining claim-specific damage segregation.

43.    Between October and November 2024, Archetype developed specifications for RealPage overlap discovery policies.

44.    By late November 2024, Archetype had nearly completed its comprehensive defendant property database and step-by-step processing methodology for RealPage litigation.

45.    Archetype's Trade Secrets and Confidential Information are valuable to the company—having been developed over several years through thousands of hours of Archetype efforts and significant financial investments—and are not generally known by or available to the general public, and have derived independent economic value from not being generally known to or readily ascertainable by proper means by other persons.

### *Archetype's Steps to Protect Trade Secrets and Confidential Information*

46.    Archetype has taken reasonable efforts to protect Archetype's Trade Secrets and Confidential Information.

47.    Section 10 of the Operating Agreement imposes duties of confidentiality and other restrictive covenants on Schneider, requiring him to hold and keep in strict confidence and not use, without the prior written approval of Mayer, for his own benefit or the benefit of any party, or disclose to any person, any "Confidential Information," as defined in the Operating Agreement.

48.    Section 5.4 of the Operating Agreement outlines the "Duties of Parties," and provides that Schneider's rights to engage in other business activities are limited by Section 10. By imposing those restrictions, the Operating Agreement imposes fiduciary duties on Members,

including duties of utmost good faith and loyalty, confidentiality, and non-use of Archetype's Trade Secrets and Confidential Information, all of which Schneider was obligated to uphold.

49.     The Operating Agreement also prohibits Schneider from competing against Archetype for a period of 12 months following the termination of his membership interest in the company.

50.     The Operating Agreement also prohibits Schneider from soliciting Archetype customers, directly or indirectly; from influencing any of the company's clients, customers, licensors, or licensees to not purchase Archetype's products or services; and from influencing any clients, customers, licensors, or licensees to purchase the products or services from other companies that provide the same product or service.

51.     Pursuant to the Operating Agreement, the parties agreed that in the event a party breached the confidentiality, non-compete, or non-solicitation provisions, the other party would suffer irreparable harm and be entitled to injunctive relief in addition to any other legal and equitable remedies available.

52.     Section 6.2 of the Operating Agreement expressly provides that no member has the right or power to voluntarily withdraw from the company and any member who attempts to do so is in intentional breach of the Operating Agreement.

53.     Archetype never waived and will not waive any portion of the Operating Agreement, portions of which survive the resignation of a partner and remain enforceable.

54.     Archetype has similar confidentiality provisions in employee contracts to protect Archetype's Trade Secrets and Confidential Information.

55.     Archetype also maintains security and data privacy controls, based on industry standards, to ensure that only authorized members hold access to systems and data.

56. These include, but are not limited to, data encryption at rest and in transit using Advanced Encryption Standard (AES), Transport Layer Security (TLS), centralized access and authentication through Single Sign On (SSO), and various protective and detective security platforms and protocols that include, but are not limited to, insider threat tracking of activity on company platforms, screen recording, email logs, threat logs, keystroke logs, endpoint detection and response (EDR), suspicious authentication alert triage and blocking, and anti-phishing technologies.

57. Also, Archetype, with Schneider's participation and assistance, created the "Archetype Incident Response Plan" that outlines the company's response to information security incidents, and defines "incident" as "[a] violation or imminent threat of violation of computer security policies, acceptable use policies, or standard security practices that jeopardizes the confidentiality, integrity, or availability of information resources or operations."

58. Archetype also has a security awareness training program, in conjunction with recurring simulated phishing attack campaigns.

59. It is also Archetype's practice to require customers and potential customers to sign a Non-Disclosure Agreement before Archetype shares any Trade Secret and Confidential Information.

### *Archetype's Initial Relationship with BLG*

60. BLG, a Georgia law firm headed by Tina Bullock ("**Tina**"), specialized in litigating complex mass tort and medical malpractices cases. Specifically, BLG serves as plaintiffs' counsel in the VGA litigation and is responsible for the settlement of the claims.

61. Archetype and BLG executed a Non-Disclosure Agreement in May 2024 ("**BLG NDA**") for the purpose of allowing Archetype to evaluate investment opportunities

intended to assist BLG in obtaining litigation funding, expanding its client acquisition on VGA cases, and reducing per-case qualification and claims work up costs.

62.     The purpose of this relationship was to evaluate opportunities for BLG to obtain litigation funding (for which Archetype would receive a fee), and related to entering into a consulting agreement with Archetype to assist BLG in increasing its client acquisition on VGA cases, and reducing its per-case qualification and claims work up costs.

63.     It is typical in Archetype's industry to pay a 2% fee for underwriting and origination of a loan. BLG and Archetype understood that BLG would pay Archetype such a fee each time funding is secured through Archetype or utilizing Archetype's services, Trade Secrets, and/or Confidential Information.

64.     While he was a Member of Archetype, Schneider worked with BLG as a potential customer. Schneider, acting at the direction of and as a Member of Archetype, handled the BLG relationship.

65.     Archetype requested that Schneider get a standard consulting agreement signed by BLG that would memorialize the fee to be paid to Archetype for underwriting and helping place a loan for BLG.

### Defendants' Conspiracy to Misappropriate Archetype's Trade Secrets and Confidential Information

A.     **Defendants Initiate their Scheme**

66.     Upon information and belief, in or around May, June, or July of 2024, Schneider began implementing a scheme whereby he would leave Archetype to join BLG and take Archetype's Trade Secrets and Confidential Information with him in violation of the Operating Agreement and the fiduciary duties prescribed by the Operating Agreement, the Incident Response Plan, Information Security Policy & Data Privacy Program, and other contractual protections.

13

67. On June 17, 2024, Schneider, without Archetype's authorization, sent Tina of BLG a detailed analysis of BLG's VGA claims, where Schneider identified critical flaws in BLG's existing strategy concerning alternative causation arguments—an issue BLG had no solution for at the time, and disclosed Archetype's proprietary alternative causation strategy.

68. Schneider informed Mayer that Tina had no solution to the alternative causation problem until he provided her with Archetype's confidential analysis.

69. At this time, BLG's VGA claimant pool was only 2,590 cases. Only after Schneider began sharing Archetype's proprietary methods did BLG's numbers—and its negotiating leverage—significantly increase.

70. In late September and early October 2024, Schneider began sending Archetype's Trade Secrets and Confidential Information to BLG without authorization to allow BLG to use such information to secure alternative funding (not through Archetype) for its VGA cases.

71. In connection with their efforts to misappropriate Archetype's Trade Secrets and Confidential Information, Schneider and BLG sought to work together outside the authorized relationship between Archetype and BLG.

72. To that end, Schneider proposed to Mayer an arrangement whereby Schneider would become "**Settlement Counsel**" for BLG. When asked, Schneider explained to Mayer that he would "work with Tina in the settlement room to make sure she got a good deal from the named defendants in that case." Schneider said he could not show Mayer the agreement as it was privileged. Mayer and Schneider discussed that having Schneider as an insider would also help Archetype stay involved with BLG's litigation funding and VGA claims review process. With this understanding, Mayer agreed that Schneider should work with BLG as Settlement Counsel.

73. On September 26, 2024, Schneider and BLG agreed, without Mayer's knowledge, that as Settlement Counsel Schneider would "use [his] private settlement comparable from [his] database as a cross check."

74. At that time, Schneider was neither practicing law independently nor employed outside of Archetype and therefore had no separate "database" from which to draw such settlement comparables. Schneider instead utilized and relied upon Archetype's Trade Secrets and Confidential Information to assist BLG settlement negotiations.

75. As part of Defendants' conspiracy to misappropriate Archetype's Trade Secrets and Confidential Information, Schneider and BLG executed a Joint Venture Agreement on September 27, 2024 ("**Schneider/BLG JVA**").

76. Under the Schneider/BLG JVA, Schneider would receive 2% of gross settlements of VGA claims.

77. Archetype did not authorize Schneider to execute the Schneider/BLG JVA, nor was Archetype included or otherwise identified in the Schneider/BLG JVA.

78. Upon information and belief, the Schneider/BLG JVA identifies Schneider's duties to include the following:

   a. "[P]repare a settlement framework that maximizes the value of the overall [VGA] litigation instead of individual claimants.
   b. Participate in—and support—settlement negotiations.
   c. Actively take part in negotiations.
   d. Assist Tina Bullock during those negotiations by providing strategic modeling.
   e. Identify and analyze negotiating points - Pinpoint potential bargaining issues and evaluate them so that Bullock is fully prepared.
   f. Perform timely reviews of settlement proposals - examine each proposal promptly and assess its impact on the class.
   g. Analyze downstream litigation effects - evaluate how the claim—and any eventual settlements—could affect future litigation based on the same theory of injury, including potential offsets when nonsettling defendants later become settling defendants."

(Collectively herein referred to as the "**Settlement Counsel Activities**").

79. Upon information and belief, Schneider and BLG conspired between themselves to commence activities outside the Settlement Counsel Activities by including other parties in furtherance of misappropriating Archetype's Trade Secrets and Confidential Information as well as circumventing Archetype in other business dealings (including, but not limited to, any further lending BLG would seek).

80. In October and November 2024, in furtherance of their scheme, Schneider sent BLG additional Archetype's Trade Secrets and Confidential Information regarding the methodologies, alternative causation, and contributing factors as offsets for monetary value.

81. Using Archetype's Trade Secrets and Confidential Information, BLG obtained refinancing in October 2024 for hundreds of thousands of dollars in litigation funding for the VGA Cases and RealPage cases by leveraging Archetype's model—all while Schneider was still working for Archetype.

82. BLG was aware that Schneider worked for Archetype and was utilizing Archetype's Trade Secrets and Confidential Information to assist BLG in its business. But BLG failed to inform Archetype of this fact and failed to compensate Archetype.

83. In early October 2024, Schneider sent BLG Archetype's "VGA Proposed Document List For Injuries" and disclosed Archetype's proprietary methodology concerning claim qualification and alternative causation defenses to prepare BLG for its November mediation with one of the corporate defendants in the VGA litigation ("**Defendant X**").[7]

84. Through October 2024, Schneider distributed memoranda to litigation funders describing the VGA litigation and requesting capital, which substantially replicated Archetype's

---

[7] Archetype refers to the principal corporate defendant in the VGA litigation as **"Defendant X"** to preserve confidentiality and avoid disrupting ongoing sealed settlement negotiations.

"Video Game Addiction Litigation Overview" and "Settlement Values by Range" documents created in July and October 2024 and which contain Archetype's Trade Secrets and Confidential Information. Four of the parties who received these memoranda—Western Alliance Bank, Nhan Nguyen, Kerberos, and Legalist—had pre-existing relationships with Archetype.

85.     Although Schneider was still working for Archetype, the October 2024 memoranda sent by Schneider on behalf of BLG made no reference to Archetype.

86.     Unbeknownst to Mayer and Archetype, BLG hired Schneider in early November 2024. But Schneider nonetheless remained a Member of Archetype until February 2025.

**B.     <u>Defendants Utilize Vendors in Their Conspiracy to Divert Archetype Business</u>**

87.     Defendants' conspiracy to misappropriate Archetype's Trade Secrets and Confidential Information included utilizing various vendors for the purpose of enriching themselves at the expense of Archetype.

88.     Once hired by BLG, Schneider began working with SimplyConvert[8] to upload materials—including another Archetype client's mass tort Risperdal docket and Archetype's proprietary methodologies and requirements related to that docket—into the SimplyConvert platform. Among the documents Schneider transmitted was Archetype's "Document List to Confirm Injury by Tier and Process."

89.     The arrangement between Schneider, BLG, and SimplyConvert created an all-in-one platform for mass torts processing and settlement like the one Archetype had been working on since early 2024.

90.     SimplyConvert became BLG's and its referring counsels' exclusive Customer Relationship Management ("**CRM**") vendor to provide data management and support services for

---

[8] SimplyConvert is a technology platform for client data housing, document housing and settlement administration, among other technology providers that BLG utilizes for its VGA litigation services.

VGA client workup and settlement. This all-inclusive platform allows other law firms that BLG partners with to upload and store data in one CRM while the data is mined for additional claims in current and other litigation that entitle the law firm to referral fees for no additional work.

91. The agreements with BLG and Schneider were lucrative for SimplyConvert and created a financial arrangement whereby any fees collected from other counsel for access to the Archetype's proprietary claims data system would be credited against BLG's monthly fees.

92. As evidenced by a call between Marc Stern of SimplyConvert, Schneider, and potential funders in February of 2025, SimplyConvert derived substantial direct financial benefit from its misappropriation of Archetype's Trade Secrets—more than doubling its annual revenue after implementing Schneider's VGA litigation platform customized by Schneider.

93. Schneider and BLG knew or should have known that SimplyConvert competed directly with the technology and capabilities that Archetype provided.

94. BLG knew or should have known that Schneider was a Member of and working for Archetype while he was working with BLG to design the VGA litigation platform, and that the information and methodologies that Schneider shared belonged to Archetype.

95. Defendants also designated BlueKey Tek[9] as the data processor responsible for applying proprietary algorithms to confirm Gamertags, which is a required step for claims validation in settlement agreements in the VGA litigation.

96. Lastly, BLG appointed Milestone Settlement Solutions ("**Milestone**") as the administrator of VGA Qualified Settlement Funds ("**QSF**") in charge of processing all the Defendant X settlement funds and administering distributions to plaintiffs and counsel.

---

[9] BlueKey Tek, owned by Alan Bracken, Tina Bullock's son, serves as a BLG vendor providing services such as call center intake, medical records retrieval, and gamer tag verification for VGA litigation. Further, Tina Bullock is the registered agent for BlueKey Tek.

97.    On January 7, 2025, the relationship among BLG, SimplyConvert, and BlueKey Tek were formalized through the "**Video Game Addiction Data Hosting and Claimant Workup Services Agreement**" signed by Tina and Jessica Paluch-Hoerman of SimplyConvert.[10] This agreement authorized BlueKey Tek as a subcontractor/partner for data acquisition and verification services, and stated that "SimplyConvert may only share data acquired under this Agreement as necessary to fulfill its obligations under this Agreement, which includes partners such as BlueKey Tek." This agreement locked in SimplyConvert and BlueKey Tek as the exclusive providers of these services for BLG's VGA cases—using Archetype's Trade Secrets and Confidential Information. This comprehensive agreement connected Defendants to SimplyConvert, and BlueKey Tek into a single, coordinated conspiracy for exploiting Archetype's Trade Secrets and Confidential Information.

98.    In January 2025, Schneider began providing underwriting services to SimplyConvert to raise capital for the VGA and RealPage cases for BLG in direct competition with Archetype.

99.    Upon information and belief, Schneider and BLG continue to monetize Archetype's Trade Secrets and Confidential Information through its ongoing contractual relationships with SimplyConvert, BlueKey Tek, and other law firms in the VGA litigation cases, as well as for other mass tort cases such as RealPage and PFAs.

C.    **Defendants Grow BLG's Client Base and Secure Funding Using Archetype's Trade Secrets and Confidential Information**

100.    In or around October 2024, Schneider, using his Archetype email address, and without Archetype's express authorization, sent Paul Crouch of the Crouch Law Firm ("**Crouch**")

---

[10] Paluch-Hoerman is directly affiliated with other law firms and legal marketing groups that have partnered with BLG on the VGA cases at issue, including representing over 100 Nevada claimants together and referring numerous additional Nevada claimants to BLG.

a proposal to work together to settle VGA claims. Crouch had been a client of Archetype since October 2020, and Archetype had previously worked with Crouch to secure litigation funding for Crouch's Risperdal docket, a mass tort case.

101. Schneider formalized his and BLG's relationship with Crouch through separate JVAs, enabling Defendants—working in coordination with SimplyConvert—to mine Crouch's Risperdal docket for overlaps using Archetype proprietary VGA claim-qualification criteria.

102. In November 2024, SimplyConvert, BlueKey Tek, BLG, Schneider, and Crouch, acting in concert, launched the first test marketing campaign for VGA claims, targeting Crouch's Risperdal docket. Overnight, BLG reported acquiring forty-two new signed cases and twelve additional pending contracts.

103. Following the November 2024 Crouch campaign, Schneider and BLG represented to litigation funders that BLG's claimant pool had grown from 2,590 to approximately 40,000—a 1,444% increase. This helped BLG to secure substantial funding agreements, including $20 million from Calumet Capital, with One Williams Street as one of the main investors.[11]

104. According to Schneider, in the BLG funding memoranda he wrote and disbursed, "[t]he Risperdal docket is where the data mining project began for the VGA Litigation. The Risperdal docket was mined for VGA cases because of correlation," and that the overlapping claims are "bonus cases from previous and current clients."

105. Defendants used this same or similar JVA process with co-counsel to grow BLG's pool of VGA litigation claimants. By working with co-counsel as referring firms for VGA claims, "BLG has a lower overall fallout rate, and external marketing capital paying for its cases."

106. Because BLG cannot advertise for or directly solicit new claimants, its growth model depends on JVAs with co-counsel firms rather than traditional marketing. Under those

_____

[11] One Williams Street was also under NDA with Archetype.

JVAs, BLG is permitted to spend funds only on the SimplyConvert system, and all co-counsel are contractually required to use as their case-management platform, built on Archetype's Trade Secrets and Confidential Information.

107. This structure allows BLG to acquire new claims through co-counsel. Through JVAs, co-counsel upload claims into SimplyConvert, BLG exercises centralized settlement authority over those claims, and BLG maintains control over the litigation and settlement process. BLG thus used the JVAs to exploit Archetype's Trade Secrets and Confidential Information for purposes of growing its pool of clients.

108. Upon information and belief, Defendants deliberately sought JVAs with firms to develop client leads in the key states identified by Archetype's Marketing Demographics VGA tool, including Nevada.

109. For example, in January 2025, BLG executed a JVA with a Nevada law firm, Van Law, specifically for VGA litigation that provided BLG additional VGA litigation claimants. Similarly, BLG subsequently executed a JVA with another law firm, Stranch, Jennings, & Garvey PLLC ("**Stranch**") on February 3, 2025, specifically for VGA litigation. Stranch maintains a Nevada office. These agreements were executed only **after** Archetype highlighted the importance of Nevada for a successful VGA campaign.

110. These deliberate, Nevada-directed acts are tied directly to the expansion of BLG's VGA docket and the settlement proceeds at issue. As of January 30, 2025, BLG's VGA claim inventory included at least 974 Nevada resident claimants, 605 of whom executed retainers directly with BLG. All but two of those Nevada claimants were acquired **after** the Schneider/BLG JVA was executed and **after** BLG began using Archetype's Trade Secrets and Confidential Information Schneider shared.

111.    These JVAs give BLG direct attorney-client relationships with these almost one thousand Nevada-based claimants through standardized settlement authority provisions. These JVAs mean that BLG entered agreements with mass tort plaintiffs in Nevada that are part of the misappropriated trade secrets. Under those agreements, BLG is vested with exclusive authority to negotiate settlements, bind claimants to settlement frameworks, and control the disposition of settlement proceeds.

112.    By February 2025, BLG had expanded its co-counsel network to about seventy-five firms with fee-split agreements for the VGA litigation and had 148,219 VGA cases with SimplyConvert—an extraordinary expansion from the 2,590 claims BLG held before the October 2024 mediation with the Defendant X.

113.    Throughout this process of expanding its network of co-counsel and clients, Defendants continued to use additional components of Archetype's Trade Secrets and Confidential Information. For example, Schneider created a document on December 10, 2024 titled "Using the VGA Data to Aggregate Additional Cases," which described the systematic processing methodology and cross-litigation overlap strategy originally developed by Archetype.

114.    On December 28, 2024, Schneider sent Tina a "step-by-step guide of overlap in mass tort" to add cases to their inventory, describing it as "the secondary thing I've been working on. A step-by-step guide to aggregating additional cases with no additional costs." In reality, Schneider was sharing Archetype's Trade Secrets and Confidential Information, including its "RealPage step-by-step guide" AR-RP database and "RealPage Litigation overview," without Archetype's authorization.

115.    On December 22, 2024, just four days after Defendants executed an agreement with Milestone for the QSF, Schneider attempted to resign from Archetype.[12] Although Archetype did

---

[12] Neither Archetype's Operating Agreement nor Nevada law allows Schneider to "voluntary withdrawal."

not accept Schneider's resignation until February 18, 2025, Schneider remained bound by the Operating Agreement's one-year non-compete provision regardless of the effective date.[13]

116.    The day after Schneider attempted to resign from Archetype, BLG created a "Video Game Addiction Litigation step-by-step" document that combined Archetype's Trade Secret and Confidential Information materials, including: "Document List to Confirm Injury by Tier and Process" (created October 1, 2024), "Settlement Values By Range" (created October 7, 2024), and "Step By Step Video Game Addiction Litigation Review" (created November 18, 2024).

117.    In January 2025, Schneider and BLG continued working together to secure funding for VGA cases for BLG and other law firms (some of whom were customers of Archetype) and solicit investors and funders that were affiliates of Archetype to see if they would lend to law firms on VGA Cases.

**D.    Defendants Rely Upon Archetype's Trade Secrets and Confidential Information to Drive Mass Tort Settlement Recoveries**

118.    In funding memoranda, Schneider represented on behalf of BLG that "BLG is concentrating most of its human and capital resources on *VGA Litigation*. The goal is to finalize the settlement discussions with [Defendant X] to use as a framework for the next set of defendants."

119.    In November 2024, BLG drafted a "Confidential Master Settlement Agreement" that incorporated Archetype's Trade Secrets and Confidential Information. For example, Section E, "Tiers of Injury and Extraordinary Injury Funds," drew from Archetype's "Settlement Value by Range" document created on October 7, 2024, and the "Step by Step Video Game Addiction Litigation Review" created on November 18, 2024, including language requiring claimant to "display 5 out of 9 symptoms."

---

[13] The one year non-compete has not commenced because Schneider has never come into compliance.

120.    As of January 2025, BLG represented that "[a]dditional settlements are expected to occur during the next 18-24 months under a similar framework." There were even two mediations scheduled with two other VGA defendants as of January 10, 2025.

121.    On February 5-6, 2025, BLG participated in a mediation with Defendant X, during which the parties developed a proposed settlement framework intended to serve as a model for all other VGA defendants moving forward.

122.    BLG identified Defendant X as bearing approximately 25% to 30% of the overall liability in the VGA litigation and represented that it had approximately 61,293 claims against Defendant X alone.

123.    The mediation produced a non-binding term sheet, outlining a general settlement structure. Under the proposed framework, rather than a lump-sum payment, Defendant X would retain a Settlement Administrator to determine claim validity and payment eligibility. Each eligible claimant would receive a base payment with the potential for enhancements depending on the severity of symptoms and supporting documentation. As discussed, "[e]veryone who meets the causation threshold would be entitled to a base payment at the lowest tier," with a contemplated range of $15,000-$25,000 per base claim for Defendant X's portion.

124.    The draft terms provided that, within 60 days of executing a final settlement agreement, claimants would submit a claim form and supporting documentation establishing eligibility. The Settlement Administrator would then review submissions, determine which claimants qualified for enhanced payments, and notify eligible claimants, who would have 30 days to execute a release before payment.

125.    Crucially, the draft settlement framework incorporated Archetype's proprietary methodology drawn directly from its "Step-by-Step Video Game Addiction Litigation Review" document, finalized on November 18, 2024, including the "5 of 9 symptoms" diagnostic criteria,

24

the "parent declaration" option that removed the requirement for a formal medical diagnosis, the objective gameplay metric of fifteen hours per week, the GPA impact measurement, and the age cutoff of twenty-five for eligible claimants.

126.    After the February mediation, the parties scheduled another mediation for May 2025, presenting additional opportunities for profit. As of January 2025, BLG scheduled mediations with two other VGA defendants. Now that a settlement framework is established, Defendants can pursue and finalize settlements with other VGA defendants, allowing them to continue profiting off Archetype's Trade Secrets and Confidential Information.

**E.    Defendants Launch their RealPage Litigation Strategy on the Back of Archetype's Trade Secrets and Confidential Information**

127.    By January 2025, Schneider persuaded BLG to transition its strategy toward RealPage litigation, positioning the proprietary Archetype methodologies they had misappropriated as the foundation of BLG's new practice area:

> RealPage Litigation. BLG has compiled a spreadsheet that can confirm with certainty that a current client is a member of this class. The individual claims are small and would not be worth acquiring if there was a cost involved. The cost of acquisition is $0 per claim which alleviates this concern. The overlap of these claims with other litigation is uncomfortably high because of the correlation of the plaintiff populations. Claims who respond are more likely to answer some additional questions to screen for discrimination in housing, wage discrimination, PFAS claims, discrimination in schools, etc. The same data points can be mined beyond just the Sherman Antitrust violations.

128.    Like VGA, the RealPage material was processed through SimplyConvert, creating a system that automatically filters additional RealPage and PFAS claims, converting Archetype's proprietary overlap framework into a built-in feature. This created a self-sustaining pipeline that generates new claims and revenue—an enormous and ongoing stream of value from continued misappropriation of Archetype's Trade Secrets and Confidential Information.

129.    By mid-January 2025, Schneider, while still working for BLG, said he was meeting with Scott & Scott Attorneys at Law LLP, the court appointed Plaintiffs' Interim Co-Lead Counsel

25

in the RealPage litigation, to pitch BLG's RealPage litigation services that utilized RealPage claims analyzer and overlap discovery methodologies misappropriated from Archetype.

130.    As of June 2025, BLG was publicly advertising four practice areas on its website were: product liability; VGA; Roblox sex abuse cases; and video game sexual abuse litigation. In September 2025, BLG launched a public marketing website adding RealPage litigation as one of its five listed practice areas. Only after Archetype filed its Complaint, BLG removed RealPage litigation from its webpage.

**F.    <u>Defendants' Continued Misappropriation Caused Archetype Significant Damage</u>**

131.    As part of their scheme to defraud and steal from Archetype, Defendants purposefully did not inform Archetype of their use of Archetype's Trade Secrets and Confidential Information. BLG also did not compensate Archetype for the use and monetization of the Archetype's Trade Secrets and Confidential Information.

132.    From January 2025 forward, Schneider continued to use his Archetype computer containing significant amounts of company records, Trade Secrets and Confidential Information.

133.    Despite requests to return the computer, before January 23, 2026, Schneider refused to surrender the computer and continued to use that Archetype computer with all its proprietary and confidential Archetype materials.

134.    As part of Defendants' scheme, BLG encouraged Schneider to retain the computer and has used, received, and benefitted from the information on the computer in connection with BLG's work.

135.    Upon information and belief, Schneider, with the help of BLG, has been soliciting, directly and indirectly, Archetype's customers and influencing the customers to use other litigation funding sources not affiliated with Archetype and diverting business opportunities elsewhere.

136. Through their coordinated activities, Defendants have caused Archetype damage in Nevada over $100 Million. This consists of actual losses to Archetype such as (without limitation):

    a. Direct damages to Archetype's claims business and litigation finance activities, including lost marketing and lead generation revenue (on a per-lead generated basis), claims workup revenue (on a per claim generated basis), and lost origination fees for each verified deal.

    b. Lost profits based upon the value of corporate opportunities that belonged to Archetype that were usurped and diverted by Defendants.

    c. Financial harm by Defendants' improper solicitation and disruption of Archetype's contracts and client/vendor relationships.

    d. Consequential and punitive damages, where appropriate.

In addition to these actual losses suffered by Archetype, Defendants have also derived substantial unjust enrichment from their misappropriation and misuse of Archetype's Trade Secrets and Confidential Information (as well as the breaches of contractual, fiduciary, and common law duties set forth above) which are not addressed by the actual loss damages suffered by Archetype. This includes, without limitation, the funding, fee interests, and fee awards associated with the dockets and cases — such as the VGA mass tort campaign discussed — which Defendants have wrongfully obtained using Archetype's Trade Secrets and Confidential Information.

## COUNT I
### *(Breach of Fiduciary Duty – Schneider)*

137. Archetype incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

138. Schneider owed Archetype fiduciary duties, including duties of utmost good faith and loyalty, confidentiality, and non-use of Archetype's Trade Secrets and Confidential Information, all of which Schneider was obligated to uphold. This was pursuant to both his role within, and relationship to, Archetype, as defined by the Operating Agreement, Incident Response Plan, Information Security Policy & Data Privacy Program, and other contractual protections that expressly prescribe fiduciary duties.

139. Schneider breached his fiduciary duty of utmost good faith and loyalty by engaging in self-dealing, pursuing for his own benefit an opportunity that would have been valuable and germane to Archetype's business without first having offered that opportunity to Archetype, intentionally harming Archetype, intentionally benefiting himself to the detriment of Archetype, displaying an intentional dereliction of duty or a conscious disregard for his responsibilities, and taking other similar actions.

140. The fiduciary duty of utmost good faith and loyalty obliged Schneider to preserve and enhance the property and earning power of Archetype, even if the interests of the company conflict with his personal interests.

141. Schneider breached his fiduciary duties by elevating his personal interests above Archetype's interests, acting in bad faith, and usurping and diverting Archetype's opportunities. He entered the Schneider/BLG JVA under false pretenses and jointly pursued opportunities. Schneider harmed Archetype on his way out of Archetype, wrongfully disclosing Archetype's Trade Secrets and Confidential Information, wrongfully retaining company information and property that he used for his own personal gain.

142. Schneider used his position of power and authority within Archetype to gain access to trade secrets and confidential information and new business opportunities, and to take those opportunities for himself (and for the benefit of BLG, BlueKey Tek, and SimplyConvert) without Archetype's approval and without paying Archetype for the opportunities he diverted or the Trade Secrets and Confidential Information misappropriated.

143. As set forth herein, Schneider acted in bad faith by devising and carrying out his scheme to defraud and steal from Archetype.

144. As a direct and proximate cause of Schneider's many breaches of his fiduciary duties, Archetype has been damaged in an amount over $100 Million.

## COUNT II

### *(Aiding and Abetting Breach of Fiduciary Duty – BLG)*

145.    Archetype incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

146.    BLG is a potential client of Archetype, knew Schneider worked for Archetype, and was aware of Schneider's agreement to not disclose Archetype's Trade Secrets and Confidential Information.

147.    Upon information and belief, BLG was aware that Archetype took great care in protecting the Archetype's Trade Secrets and Confidential Information.

148.    BLG was aware of Schneider's contractual relationship and obligations, and his role at Archetype. As attorneys and sophisticated entities in the legal services industry, they understand the fiduciary duties Schneider owed to Archetype.

149.    Despite knowledge of Schneider's fiduciary duties to Archetype, BLG aided and abetted Schneider in breaching those duties by, among other things:

  a.  Entering the Schneider/BLG JVA and jointly pursuing Archetype opportunities;

  b.  Devising a plan with Schneider to defraud and steal from Archetype;

  c.  Encouraging and causing Schneider to disclose Archetype's Trade Secrets and Confidential Information to BLG and other third parties;

  d.  Obtaining litigation funding and entering term sheets to receive litigation funding using Archetype's Trade Secrets and Confidential Information that would not have otherwise been obtained without the Archetype's Trade Secrets and Confidential Information Schneider misappropriated on behalf of himself and BLG;

  e.  Entering the Video Game Addiction Data Hosting and Claimant Workup Services Agreement and creating an exclusive business structure that deliberately excluded Archetype from the VGA litigation market; and

  f.  Soliciting Archetype's actual or potential customers and investors.

150.    BLG, along with Schneider, carried out its actions and omissions purposefully, with malice, and with the intent to injure Archetype.

29

151.    The actions of BLG procured Schneider's breaches of his fiduciary duties.

152.    As a direct and proximate cause of BLG's actions, Archetype has been damaged in an amount over $100 Million.

153.    Archetype seeks punitive damages because BLG's actions were willful and malicious or manifested a knowing and reckless disregard and indifference toward Archetype's rights.

## COUNT III
### *(Breach of Contract - Schneider)*

154.    Archetype hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

155.    The Operating Agreement, including the confidentiality, non-disclosure, non-compete, and non-solicitation provisions, are valid and enforceable contracts between Schneider and Archetype.

156.    Archetype performed all its obligations under the Operating Agreement.

157.    Schneider breached the Operating Agreement by, among other things:

   a.  Wrongfully disclosing Archetype's Trade Secrets and Confidential Information to BLG and other third parties;

   b.  Wrongfully using Archetype's Trade Secrets and Confidential Information without permission;

   c.  Failing to return Archetype's Trade Secrets and Confidential Information;

   d.  Failing to return Archetype's property, including the computer Schneider took when he left the company and refused to return;

   e.  Entering the Schneider/BLG JVA;

   f.  Assisting BLG in obtaining tens of millions of dollars of litigation funding using Archetype's Trade Secrets and Confidential Information;

   g.  Soliciting Archetype actual or potential customers and investors;

   h.  Competing with Archetype through his own business and through the Schneider/BLG JVA;

     i. Facilitating and designing the Video Game Addiction Data Hosting and Claimant Workup Services Agreement and creating a business structure that deliberately excluded Archetype from the VGA litigation market; and

     j. Usurping or diverting business opportunities that belonged to Archetype.

158. Archetype Trade Secrets and Confidential Information taken by Schneider were used, and are currently being used, to unlawfully and wrongfully usurp business opportunities from Archetype for Defendants' economic benefit and to Archetype's detriment.

159. There is no interpretation of the Settlement Counsel Activities under the Schneider/BLG JVA where Schneider would be authorized to disclose the Archetype's Trade Secrets and Confidential Information.

160. Schneider's actions have damaged Archetype in an amount over $100 Million.

161. At all material times, Schneider's Breaches of the Agreements and actions described herein have caused and continue to cause irreparable injury to Archetype, for which Archetype has no adequate remedy at law and will continue to suffer injury unless enjoined.

162. Archetype is entitled to injunctive relief against Schneider to prevent further damage and harm and ordering the return and nonuse of Archetype Trade Secrets and Confidential Information and computer.

163. Archetype is entitled to receive its reasonable attorney fees and costs incurred in enforcing the Operating Agreement.

### COUNT IV
***(Breach of Duty of Good Faith and Fair Dealing - Schneider)***

164. Archetype hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

165. The Operating Agreement includes an implied covenant of good faith and fair dealing.

166.    The implied covenant of good faith and fair dealing obligated Schneider to, among other things:

   a.  In good faith, safeguard Archetype's Trade Secrets and Confidential Information;

   b.  In good faith, investigate any disclosure of Archetype's Trade Secrets and Confidential Information and take reasonable steps to correct the improper disclosure;

   c.  In good faith, not attempt to frustrate the business relationships between Archetype and its customers and potential customers and investors;

   d.  In good faith, refrain from any intentional conduct that would cause harm to Archetype; and

   e.  In good faith, not attempt to conceal and avoid disclosure of improper disclosures, usurping corporate opportunities, and steal Archetype property.

167.    Upon information and belief, Schneider repeatedly breached his duty of good faith and fair dealing with the acts and omissions set forth in this Complaint.

168.    As a direct and proximate cause of Schneider's many breaches of his duties of good faith and fair dealing, Archetype has been damaged over $100 Million.

## COUNT V
### *(Defend Trade Secrets Act (18 U.S.C. § 1836) - Defendants)*

169.    Archetype hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

170.    As part of his ownership in Archetype and his role at the company, Schneider had access to, knew of, and obtained possession of Archetype's Trade Secrets and Confidential Information.

171.    Schneider kept some or all of Archetype's Trade Secrets and Confidential Information on his computer; failed to return the computer, trade secrets, and confidential information upon his voluntary withdrawal from the company; and continued to use the computer for BLG work.

32

172. Also, BLG knowingly and wrongfully obtained Archetype's Trade Secrets and Confidential Information through Schneider while he was acting as a Member of Archetype, and BLG knew that Schneider was acting in that capacity when it obtained such information.

173. Archetype–not Defendants–owns Archetype's Trade Secrets and Confidential Information.

174. The misappropriated Archetype Trade Secrets and Confidential Information are "trade secrets" under 18 U.S.C. § 1839(3) because:

    a. the information derives actual and/or potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information; and

    b. Archetype took reasonable measures to keep the information secret.

175. Defendants knew the information wrongfully disclosed and taken by Schneider constituted Archetype's Trade Secrets and Confidential Information.

176. Defendants used improper means to acquire Archetype's Trade Secrets and Confidential Information, including without limitation: theft, misrepresentation, breach of duties to maintain secrecy, and inducement of breaches of duties to maintain secrecy.

177. Defendants have used and intend to continue using Archetype's Trade Secrets and Confidential Information, which were acquired via improper means, for their personal economic benefit to obtain millions of dollars in fees and litigation funding to the detriment of and without compensation to Archetype.

178. Defendants misappropriated Archetype's Trade Secrets and Confidential Information and intended to misappropriate Archetype's Trade Secrets and Confidential Information.

179. Defendants' misappropriation of Archetype's Trade Secrets and Confidential Information was willful and malicious and for an improper purpose.

180. Defendants' misappropriation of Archetype's Trade Secrets and Confidential Information has directly and proximately damaged Archetype and its business.

181. Archetype is entitled to an award of damages for its actual loss as well as Defendants' unjust enrichment that are not addressed by computing Archetype's actual loss. That amount is over $100 Million. In the alternative, the Defendants are liable to Archetype in the amount of at least a reasonable royalty for the unauthorized use and/or disclosure of Archetype's Trade Secrets at issue.

182. Because Defendants' misappropriation of Archetype's Trade Secrets and Confidential Information was willful and malicious, Archetype is entitled to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) in an amount not to exceed two times the award of damages as well as its attorney fees under 18 U.S.C. § 1836(b)(3)(D).

183. At all material times, the above-described actions have caused and continue to cause irreparable harm and injury to Archetype, for which Archetype has not adequate remedy at law, and will continue to suffer injury unless Defendants are enjoined.

184. Archetype is entitled to injunctive relief against Defendants to prevent further harm to Archetype.

### COUNT VI
***(Nevada Uniform Trade Secrets Act (Nevada Code NRS §600A.010 – Defendants)***

185. Archetype hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

186. For the same reasons set forth above in relation to Count V, Archetype's Trade Secrets and Confidential Information are "trade secrets" under Nevada Code NRS § 600A.030(5), and Defendants have misappropriated Archetype's Trade Secrets and Confidential Information under Nevada Code NRS § 600A.030(2), including, without limitation, by:

a.  Acquiring Archetype's trade secrets through improper means;

b.  Using and disclosing Archetype's trade secrets without express or implied consent; and

c.  Using and disclosing Archetype's trade secrets while knowing or having reason to know that the trade secrets were acquired through improper means.

187.  Defendants' misappropriation of Archetype's trade secrets directly and proximately caused damage to Archetype in both its actual loss and Defendants' unjust enrichment which are not addressed by computing Archetype's actual loss. That amount is over $100 Million. In the alternative, the Defendants are liable to Archetype in the amount of at least a reasonable royalty for the unauthorized use and/or disclosure of Archetype's Trade Secrets at issue.

188.  Because Defendants' misappropriation was willful and malicious, Archetype is entitled to exemplary damages under NRS 600A.050(2) in an amount not exceeding twice the award for actual damages, as well as reasonable attorneys' fees under NRS 600A.060.

189.  Archetype is entitled to injunctive relief against Defendants under NRS 600A.040 to prevent the actual or threatened misappropriation of its trade secrets.

190.  At all material times, the above-described actions have caused and continue to cause irreparable harm and injury to Archetype, for which Archetype has not adequate remedy at law and will continue to suffer injury unless Defendants are enjoined.

191.  Archetype is entitled to injunctive relief against Defendants to prevent further harm to Archetype.

## COUNT VII
### (Conversion – Defendants)

192.  Archetype hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

35

193.    Archetype has the right to immediate possession of its property including, but not limited to, Archetype's Trade Secrets and Confidential Information, the computer wrongfully taken and retained, and the information and company records on the computer.

194.    Defendants wrongfully retained and exerted control over Archetype's Trade Secrets and Confidential Information, the computer, and the information and company records on the computer.

195.    Defendants' distinct actions of dominion are inconsistent with Archetype's right to possess and control its property.

196.    Defendants have intentionally and unjustifiably interfered with and wrongfully exerted control over Archetype's property.

197.    Archetype has suffered damages resulting from Defendants' conversion and interference in an amount over $100 Million.

198.    At all material times, the above-described actions have caused and continue to cause irreparable harm and injury to Archetype, for which Archetype has not adequate remedy at law, and will continue to suffer injury unless Defendants are enjoined.

199.    Archetype is entitled to injunctive relief against Defendants to prevent further harm to Archetype.

## COUNT VIII
### *(Conspiracy – Defendants)*

200.    Archetype hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

201.    Defendants devised a scheme to defraud and steal from Archetype.

202.    Defendants had a meeting of the minds for the scheme to defraud and steal from Archetype and worked in concert with each other to carry out the scheme. Defendants entered a joint venture that carried out the scheme to defraud, including without limitation:

a.  The Schneider/BLG JVA executed on September 27, 2024;

b.  The November 14, 2024 email of BLG granting contracting and negotiating authority to Schneider for purposes of negotiating the "Video Game Addiction Data Hosting and Claimant Workup Services Agreement" between BLG and SimplyConvert; and

c.  The January 7, 2025 "Video Game Addiction Data Hosting and Claimant Workup Services Agreement" between BLG and SimplyConvert, which specifically integrated BlueKey Tek into the agreement by name as an authorized partner for data sharing. This agreement created a formal business structure connecting Defendants in a unified enterprise designed to exploit Archetype's Trade Secrets and Confidential Information.

203.  As set forth above, the scheme to defraud and steal—and the breach of fiduciary duties, theft, and conversion—are wrongful and unlawful acts.

204.  As a direct and proximate cause of Defendants' actions, Archetype has been damaged in an amount over $100 Million.

## COUNT IX

### *(Intentional Interference with Economic Advantages and Prospective Relationship - Defendants)*

205.  Archetype hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

206.  As part of their scheme to defraud and steal from Archetype, Defendants intentionally and wrongfully interfered with Archetype's actual and prospective contractual relationship with third parties, including, but not limited to, Calumet Capital, Contingency Capital, LLC, Kerberos Capital Management, LLC and numerous other customers and potential customers as well as Affiliates and potential Affiliates.

207.  Schneider knew of Archetype's actual and prospective relationships and, upon information and belief, disclosed those relationships to BLG.

208.  Defendants actually contacted Archetype's actual and potential customers and investors in efforts to obtain litigation funding, after stealing Archetype's Trade Secrets and Confidential Information.

209. Defendants, upon information and belief, stole and defrauded Archetype with the intent to harm and injure the company and to damage Archetype's existing relationships and potential relationships, including, but not limited to, Calumet Capital, Contingency Capital, LLC, Kerberos Capital Management, LLC, and others.

210. Defendants had no justification or privilege to cause the harm and prevent Archetype from entering the relationships and had no justification or privilege for using the wrongfully obtained and wrongfully disclosed Trade Secrets and Confidential Information.

211. Defendants' actions have been and are the direct and proximate cause of harm and injury to Archetype.

212. Archetype has been damaged in an amount to be proven at trial but believed to be over $100 Million.

## PRAYER FOR RELIEF

WHEREFORE, Archetype prays for judgment against Defendants as follows:

1. For injunctive relief restraining and enjoining Defendants as set forth herein;

2. For an order requiring the return of Archetype's Trade Secrets and Confidential Information, computer, and other company property;

3. For monetary damages, including Archetype's actual losses or damages, as well as Defendants' unjust enrichment which are not addressed by computing Archetype's actual loss or damages, in the precise amount to be proven at trial, but believed to be over $100 Million[14];

4. For exemplary and punitive damages to the maximum amount allowable under applicable statutory and/or common law bases;

---

[14] In the alternative, a reasonable royalty for the unauthorized use and/or disclosure of Archetype's Trade Secrets pursuant to 18 U.S.C. § 1836(b)(3)(B) or NRS §600A.50.

5.    For pre- and post- judgment interest at the maximum rate allowed by law for contract;

6.    For reasonable attorney fees and costs as allowed by statute or contract; and

7.    For such other relief as the Court deems just and equitable.

## JURY DEMAND

Archetype hereby demands a trial by jury on all claims or issues so triable. The jury demand fee has previously been paid to the Court.

DATED this 24th day of March, 2026.

/s/ Hilary R. Adkins
Kevin N. Anderson, Esq.
Nevada State Bar No. 4512
**FABIAN VANCOTT**
2275 Corporate Cir., Suite 220
Henderson, NV 89074
Telephone:    (702) 233-4444

Hilary R. Adkins (admitted *pro hac vice*)
Utah State Bar No. 18296
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111
Telephone: (801) 531-8900

*Attorneys for Plaintiff*